# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY,
620 Eighth Avenue
New York, NY 10018;

JULIAN E. BARNES,
The New York Times Company
1627 I Street NW, Suite 700
Washington, DC 20006,

*Plaintiffs*,

v.

DEPARTMENT OF DEFENSE A/K/A
DEPARTMENT OF WAR,
1400 Defense Pentagon,
Washington, DC 20301;

PETE HEGSETH,
in his official capacity as Secretary of
Defense, 1400 Defense Pentagon,
Washington, DC 20301;

SEAN PARNELL,
in his official capacity as Chief Pentagon
Spokesman, 1400 Defense Pentagon,
Washington, DC 20301,

TIMOTHY PARLATORE,
in his official capacity as Special Advisor to
the Secretary of Defense,
1400 Defense Pentagon,
Washington, DC 20301.

*Defendants*.

**Civil Case No. _____**

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1. Plaintiffs The New York Times Company ("The New York Times" or "The Times") and its reporter Julian E. Barnes ("Barnes") bring this suit to vacate and enjoin a revised "interim" policy of the United States Department of Defense or Department of War ("Department") that violates the Administrative Procedure Act and Plaintiffs' First and Fifth Amendment rights (the "Interim Policy").

2. This is the second time Plaintiffs have been forced to file suit in this District to challenge Defendants' unlawful efforts to restrict Plaintiffs' constitutionally protected newsgathering and reporting, and to punish Plaintiffs for exercising their First Amendment rights. Defendants adopted the Interim Policy one business day after—and in direct response to—a court order that vacated and enjoined provisions of a prior Pentagon press credentialing policy as unconstitutional. The Department's Interim Policy not only revives unconstitutional provisions vacated by that prior court order but also employs additional means of carrying forward the same impermissible, viewpoint-discriminatory aim that has motivated Defendants from the beginning: closing the Pentagon to any journalist or news organization unwilling to report only what Department officials approve. Like its predecessor, the Department's Interim Policy is patently unconstitutional.

3. In the first lawsuit filed by Plaintiffs, Judge Paul L. Friedman concluded that the Pentagon's press credentialing policy violated the First and Fifth Amendments, vacated its unconstitutional provisions, and enjoined their enforcement against The Times and Barnes. When the Department responded by hastily issuing the Interim Policy, Judge Friedman granted The Times's Motion to Compel Compliance, recognizing the Interim Policy for what it was: an obvious attempt to evade the court's prior order. Defendants appealed both rulings and obtained a limited stay pending appeal from the D.C. Circuit allowing the Interim Policy's ban on unescorted access to

the Pentagon by credentialed journalists to go into effect. That stay ruling was based not on any finding that the Interim Policy was lawful, but rather on the ground that the escort requirement was likely not encompassed within the scope of the prior district court order. Because the escort requirement is inflicting—and the Interim Policy as a whole, if it is permitted to go into effect, will inflict—irreparable harm on Plaintiffs, and because it violates not only the First and Fifth Amendments but also the Administrative Procedure Act, Plaintiffs bring this second lawsuit to challenge the Interim Policy on its own terms. By this Complaint, Plaintiffs seek the Interim Policy's vacatur and, in the immediate term, preliminary relief from the currently in-force escort requirement.

4.      Like the unlawful policy it replaced, the Department's Interim Policy aims to control the content of newsgathering and reporting about the Pentagon and its leadership, and to allow Department officials to punish reporters for coverage they disapprove. And, as a transparent effort to avoid complying with a prior district court ruling requiring that Times reporters' access to the Pentagon be restored, the Interim Policy also amounts to blatant retaliation against Plaintiffs, not only for their editorial viewpoint but also for vindicating their constitutional rights in litigation. If allowed to stand, the Interim Policy will upend the longstanding and "healthy adversarial tension between the government, which may seek to keep its secrets" and "the press, which may endeavor to" report them, Alexander Bickel, *The Morality of Consent* at 79 (1977). And it will deprive the public of vital information about the United States military and its leadership during a time of war.

5.      For nearly a century, members of the press have worked from the Pentagon. Journalists with The Times, including Barnes, have held Pentagon press credentials for decades. That access has served the public interest—and benefitted the Department—by enabling reporters to quickly disseminate accurate information to the American people, especially during times of war and other military actions, and by facilitating journalists' efforts to hold the Department

2

accountable and help the public better understand the work of the United States military.  In recent years, press access to the Pentagon has been facilitated by the issuance of "Pentagon Facility Alternate Credentials" or "PFACs."  The D.C. Circuit has recognized that reporters' interest in maintaining press credentials and the access they have historically provided is constitutionally protected.  *Karem v. Trump*, 960 F.3d 656, 660 (D.C. Cir. 2020).

6.      Spurred by reporting from The Times and other members of the Pentagon press corps that Department leadership perceived as negative, the Department under Secretary Hegseth has taken a series of escalating steps designed to stop unfavorable coverage.

7.      As part of that effort, on October 6, 2025, the Department promulgated a new policy pertaining to PFACs (the "October Policy").  Ex. 3.  The policy vested Department officials with unbridled discretion to immediately suspend and ultimately revoke a reporter's PFAC for engaging in lawful newsgathering, both on and off Pentagon grounds, or for reporting any "unauthorized information"—information Department officials had not approved.  When the vast majority of the Pentagon press corps refused to sign on to that policy and surrendered their PFACs, Department officials publicly derided them as "activists" and "propagandists" who spread "lies . . . to the American people," while simultaneously praising members of the media willing to sign on to the policy as free from "a biased agenda" and "willing to serve the Commander in Chief."[1]

8.      Judge Friedman ruled that the Department's October Policy was unconstitutional on numerous grounds.  Among other things, the district court found that the policy treated core newsgathering activities—like asking questions to Department personnel and publishing ways for

---

[1] Sean Parnell (@SeanParnellASW), X (Oct. 22, 2025, at 1:21 PM), https://x.com/SeanParnellASW/status/1981048206923329719 (attached as Ex. 19); DOW Rapid Response (@DOWResponse), X (Dec. 2, 2025, at 11:21 am), https://x.com/DOWResponse/status/1995890967002452302 (attached as Ex. 12).

potential sources to contact journalists to provide tips and other newsworthy information—as grounds for suspending and revoking journalists' press credentials. *New York Times Co. v. Dep't of Def.*, No. CV 25-04218 (PLF), 2026 WL 788689, at *12 (D.D.C. Mar. 20, 2026) (hereinafter "*NYT I*"). And the district court also found that, at its core, the October Policy was issued for an impermissible purpose: "to weed out disfavored journalists—those who were not, in the Department's view, 'on board and willing to serve' [by toeing the Department's line]—and replace them with news entities that are." *Id.* at *14. "A speech regulation that is neutral on its face may nonetheless be viewpoint discriminatory if it was adopted 'because of disagreement with the message [the speech] conveys.'" *Id.* at *13 (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011)). As the district court concluded in vacating the October Policy's unconstitutional provisions and enjoining their enforcement, that policy was exactly the type of speech- and press-restrictive scheme that the Supreme Court and D.C. Circuit have recognized violates the First Amendment. *See id.* at *15–17; *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988); *Ateba v. Leavitt*, 133 F.4th 114, 124–25 (D.C. Cir. 2025); *see also Minn. Voters All. v. Mansky*, 585 U.S. 1, 11–12 (2018).

9.      The next business day following Judge Friedman's order vacating the October Policy's unconstitutional provisions and requiring Defendants to restore The Times reporters' access to the Pentagon, Department officials adopted the Interim Policy to evade compliance with that order and eliminate the access that Plaintiffs' credentials had previously provided. "Effective immediately," the Department closed the dedicated workspace in the Pentagon that journalists had used for decades, Correspondents' Corridor, and imposed an appointment and escort requirement on PFAC holders that, as the district court recognized, rendered the Times's reinstated credentials essentially worthless. *See New York Times Co. v. Dep't of Def.*, No. CV 25-04218 (PLF), 2026

WL 962252, at *8 (D.D.C. Apr. 9, 2026) (hereinafter "*NYT II*") ("[T]he access now available to PFAC holders . . . is not even close to as meaningful as the broad access that PFAC holders had previously been afforded" and the "restrictions make it exceedingly difficult to cover the Department and the U.S. military from the Pentagon grounds.")

10.    The Interim Policy is patently retaliatory, utterly unreasonable, and manifestly arbitrary and capricious.  Defendants adopted it as a means to thwart a district court order and to punish The Times both for its editorial viewpoint and its successful suit vindicating its constitutional rights.  And the Interim Policy, like the unlawful policy it replaced, is impermissibly aimed at chilling independent newsgathering and reporting by threatening punishment—via suspension or revocation of access—for reporters who seek information from individuals not officially authorized to speak to the press on approved topics, or for offering to speak to a source on background, off-the-record, or not for attribution, despite such conversations being an everyday, necessary journalistic practice.  The purpose of the Interim Policy is to restrict journalists' ability to do what they have always done: ask questions of government employees and gather information to report stories that take the public beyond official pronouncements.  For each of the following reasons, the Interim Policy violates the First Amendment, the Due Process Clause, the Administrative Procedure Act, and binding D.C. Circuit precedent.

11.    First, the Policy dramatically curtails longstanding press access to the Pentagon by barring credentialed journalists from the building unless they are invited to a press conference or secure a pre-arranged interview or meeting—and, even then, only if they are accompanied by a Department escort. Ex. 1. Defendants imposed those onerous limitations not to further any interest in security or safety, but to evade the injunction entered by the district court and carry out the same viewpoint-discriminatory, speech-suppressive purpose that court found unconstitutional.  *NYT II,*

2026 WL 962252, at *4.  The sequence of Department officials' actions and their own statements place the purpose and effect of the Interim Policy in stark relief: to restrict coverage of the Pentagon by independent journalists and news organizations who will not agree to only publish information "spoon-fed by Department leadership." *NYT I,* 2026 WL 788689, at *14.

12.     Second, the Interim Policy revives vacated prohibitions on newsgathering and reporting that Judge Friedman already correctly found to be unconstitutional.  The Interim Policy's architect, Commander Timothy Parlatore, openly admitted that it merely "us[ed] more words to say the same thing." *NYT II*, 2026 WL 962252, at *5 (quotation marks omitted).  Through the Interim Policy, the Department, again, purports to apply to newsgathering and reporting that takes place off Pentagon grounds.  And, while the Interim Policy purports to prohibit only questions that seek information the journalist knows an employee is legally prohibited from providing, the Interim Policy fails to delineate how that prohibition will be enforced.  Worse, the Interim Policy expressly "presumes" that any agreement to speak to any Department-affiliated source that is not entirely on-the-record indicates such knowledge.  Ex. 1.  Because conversations with sources on background or off-the-record are a routine and necessary part of reporting, the Interim Policy gives Department officials unbounded discretion to suspend or revoke the Pentagon access of any reporter who publishes a story without naming all her sources.  And punishing a reporter for merely engaging in routine newsgathering violates the First Amendment. *See Fla. Star v. B.J.F.*, 491 U.S. 524, 538 (1989) (the government may not impose civil liability for "routine newspaper reporting techniques" (internal alterations omitted)).

13.     The Department's attempt to creatively achieve its unlawful ends through revised retaliatory means is impermissible. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188, 190 (2024) (a government official can neither "use the power of the State to punish or suppress

disfavored expression" nor "do indirectly what [he] is barred from doing directly"); *Media Matters for Am. v. Paxton*, 138 F.4th 563, 570 (D.C. Cir. 2025) ("retaliation against a media company" for engaging in protected conduct violates the First Amendment (emphasis omitted)). Even if the Department ordinarily has discretion to impose reasonable restrictions on press access to the Pentagon, it cannot do so for this constitutionally invalid purpose. *See Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 94 (D.D.C. 2025); *Nat'l Pub. Radio, Inc. v. Trump*, No. 25-1674 (RDM), 2026 WL 877434, at *1 (D.D.C. Mar. 31, 2026) ("[T]he First Amendment draws a line, which the government may not cross, at efforts to use government power . . . 'to punish or suppress disfavored expression' by others." (citation omitted)). Moreover, and in any event, the Interim Policy's provisions—in particular its escort requirement and related physical access limitations—are unconstitutionally unreasonable restrictions on expression in a nonpublic forum because they undermine the forum's purpose: to facilitate accurate, timely news reporting. *See Minn. Voters All. v. Mansky*, 585 U.S. 1, 13 (2018).

14.    The Interim Policy marks a radical departure from a tradition deeply rooted in the Department and across the federal government, and it is inflicting irreparable harm on The Times and the American public. While Plaintiffs' enterprising reporting on the military will continue, as it has since the October Policy took effect, the Interim Policy ensures that certain newsworthy information—information, for instance, obtained through routine, unplanned interactions between journalists and Pentagon personnel on Pentagon grounds or through conversations with multiple press officials and press offices—will be simply unavailable to The Times and to the public that relies on The Times for fact-based, independent journalism.

15.    By this Complaint, Plaintiffs seek vacatur of the provisions of the Interim Policy targeting the exercise of their First Amendment rights as well as injunctive relief barring

Defendants from enforcing those provisions—or any similar policy designed to retaliate against and impede their independent reporting—and restoring Plaintiffs' access to the Pentagon that is commensurate with the access they had for decades prior to October 2025.

## PARTIES

16.    The New York Times Company is a privately owned for-profit corporation located in New York.  The Times is headquartered at 620 Eighth Avenue, New York, NY 10018.  The Times' Washington Bureau is located at 1627 I Street NW, Suite 700, Washington, DC 20006. The Times and a number of its reporters, including Julian E. Barnes, hold PFACs.

17.    Julian E. Barnes is a national security reporter with The Times who focuses on the Pentagon, United States intelligence agencies, and international security, among other subjects. Barnes has been with The Times since June 2018.  Prior to that, Barnes covered the Pentagon for other news organizations including U.S. News and World Report, The Los Angeles Times, and The Wall Street Journal.  He was first issued a PFAC in 2004.  Except for an approximately 18-month period in 2016 and 2017, Barnes continuously held a PFAC from 2004 until the end of August 2025, when it lapsed.  Though he was eligible to and invited to do so, Barnes did not seek to renew his PFAC due to the Department's adoption of the October Policy.  As a result of that policy, Barnes was compelled to turn in his lapsed PFAC on October 15, 2025.  Barnes was provided a new, physical PFAC card, following the district court's order, on March 24, 2026.  Barnes resides in the District of Columbia and is assigned to The Times' Washington Bureau.

18.    Defendant United States Department of Defense, also known as the Department of War, is an executive agency of the U.S. federal government tasked with overseeing the U.S. Armed Forces.  The Department is headquartered at the Pentagon and maintains offices and facilities in Washington, DC, and conducts a substantial amount of official business in and relating to this District.  The Department's address is 1400 Defense Pentagon, Washington, DC 20301.

19.     Defendant Pete Hegseth is the U.S. Secretary of Defense.  He is sued in his official capacity.  Secretary Hegseth is responsible for overseeing the operations and administration of the Department of Defense and the U.S. Armed Forces, which include the Army, the Navy, the Marine Corps, the Air Force, and the National Guard, as well as developing national defense policy.  He has ultimate authority over all Department policies and actions, including the Interim Policy and acts at issue here, and he conducts a substantial amount of official business in and relating to this District.  As a member of the President's Cabinet, Secretary Hegseth regularly performs his official duties within the District of Columbia.

20.     Defendant Sean Parnell is the Chief Spokesman for the Pentagon and Assistant to the Secretary of Defense for Public Affairs and conducts a substantial amount of official business in and relating to this District.  He is sued in his official capacity.  Parnell serves as the Department's principal spokesperson responsible for providing timely and accurate information about the Department to the media, the U.S. Congress, and the public.  He also coordinates and conducts press briefings with members of the media.  He issued the "Memorandum for Senior Pentagon Leadership" that together with the "Pentagon Reservation In-Brief for Media Members" ("In-Brief"), constitute the Interim Policy and, on information and belief, is responsible for implementation of the Interim Policy.

21.     Defendant Commander Timothy Parlatore is an attorney and Special Advisor to Secretary Hegseth.  He serves part time in this role, while simultaneously maintaining his private practice at Parlatore Law Group.[2]  In his private capacity, he represents Secretary Hegseth in personal legal matters.  On or about March 7, 2025, Cmdr. Parlatore was recommissioned as a Navy Reserve officer and appointed as a Special Advisor to aid the Secretary in his official capacity.  In

---

[2] *See* https://parlatorelawgroup.com/.

that official capacity, Cmdr. Parlatore has communicated with the press, including counsel for Plaintiffs, on behalf of the Department regarding the Department's PFAC policies, and appeared as counsel for the Department in the Plaintiffs' action challenging the October 2025 PFAC Policy. He has played and continues to play a significant role in developing and implementing the Department's PFAC and other press-related policies, including the Interim Policy at issue.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction because this action arises under the Constitution of the United States and federal statutes, 28 U.S.C. § 1331, and because the individual Defendants are U.S. officials sued in their official capacities, 28 U.S.C. § 1346(a)(2).

23.     The Court is authorized to grant the requested relief under 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. § 705, Rule 65 of the Federal Rules of Civil Procedure, and pursuant to its inherent equitable powers.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1391(e)(1) because Barnes resides in this District, because The Times and its journalists, including Barnes, regularly engage in newsgathering and reporting in this District, including at The Times' Washington Bureau, and because Defendants conduct a substantial amount of official business in this District, and a substantial part of the events giving rise to the claims occurred in the District of Columbia.  In particular, among other things, Secretary Hegseth, as a member of the President's Cabinet, "'performs a significant amount of his official duties in the District of Columbia,'" *Bartman v. Cheney*, 827 F. Supp. 1, 2 n.2 (D.D.C. 1993) (citation omitted); *see also Chin-Young v. Esper*, No. 18-2072 (RDM), 2019 WL 4247260, at *5 (D.D.C. Sept. 6, 2019), and the Department's and Defendants' decision-making with respect to the development and implementation of the Policy occurred, in substantial part, within this District.

## FACTUAL ALLEGATIONS

### Historic Press Access at the Pentagon

25.    There is a long tradition of journalists covering the military from the grounds of the Pentagon.  That access has enabled, among other things, real-time, eyewitness reporting on the Department's response to the terrorist attacks of September 11, 2001, including the attack on the Pentagon itself—coverage the Department has lauded.[3]  The ability of journalists to cover the military from the Pentagon grounds benefits the American public, in part, because it gives Department officials the ability to correct misinformation and get accurate information to journalists and, in turn, to the public quickly when there is a crisis.

26.    Since the Pentagon opened in 1942, Department officials have afforded qualified members of the press, including reporters with The Times, access to the Pentagon complex to report on the military and other defense activities.[4]  Hanson W. Baldwin, a Times reporter who won a Pulitzer Prize in 1943 for his coverage of World War II, for example, routinely visited the Pentagon to gather news and speak with Department sources.

27.    Historically, members of the press have had unescorted access to areas including the Pentagon Press Briefing Room and corridors between the press offices for components of the Department of Defense.  Their access also encompassed areas in the Pentagon that include shops, the cafeteria, and spaces in which public tours are conducted, among others.  This access permitted reporters to engage with Department personnel in a timely, iterative manner conducive to real-

---

[3] *See, e.g.*, Jim Garamone, *Senior Pentagon Correspondent Recalls 9/11*, DOD News (Sept. 7, 2021), https://www.war.gov/News/Feature-Stories/Story/Article/2765676/senior-cnn-pentagon-correspondent-recalls-911/ (Department press office interview with then-ABC News producer Barbara Starr recounting her coverage of 9/11 from the Pentagon) (attached as Ex. 26).

[4] Eleanor Watson, *CBS News Ends Over 60-Year Presence at Pentagon After Declining to Sign New Press Requirements*, CBS News (Oct. 17, 2025), https://www.cbsnews.com/news/cbs-news-pentagon-60-year-presence-press-requirements/ (attached as Ex. 22).

time, comprehensive reporting.  As The Times opinion columnist Maureen Dowd described in an October 18, 2025 column about the Policy, journalists from The Times and other media outlets previously "could stake out Jim Mattis, a defense secretary in President Trump's first term, when he picked up his clothes at an in-house dry cleaners and have an off-the-record chat as he walked back to his office, shirts slung over his shoulder" or "might bump into the chairman of the Joint Chiefs of Staff at a Pentagon Starbucks and have a conversation that could turn into a story."[5]

28.    In addition, since the 1970s, the Pentagon provided reporters with dedicated office space in the building, known as Correspondents' Corridor, where reporters set up desks and TV network booths.  Qualified members of the press, including The Times journalists, have had access to such areas within the Pentagon building for more than eight decades.  That access, which was not conditioned on the perceived viewpoint of journalists and their news organizations, or the content of their reporting, served the interests of the American public and posed no security or safety risk to Pentagon property or personnel.

29.    As is true of most journalists, particularly those covering governmental institutions, Pentagon reporters frequently talk to sources, including Department officials, on background or off-the-record.  Reporters permit sources to discuss matters off-the-record or without attribution regularly for all sorts of reasons.  Many sources authorized to speak to members of the press, including high-ranking officials and Department Public Affairs Office staff, often ask to speak only on background even to discuss information they are authorized to convey to the press.

---

[5] Maureen Dowd, *Fraidy-Cat at the Pentagon*, N.Y. Times (Oct. 18, 2025), https://www.ny-times.com/2025/10/18/opinion/pentagon-journalists-news-hegseth.html (attached as Ex. 21).

**Department Officials Including Secretary Hegseth Repeatedly Criticize The Times and Other Media Outlets for Their Coverage**

30.    On November 12, 2024, then President-elect Donald Trump named Defendant Pete Hegseth as his nominee for Secretary of Defense.  Hegseth was confirmed as Secretary of Defense on January 24, 2025.

31.    Since he was nominated, Secretary Hegseth and other Department officials have continually criticized and threatened the press for publishing stories they consider unflattering.

32.     "The story begins prior to the adoption of the Policy."  *NYT I*, 2026 WL 788689, at *13.  During the debate over Secretary Hegseth's nomination, The Times and other news organizations reported extensively on his background, including allegations of past sexual assault, excessive drinking, and infidelity, as well as questions about his lack of experience.  As the Department conceded in *NYT I*, "Secretary Hegseth and Department officials openly complained about reporting they perceive[d] as unfavorable to them and the Department."  *Id.* (quotation marks omitted).

33.    At the same time, the Department has sought to impose increasingly stringent and unprecedented restrictions on journalists covering the Department and its leadership.

34.    In or around January and February 2025, the Department announced that it was requiring several news outlets—specifically, The Times, NBC News, Politico, National Public Radio, CNN, the Hill, and the War Zone—to give up their dedicated working spaces in the Pentagon as part of a new so-called "rotation" system.[6]  Citing the "'journalist value of working from physical office space in the Pentagon,'" the Department announced that it would be requiring The

---

[6] Associated Press, *More News Outlets Lose Pentagon Workspaces*, The Columbian (Feb. 9, 2025), https://www.columbian.com/news/2025/feb/09/more-news-outlets-lose-pentagon-work-spaces/#:~:text=By%20Associated%20Press,going%20forward%2C%E2%80%9D%20Ul-lyot%20wrote (attached as Ex. 37).

Times to vacate its workspace for *The New York Post*, a media outlet without a Pentagon corre-spondent.[7]  The Department's decision to require specified news outlets to give up their dedicated workspaces in the Pentagon press room was criticized, including by former Defense Department officials.

35.     Department officials continued to make negative statements about the Pentagon press corps related to the content of their reporting.

36.     These attacks intensified in March of 2025, when Jeffrey Goldberg of The Atlantic revealed in a story that Secretary Hegseth and other top officials had inadvertently included him in a group chat on the messaging platform Signal that disclosed details regarding imminent U.S. airstrikes in Yemen.[8]

37.     That same month, after The Times reported that the Department planned to give Elon Musk a classified briefing on plans for a potential war with China, Chief Spokesman and Senior Advisor Sean Parnell said that "this type of garbage from the New York Times . . . under-mines our mission"—and that "[t]he days of the Pentagon just allowing these fake narratives to spread is over."[9]

---

[7] Amanda Terkel, *Pentagon Removes Major Media Outlets, Including NBC News, from Dedicated Workstations in New 'Rotation Program,'* NBC News (Feb. 1, 2025), https://www.nbcnews.com/politics/donald-trump/pentagon-removes-major-media-outlets-nbc-news-dedicated-workstations-p-rcna190276 (attached as Ex. 38).

[8] *See* Jeffrey Goldberg, *The Trump Administration Accidentally Texted Me Its War Plans*, The Atlantic (Mar. 24, 2025), https://www.theatlantic.com/politics/archive/2025/03/trump-administra-tion-accidentally-texted-me-its-war-plans/682151/; Pete Hegseth (@PeteHegseth), X (Mar. 26, 2025, at 11:29 AM), https://x.com/petehegseth/status/1904918673250468002?s=46&t=_B86ruy-GVxABuY-Q9DIrhw (attached as Ex. 35).

[9] Sean Parnell (@SeanParnellASW), X (Mar. 21, 2025, at 8:19 AM), https://x.com/SeanPar-nellASW/status/1903058997835440144 (attached as Ex. 36).

38.    Later that month, after The Times broke the story that Secretary Hegseth's wife, brother, and personal lawyer and Senior Advisor, Cmdr. Parlatore,[10] were included in a second private Signal group chat in which the Secretary had shared details about imminent U.S. plans to strike Yemen, Secretary Hegseth complained: "This is what the media does. . . . [T]hey try slashing and burning people to ruin their reputations."[11]

39.    Department officials have especially fixated on The Times's choice of sources—its use of unnamed sources and refusal to give controlling weight to the Department's official narrative.  Parnell complained about The Times's use of "five anonymous sources."[12]

40.    Parnell elsewhere criticized The Times for "rel[ying] only on the words of people who were fired this week and appear to have a motive to sabotage the Secretary and the President's agenda."[13]

---

[10] While Cmdr. Parlatore serves as a Senior Advisor to the Secretary, it is not clear whether he has a top-secret clearance and has continued to represent private clients in litigation against the government; as a result, his "frequent presence in the Defense secretary's office" and participation in meetings with the Defense secretary and his senior staff has raised concerns within the Department as well as Congress.  *See* Daniel Lippman and Josh Gerstein, *Hegseth Attorney's Dual Roles Trip Conflict-of-Interest Alarms*, Politico (May 3, 2025), https://www.politico.com/news/2025/05/03/parlatore-hegseth-navy-conflict-00323266 (attached as Ex. 31); *see also*, Congressman Jason Crow, Press Release: *Crow Presses Secretary Pete Hegseth Over Defense Department Corruption, Conflicts of Interest* (April 30, 2026) (transcript of Congressman Crow questioning Secretary Hegseth about Cmdr. Parlatore's lack of a security clearance and work in private practice, including on behalf of foreign governments) (attached as Ex. 7).

[11] Susan Carpenter, *Hegseth Blames Media, Disgruntled Former Employees for Second Signal Chat Leak*, Spectrum News (Apr. 21, 2025), https://spectrumlocalnews.com/us/snplus/politics/2025/04/21/hegseth-second-signal-chat (attached as Ex. 33).

[12] Sean Parnell (@SeanParnellASW), X (Mar. 21, 2025, at 8:19 AM), https://x.com/SeanParnellASW/status/1903058997835440144 (attached as Ex. 36).

[13] Tara Copp, *Hegseth Had a Second Signal Chat Where He Shared Details of Yemen Strike, New York Times Reports*, PBS News (Apr. 21, 2025), https://www.pbs.org/newshour/politics/hegseth-had-a-second-signal-chat-where-he-shared-details-of-yemen-strike-new-york-times-reports (attached as Ex. 34).

41.     Secretary Hegseth too objected that The Times had quoted "anonymous sources" in an article about him.[14]

42.     Secretary Hegseth also complained that The Times's coverage of the June 2025 attack on Iran relied too heavily on sources suggesting the attack had failed and too little on sources supporting his claim that the United States had "obliterate[ed]" Iran's nuclear capacity. "Have any of these quotes made their way into New York Times?"[15]

43.     In late summer 2025, Department leadership even publicly asserted that recent coverage should be "punished."[16]

**The Pentagon Announces a New PFAC Policy**

44.     On May 23, 2025, Secretary Hegseth issued what he called "Updated Physical Control Measures for Press/Media Access Within the Pentagon," imposing restrictions on journalists' access to specific areas of the building, including in the vicinity of his office, and requiring journalists to be accompanied by official "escorts" when visiting certain areas. Ex. 39. These changes were not precipitated by any security or safety incident involving a PFAC holder. *See, e.g.*, Defs.' *NYT I* SUMF, Dkt. 22-2 at 2 (¶ 11) (agreeing this fact is "[u]ndisputed"). According to the "Memorandum for Resident and Visiting Press Assigned to the Pentagon," these "updated security measures" were purportedly "needed to reduce the opportunities for in-person inadvertent and

---

[14] Carpenter, *Hegseth Blames Media, Disgruntled Former Employees For Second Signal Chat Leak*, supra n. 11 (attached as Ex. 33).

[15] PBS NewsHour, Hegseth holds briefing Israel-Iran war (June 26, 2025), https://www.youtube.com/watch?v=ttWMTNGJIqE (attached as Ex. 30).

[16] Deputy Press Secretary Joel Valdez (@JoelValdezDOW), X (Aug. 20, 2025, at 8:56 AM), https://x.com/JoelValdezDOW/status/1958151139331088527 (attached as Ex. 28); *see also* Brian Flood, *Pentagon officials blast Washington Post for putting 'lives at risk' with report on Pete Hegseth's security,* Fox News (Aug. 20, 2025), https://www.foxnews.com/media/pentagon-officials-blast-washington-post-putting-lives-risk-report-pete-hegseths-security(attached as Ex. 27).

unauthorized disclosures." Ex. 39 at 1; *see also* Erik Wemple, *Inside Hegseth's Effort to Limit Press Access at the Pentagon*, N.Y. Times (Oct. 10, 2025) ("Under [Secretary Hegseth's] leadership, the [D]epartment has removed national news outlets from a shared media workspace . . . ; [and] has scaled back reporters' ability to roam Pentagon corridors.").[17] These restrictions coincide with other efforts by the Department to restrict the flow of newsworthy information to the public, both via the press,[18] and via Congress.[19]

45.    On September 18, 2025, Parnell issued a "Memorandum for Senior Pentagon Leadership" ("September 18 Memorandum") purporting to implement the Department's Updated Physical Control Measures. Ex. 4. The Memorandum included an attached "Pentagon Reservation In-Brief for Media Members" ("September 18 In-Brief"; together, the "September 18 Policy"). In the September 18 Memorandum, which purported to implement the Department's "Updated Physical Control Measures for Press/Media Access Within the Pentagon," Parnell announced new policies governing the issuance, renewal, suspension, and revocation of PFACs that went even further than the newly instituted "physical control measures." *Id.* at 2–10.

46.    The September 18 Memorandum explained that "[a]ll members of the press issued a [PFAC] will be required to read and sign a new in-brief form outlining information security requirements, the new physical control measures, and [Department] expectations of their compliance with safety and security requirements." *Id.* at 1.

---

[17] https://www.nytimes.com/2025/10/10/business/media/hegseth-pentagon-press-access.html (attached as Ex. 25).

[18] *See, e.g.*, Dan Lamothe & Ellen Nakashima, *Hegseth team told to stop polygraph tests after complaint to White House*, Wash. Post (July 26, 2025), https://www.washingtonpost.com/national-security/2025/07/26/pete-hegseth-leak-investigation-trump/ (attached as Ex. 29).

[19] *See, e.g.*, Ben Finley & Konstantin Toropin, *Hegseth changes policy on how Pentagon officials communicate with Congress*, AP News (Oct. 21, 2025), https://apnews.com/article/defense-department-pentagon-hegseth-congress-c15a2050aa95998f28e31a6b5c1d287a (attached as Ex. 20).

47. In addition to setting out specific requirements for physical presence within the facility, including restrictions on journalists' access to certain floors of the Pentagon, *id.* at 4, the September 18 In-Brief also included provisions addressed to the "unauthorized" disclosure of information. Specifically, it stated that "[Department] information must be approved for public release by an appropriate authorizing official before it is released, even if it is unclassified" because "[u]nauthorized disclosure of CNSI [classified national security information] or CUI [controlled unclassified information] poses a security risk that could damage the national security of the United States and place [Department] personnel in jeopardy." *Id.* at 6.

48. The September 18 iteration of the In-Brief was followed by an "Acknowledgment" that required PFAC holders to agree that they could be "determined to pose a security or safety risk . . . based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure of [classified national security information] or [controlled unclassified information]," and to initial next to other statements, including that "PFACs are . . . a courtesy." *Id.* at 12.

49. The September 18 In-Brief also set forth a process for PFAC issuance, renewal, and termination. It provided that "PFACs may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property[.]" *Id.* at 7, 12. It further provided that "[a]n initial determination of security or safety risk may result in an immediate suspension of Pentagon access during the process for making a final determination," which "may be based on the unauthorized access, attempted unauthorized access, or unauthorized disclosure" of Department information. *Id.* at 7; *see id.* at 12.

50. An Appendix to the September 18 Policy provided that the grounds for determining whether a journalist poses a security or safety risk "include, but are not limited to," convictions for certain offenses or "actions other than conviction . . . such as attempts to improperly obtain"

18

Department information, or "being found in physical possession of" such information "without reporting it." *Id.* at 14. This Appendix also stated that a PFAC holder would be notified of a decision to deny, revoke, or not renew a PFAC in writing, including the basis for the decision, after which the journalist would have 30 days to appeal that decision. *Id*. at 14–15.

### Members of the Press Object to the Policy

51.     The Department's announcement of its new press credentialing policy sparked widespread confusion and concern among news organizations and journalists who cover the Pentagon. On September 22, the Reporters Committee for Freedom of the Press (the "Reporters Committee" or "RCFP") sent a letter to Parnell asking for clarification as to how the Policy's restriction on disclosure would be applied and whether the Acknowledgment was intended to require journalists to agree not to publish information without first obtaining Department approval. Ex. 6.

52.     In a response letter dated September 24, Parnell wrote to "clarif[y]" that the restriction against disclosure in the Policy is one that Pentagon personnel must follow, and "does not impose restrictions on journalistic activities, such as investigating, reporting, or publishing stories." Ex. 5 at 1, 3. According to Parnell, "it informs PFAC holders of [the Department]'s internal policies and the processes for managing building access, which is a privilege extended to facilitate responsible coverage." *Id*. The letter disclaimed any attempt to require that "reporters . . . seek [Department] approval for their stories or endorse any viewpoint on pre-authorization," and stated that "[j]ournalists remain free to gather information through legitimate means, such as Freedom of Information Act requests, official briefings, or unsolicited tips, and to publish as they deem newsworthy." *Id.* at 2.

53.     This letter, however, provided cold comfort. According to Parnell, the "focus" of the Policy was "on preventing active solicitation that encourages [Department] personnel to violate

19

these disclosure rules, as such conduct is not always protected by the First Amendment." *Id*. Parnell also confirmed that the First Amendment-protected receipt and publication of unsolicited, classified or protected information "could factor" into the Department's wholly "discretion[ary]" decision to revoke a reporter's PFAC. *Id.*

54.    On September 28, 2025, Cmdr. Parlatore—Secretary Hegseth's private attorney and advisor[20]—circulated a redlined, revised version of the Acknowledgement to members of the media integrating language from the Parnell letter. Ex. 5-1. The revisions included a number of statements that appeared designed to characterize the Policy, including the Acknowledgment requirement, as "not impos[ing] any obligations on [PFAC holders] to refrain from constitutionally protected journalistic activities." *Id.* at 2. But these statements contradicted other specific statements in the Policy that do in fact directly intrude on "constitutionally protected journalistic activities." *Id.* For example, the Policy as revised continued to expressly claim that Department officials had uncabined "discretion[]" to immediately suspend a PFAC based on a determination that activities protected by the First Amendment, including lawful newsgathering and publication, posed a "security or safety risk." Ex. 3 at 13. And, according to the redlined Acknowledgement, any "direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips"—typical, lawful newsgathering techniques that journalists routinely utilize—would constitute "solicitation" in violation of the Policy. Ex. 5-1 at 2.

55.    News organizations and PFAC-holding journalists from numerous outlets, including The Times, informed Pentagon leadership that the September 28, 2025 revisions to the Policy

---

[20] *See* Dan Lamothe, *Hegseth's legal fixer at the center of Pentagon's new media restrictions*, Wash. Post (Oct. 15, 2025), https://www.washingtonpost.com/national-security/2025/10/15/hegseth-media-restrictions-tim-parlatore/ (attached as Ex. 23).

were incompatible with their First Amendment rights and responsibilities as members of the press to engage in independent journalism and that they could not sign the Acknowledgement.

**The Pentagon Announces its Final Policy and Mandates That PFAC Holders Sign the Acknowledgement**

56.     On October 6, 2025, the Department issued its final Policy ("the October Policy"), a true and correct copy of which is attached hereto as Exhibit 3.

57.     The final version of the October Policy included an Acknowledgment that stated:

> I have received, read, and understand the "Pentagon Reservation In-brief for Media Members," with [relevant appendices] which address[] the standard and procedures for denying, revoking, and not renewing a PFAC.  The in-brief describes [Department] policies and procedures.  My signature represents my acknowledgement and understanding of such [Department] policies and procedures, even if I do not necessarily agree with such policies and procedures.  Signing this acknowledgment does not waive any rights I may have under law.

Ex. 3 at 15.

58.     Even though the Policy invoked the Secretary's statutory authority under 10 U.S.C. § 2674 to safeguard the physical property of the Pentagon itself, the October Policy was neither motivated by nor narrowly tailored to any such interest.  To the contrary, the Policy reaffirmed the Department's position that it possesses unbridled discretion to rescind a PFAC based on First Amendment-protected newsgathering and reporting wherever it occurs.  Specifically, the In-Brief stated that while allowing that "the receipt of unsolicited" classified or unclassified information "and its subsequent publication is generally protected by the First Amendment and would not, on its own, normally trigger denial, revocation, or non-renewal of a PFAC," if a journalist "solicit[s] the disclosure of such information or otherwise encourage[s] [Department] personnel to violate laws and policies concerning the disclosure of such information," the Department may deem the journalist a "security or safety risk."  *Id*. at 13.

21

59.     With respect to what constitutes improper "solicitation" in the Department's view, the In-Brief stated that "solicitation" in violation of the Policy "may include direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips . . ." and it cited "an advertisement or social media post by an individual journalist or media outlet that directly targets [Department] personnel to disclose non-public information without proper authorization" as an "example" of what "would constitute a solicitation that could lead to revocation" of a PFAC. *Id.* at 13-14.

60.     The October Policy also took an expansive approach to what "non-public information" the Department may view as being off limits, and if "solicited," obtained or published could result in the denial, suspension or revocation of a reporter's PFAC. According to the Policy, such unclassified information "may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information." *Id.* at 7. And purportedly "[t]o ensure the safety of U.S. personnel," the Policy instructed journalists "who find themselves in possession of information that appears to be [classified national security information] or [controlled unclassified information]" to "discuss those materials with the [Pentagon Press Operations] prior to publication." *Id.*

61.     In addition to reiterating the Department's view that "[m]embers of the news media do not possess a legal right to access the Pentagon" and that "such access is a privilege, subject to the discretion of government authorities," *id.* at 4, the Policy explained that a PFAC "may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property," and that "[s]uch determination may be based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or

unauthorized disclosure of" classified or unclassified information "based on a reasonable assessment informed by the unique facts and circumstances of each case." *Id.* at 13.

62.     The October Policy further stated that Pentagon officials have the discretion to "deny, revoke, or refuse to renew the PFAC of any person reasonably determined to pose a security or safety risk to [Department] personnel or property." *Id.* at 16.  It explains that "[p]ersons presumed to present such a risk include, *but are not limited to*, those who have been convicted of any offense involving," among other things "[u]nprofessional conduct that might serve to disrupt Pentagon operations." *Id.* (emphasis added).  The Policy did not explain what type of "conviction" it refers to with respect to "[u]nprofessional conduct," and expressly notes that "actions other than conviction may be deemed to pose a security or safety risk." *Id.*

63.     The October Policy stated that an "initial determination" that a journalist "pose[s] a security or safety risk . . . may result in an immediate suspension" of a PFAC "while the procedures preceding a final determination are pending." *Id.* at 13.

64.     Following its issuance of the Policy on October 6, the Department gave PFAC holders until October 14 to review and sign the Acknowledgment.

65.     The decision to issue the October Policy, as well as related decisions regarding the content of the Policy, were made either in full or in substantial part by Secretary Hegseth, Mr. Parnell, Cmdr. Parlatore, and other Department officials and advisors located in the District of Columbia.

### The Department's October Policy Forces Plaintiffs and Other Journalists
### Out of the Pentagon

66.     Prior to the Department's deadline, journalists with PFACs at The Times and virtually every other major news organization covering the Pentagon uniformly declined to sign the Acknowledgment.  Instead, they informed Pentagon officials that they believed the Policy, and the

Department's insistence that they sign the Acknowledgment, violated their First Amendment rights. As a result, on October 15, 2025, they were compelled to turn in their PFACs. The vast majority of journalists and news outlets represented in the Pentagon Press Association (PPA) refused to sign the Acknowledgement.

67.     Department officials made clear that this outcome was intentional. Hegseth responded to news organizations making clear they could not sign the Policy by posting to his official X account an emoji of a hand waving goodbye.[21] Mr. Parnell similarly celebrated the Department's success in driving longtime, independent reporters from the Pentagon, posting to X that "Americans have largely abandoned digesting their news through the lens of activists who masquerade as journalists in the mainstream media," and "[w]e look forward to beginning a fresh relationship with members of the new Pentagon press corps."[22]

**The Department Selects a New "Pentagon Press Corps" Based on Editorial Viewpoint**

68.     Within days, Parnell took to his official X account to "announc[e] the next generation of the Pentagon press corps."[23] In describing the "[n]ew media outlets" willing to accede to the Department's "media access policy," Parnell wrote that they "circumvent the lies of the mainstream media and get real news to the American people," and "[t]heir reach and impact collectively are far more effective and balanced than the self-righteous media who chose to self-deport from

---

[21] Pete Hegseth (@PeteHegseth), X (Oct. 13, 2025, at 2:49 P.M.), https://x.com/PeteHegseth/status/1977808951338307907 (attached as Ex. 24).

[22] Sean Parnell (@SeanParnellASW), X (Oct. 22, 2025, at 1:21 PM), https://x.com/SeanParnellASW/status/1981048206923329719 (attached as Ex. 19).

[23] *Id*.

the Pentagon"—journalists "in the mainstream media" whom Parnell described as "activists who masquerade as journalists."[24]

69.    New PFAC recipients included the National Pulse, which was described by its editor-in-chief as "'an industry mag/site for MAGA world'"; Laura Loomer, an "influential pro-Trump activist"; and former congressman Matt Gaetz, President Trump's one-time pick for Attorney General of the United States, who is now affiliated with One America News.[25]  Many had expressed ideological support for the Trump administration or indicated that they do not intend to report critically on the Pentagon.[26]  For example, Libby Emmons, the editor-in-chief of Human Events and the Post Millennial who requested four passes for her staff after "receiv[ing] an unsolicited invitation to apply for credentials," stated that "[t]here should be a place for reporting on what they are doing without always trying to expose the dark underbelly," and Tim Pool, who disclosed that his outlet would be getting a credential, explained that his is "not an investigative news organization" and he did "not intend to maintain a significant presence in the Pentagon."[27]

70.    The following week, the Department held its first in-person press events on Pentagon grounds since the Policy went into effect, which included a press briefing and a "meet-and-greet" event with Secretary Hegseth.[28]  In welcoming what she called the "official new members

---

[24] *Id.*

[25] Ken Bensinger & Erik Wemple, *New Pentagon Press Crew Is All In on Trump*, *supra* n.5 (attached as Ex. 15); David Bauder, *Some Friendly, Some On-the-News Questions at First Briefing for New Pentagon Press Corps*, AP News (Dec. 2, 2025), https://apnews.com/article/pentagon-press-corps-access-journalists-96163e7ac0c8a73a44178fb5bb852863 (attached as Ex. 11).

[26] Bensinger & Wemple, *New Pentagon Press Crew Is All In on Trump*, *supra* n. 25.

[27] *Id.*

[28] Scott Nover, *Pentagon's right-wing, pared press corps gets a meet-and-greet*, Wash. Post (Nov. 29, 2025), https://www.washingtonpost.com/business/2025/11/29/pentagon-press-policy-hegseth/ (attached as Ex. 14).

of the Pentagon Press Corps," Pentagon Press Secretary Kingsley Wilson ("Wilson") specifically focused on the Department's preference for their First Amendment activities.  She criticized journalists and news organizations, like Plaintiffs, who had previously held PFACs, calling them "propagandists" who "stopped telling the truth," and she praised those the Department had selected to cover the Pentagon, asserting that they "actually reach Americans, ask real questions, and don't pursue a biased agenda."[29]

71.    Similarly, in determining when solicitation of unapproved information is permissible, the Department drew distinctions based on favored and disfavored content and speakers.  In her X post announcing that LOOMERED "is now a credentialed outlet at the Pentagon," Loomer stated: "I have developed a Rolodex of sources and if you have any tips, feel free to contact the Loomered Tip Line: the most influential Tip Line in all of DC."[30]  When asked whether Loomer's "request for tips violates its new press policy,"[31] the Department responded that it did not.  Through a statement attributable to Wilson, the Department stated:

> Unlike [the Washington Post's] solicitation, which explicitly and exclusively targets military personnel and DoW employees, Laura Loomer's X post regarding tips to her news outlet is a general tip line, which is constitutionally permissible.  Therefore it does not violate the Pentagon's media access policy.  This distinction was explained in detail to the Pentagon Press Association before they chose to engage in a dishonest and performative walk out.  If Fake News reporters actually had a brain and could read our policy correctly, then maybe one day they will be as effective of a journalist as Ms. Loomer is.[32]

---

[29] DOW Rapid Response (@DOWResponse), X (Dec. 2, 2025, at 11:21 am), https://x.com/DOW-Response/status/1995890967002452302 (attached as Ex. 12).

[30] Laura Loomer (@LauraLoomer), X (Nov. 3, 2025, at 11:13 PM), https://x.com/LauraLoomer/status/1985560924720124414 (attached as Ex. 18).

[31] Scott Nover (@ScottNover), X (Nov. 4, 2025, at 1:53 PM), https://x.com/ScottNover/status/1985782401755128207 (attached as Ex. 16).

[32] Scott Nover (@ScottNover), X (Nov. 4, 2025, at 2:02 PM), https://x.com/ScottNover/status/1985784630100804036 (attached as Ex. 17).

This explanation came on the heels of another statement from Wilson in which she asserted that "we have seen a lot of the mainstream media continue to lie."[33]

72.     In another instance, at the first official press conference held by Wilson on December 2, 2025, James O'Keefe, founder of the conservative group Project Veritas, noted that he had surreptitiously recorded a high-level Pentagon official making unguarded statements that were plainly unapproved by Department leadership—newsgathering then ostensibly prohibited by the October Policy.  Wilson, however, praised O'Keefe's work, which appeared to expose a critic of President Trump, noting: "That's why the work you all do is so important."[34]

73.     On December 3, 2025, new PFAC holder Cam Higby posted to his X account a video of an interview with Wilson, under the header "MSM Journalists wreaked havoc on the Pentagon during their time in the building.  Pentagon Press Sec Kingsley Wilson explains the hostile work environment created for DoW staff by adversarial media."[35]  Wilson said members of the "former Pentagon press corps" engaged in "unprofessional behavior," including by coming to her office to speak with her.[36]

### The District Court Vacates and Enjoins the October Policy

74.     The Times and Barnes filed suit on December 4, 2025, challenging provisions of the October Policy related to the Acknowledgement requirement, safety and security

---

[33] Bensinger & Wemple, *New Pentagon Press Crew Is All In on Trump*, *supra* n. 25 (attached as Ex. 15).

[34] *James O'Keefe Asks Pentagon Press Secretary Question About Identifying Anti-Trump Members of DOD*, Forbes Breaking News, YouTube (Dec. 2, 2025), https://www.youtube.com/watch?v=BQfpJfAgIdU (attached as Ex. 10); *see also* James O'Keefe (@JamesOKeefeIII), X (Apr. 23, 2025 at 3:46 PM), https://x.com/JamesOKeefeIII/status/1915175452404035624 (attached as Ex. 32).

[35] Cam Higby (@camhigby), X (Dec. 3, 2025 at 2:21 PM), https://x.com/camhigby/status/1996298682136768743 (attached as Ex. 40).

[36] *Id.*

determinations, newsgathering, and reporting. The parties cross-moved for summary judgment. Plaintiffs submitted extensive evidence demonstrating that the Policy was motivated by a viewpoint discriminatory effort to censor independent reporting and that their exclusion was causing them irreparable First Amendment injuries every day. The Department, by contrast, submitted nothing indicating that it had any legitimate national security or safety concern related to members of the press being present in the Pentagon.

75. On March 20, 2026, following full briefing and a hearing, the district court granted Plaintiffs' motion for summary judgment and denied Defendants' cross-motion for summary judgment. *NYT I*, 2026 WL 788689, at *2. The court held that provisions of the Department's October PFAC Policy violated the First and Fifth Amendments. The Department conceded that the Pentagon's press spaces were a nonpublic forum and, accordingly, that any restrictions it imposed on access to and use of that forum could be neither unreasonable nor viewpoint discriminatory. *See id.* at *25–26; *Ateba v. Leavitt*, 133 F.4th 114, 123 (D.C. Cir. 2025). The district court found that the challenged provisions were both. In particular, it concluded that even if the Policy was "facially viewpoint neutral," its "purpose and its effect" was "to chill speech that the Department perceives as unfavorable or biased." *NYT I*, 2026 WL 788689, at * 13–14 (alterations omitted).

76. The district court reached its conclusion that the October Policy was viewpoint discriminatory based on "voluminous" undisputed evidence, including that "Department officials openly complained about reporting" related to "Secretary Hegseth's background and qualifications" that they "perceived as unfavorable"; that "in the weeks and months leading up to the issuance of the Policy," senior Department officials called media outlets "scum" and "garbage" and "called for their 'severe punishment'"; and that after implementing the Policy, Department officials accused excluded journalists and news organizations, like The Times, of being

28

"'propagandists' who 'stopped telling the truth' and who 'continue to lie,'" while simultaneously praising those willing to submit to the Policy as "the absolute best people" who were "on board and willing to serve our commander-in-chief." *Id*. The district court further found that the Department was interpreting the October Policy to prohibit certain conduct by disfavored news organizations while permitting substantially identical conduct by media outlets the Department preferred. *Id*. "In sum, the undisputed evidence reflect[ed] the Policy's true purpose and practical effect: to weed out disfavored journalists—those who were not, in the Department's view, 'on board and willing to serve'—and replace them with news entities that are. That is viewpoint discrimination, full stop." *Id.* at *14 (citation omitted).

77. In assessing the constitutionality of the October Policy and weighing the injunction factors, the district court found that "[t]he regular presence of PFAC holders at the Pentagon . . . pos[es] no security or safety risk to Department property or personnel," *id.* at *3—a fact expressly conceded by the Department. *Compare* Plaintiffs' SUMF, Dkt. 10-36 at 3 (¶ 11) *with* Defendants' SUMF, Dkt. 22-2 at 2 (¶ 11) (agreeing this fact is "[u]ndisputed"). It squarely rejected the Department's "assertion that vacatur would 'compromise the safety of the Pentagon'" as "unfounded." *NYT I*, 2026 WL 788689, at *18.

78. The court vacated the challenged provisions as to all regulated parties, enjoined Defendants from enforcing those provisions against Plaintiffs, and ordered Defendants to immediately reinstate PFACs to Barnes and the six other Times journalists who held valid credentials prior to the Policy's adoption.

**The Department Retaliates Through the "Interim" Policy**

79. Rather than comply with the district court's order, pursue an orderly appeal, or take the time to construct a reasoned, lawful PFAC policy consistent with the district court's decision,

the Department scrambled to flout it.  Faced with the prospect of letting The Times journalists back into the Pentagon, Defendants instead issued the "Interim Policy" just one working day after the district court issued its order.

80.    On March 23, 2026, in an email to counsel for The Times, Department officials provided an "attached revised policy" that consisted of a "Memorandum for Senior Pentagon Leadership" from Defendant Sean Parnell (the "Memorandum"), a "Pentagon Reservation In-Brief for Media Members" (the "In-Brief"), and an Appendix.  Ex. 2.

81.    The Interim Policy provides that "PFACs may be denied, revoked, or not renewed if a person meets any of the criteria set forth in Appendix A."  Ex. 1 at 10.

82.    Appendix A sets forth certain conviction-based grounds for PFAC denial, revocation, or non-renewal, as well as so-called "[c]onduct-[b]ased [g]rounds," including the "inducement of unauthorized disclosure as defined in" the In-Brief.  *Id.* at 16.  According to the In-Brief, purportedly "[t]o correct the Court's mischaracterization" of the Policy, "the Department has replaced the term 'solicitation' with 'intentional inducement of unauthorized disclosure.'"  *Id.* at 14.  The Interim Policy defines "intentional inducement of unauthorized disclosure" to mean "intentionally encouraging, inducing, or requesting that a specific Department employee disclose classified national security information or [controlled unclassified information] that the journalist knows that the specific Department employee is not authorized to disclosing [sic] under Article 92 of the Uniform Code of Military Justice (10 U.S.C. § 892), 18 U.S.C. § 1905, or 5 U.S.C. § 552a."  *Id.*

83.    The In-Brief then lists six activities that "do not constitute 'intentional inducement of unauthorized disclosure' under" the Interim Policy, including (a) "[a]sking questions of Department personnel who are authorized to speak with the press," (b) "[r]eceiving unsolicited information," (c) "[p]ublishing calls for tips or other general appeals to the public at large that are not

specifically directed at Department personnel," (d) "[d]eveloping source relationships outside the Pentagon through independent reporting," (e) "[c]ommunicating with Department personnel through official channels for public disclosure of information," such as press briefings and interviews arranged by public affairs offices, and (f) "[a]sking questions of any Department employee where the journalist does not know that the employee is not authorized to disclose the information sought." *Id.* at 15. The In-Brief further states, however, that "[a] journalist's offer of anonymity or privacy protection to a Department employee in exchange for information shall create a rebuttable presumption that the journalist knew the employee was not authorized to disclose the information sought." *Id.* at 14.

84. The Interim Policy also states that, "[e]ffective immediately, the Correspondents' Corridor is closed" and that PFAC holders will be able to access "[a] new press workspace . . . in an annex facility outside the Pentagon" once it is "operational." *Id.* at 3. It further states that "[i]n the interim, PFAC holders" will be able to access the Pentagon only "for scheduled press briefings, press conferences, and interviews arranged through the public affairs offices," and only if they are "escort[ed] by authorized [Department] personnel at all times." *Id.* Under the Interim Policy, "all journalist access to the Pentagon will require [an] escort[,]" and, "[w]hen in the Pentagon," PFAC holders "must remain with [their] escort at all times." *Id.* at 3, 7. According to the Interim Policy, no more than "three visiting media members from the same media outlet" may obtain "escort privileges." *Id.* at 8–9.

85. Any journalist, whether a PFAC-holder or not—or any member of the public—may visit the Pentagon on these terms. And in practice, they prohibit reporters from meaningfully reporting from the Pentagon.

86.     On the same day that the Department sent The Times the Interim Policy, Defendant Parnell also announced it in a post on X.[37]  The post described the Department's decision to limit PFAC holders' access to the Pentagon to escorted visits for "scheduled press briefings, press conferences, and interviews arranged through public affairs offices." *Id.*  He asserted that the Department had determined these changes were necessary to ensure Pentagon security in light of the district court's order—stating that "[i]n assessing the Department's security posture following the court's removal of all security screening authority, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen credential holders for security risks." *Id.*  Parnell's post thus expressly attributed the Interim Policy to the court's order that The Times' PFACs be reinstated—making clear that it is retaliatory and aimed at denying Plaintiffs meaningful Pentagon access.

87.     The decision to issue the Interim Policy, as well as related decisions regarding the content and implementation of the Interim Policy, were made either in full or in substantial part by Secretary Hegseth, Mr. Parnell, Cmdr. Parlatore, and other Department officials and advisors located in the District of Columbia.

**The District Court Orders Defendants to Comply with the March 20 Order**

88.     On March 24, 2026, Plaintiffs moved to compel compliance with the district court's order.

89.     The district court granted that motion on April 9, 2026.  The court saw Defendants' conduct for what it was: the same "unlawful policy under the guise of taking 'new' action." *NYT II*, 2026 WL 962252, at \*4.  It determined that the Interim Policy had the same unconstitutional

---

[37] Sean Parnell (@SeanParnellUSA), X (Mar. 23, 2026 at 5:43 PM), https://x.com/SeanParnellASW/status/2036197221121794508 (attached as Ex. 41).

motive of "dictat[ing] the information received by the American people" that rendered the original Policy invalid, and that Defendants' effort to "cut off *all* PFAC holders' meaningful access" violated the court's March 20 Order "requir[ing] the Department to *restore* the plaintiffs' access to the Pentagon." *Id.* at 9, 19.

90.     The court enjoined the Department from enforcing the relevant provisions of the Interim Policy against The Times journalists and ordered that Mr. Barnes and other Times reporters be allowed "to access the Pentagon in a manner commensurate with the access provided to PFAC holders on March 20, 2026, following [the court's prior order]." *NYT II* Order, ECF No. 54, at 3.

91.     Defendants appealed both of the district court's orders and sought a limited stay pending appeal of the aspect of the district court's order requiring them to permit Plaintiffs to access the Pentagon without an escort.  A divided panel of the D.C. Circuit granted that motion, concluding that Defendants were likely to succeed in demonstrating that the district court's original order did not address or bar their later adoption of the escort requirement.  The court expressly did not address the Interim Policy's lawfulness. *See New York Times Co. v. Dep't of Def.*, No. 26-5113, 2026 WL 1179440, at *3 (D.C. Cir. Apr. 27, 2026).  Defendants are presently enjoined from enforcing any other aspect of the October or Interim policies against Plaintiffs.

92.     Department officials continue to make clear their disdain for The Times and other members of the Pentagon press corps, as well as their belief that legitimate reporting constitutes exclusively printing what press officials seek to share with the public.  Cmdr. Parlatore, for instance, compared reporters asking a Department official unapproved questions to a murderer trying to hire a "hit man."[38]

---

[38] Erik Wemple (@ErikWemple), X (Mar. 30, 2026 at 4:36 PM), https://x.com/ErikWemple/status/2038716982548815545 (attached as Ex. 42).

93.     Addressing the ongoing war in Iran, Hegseth recently told the "American media" that when they engaged in "relentlessly negative coverage" of the Pentagon, they did not "choos[e] wisely": "Sometimes it's hard to figure out what side some of you are actually on."  He compared the "legacy Trump-hating press" to the biblical "Pharisees" who "held counsel against [Jesus on] how to destroy him" and said the media, like the Pharisees, were wrong to have "scrutinized every good act in order to find a violation."[39]

94.     At a recent press conference, Hegseth called The Times "unpatriotic."[40]

**The Escort Requirement Does Not Serve Any Security Rationale**

95.     There is no legitimate safety or security need for credentialed Pentagon reporters to be accompanied by an escort.

96.     The Pentagon has long been staffed by thousands of nongovernment employees—such as contractors, food-service workers, and representatives of other branches of the government or other nations—many of whom move around the Pentagon unescorted each day.  In addition, members of the public are welcomed into the Pentagon for tours and other events.

97.     The Pentagon already protects information security by, among other things, keeping certain sensitive areas, like the National Military Command Center and most of the Joint Chiefs area, off limits, and through statutes governing Department employee's disclosure of certain information.

---

[39] C-Span, *Secretary Hegseth Compares Media to the Pharisees in the Bible* (Apr. 16, 2026), https://www.c-span.org/clip/news-conference/defense-secretary-hegseth-compares-media-to-biblical-pharisees/5199158 (attached as Ex. 9).

[40] Dep't of War, Transcript: Secretary of War Pete Hegseth and Chairman of the Joint Chiefs of Staff Gen. Dan Caine Hold a Press Briefing (Apr. 24, 2026), https://www.war.gov/News/Transcripts/Transcript/Article/4470197/secretary-of-war-pete-hegseth-and-chairman-of-the-joint-chiefs-of-staff-gen-dan/ (attached as Ex. 8).

98.    Defendants admitted in prior litigation that the regular presence of PFAC holders at the Pentagon poses no security or safety risk to Department property or personnel. *Compare* Plaintiffs' SUMF, Dkt. 10-36 at 3 (¶ 11) *with* Defendants' SUMF, Dkt. 22-2 at 2 (¶ 11) (agreeing this fact is "[u]ndisputed").

**Plaintiffs Suffer Ongoing Irreparable Harm From the Interim Policy**

99.    While the Department has no legitimate security or safety interest in terminating meaningful press access to the Pentagon, their decision to do so is causing irreparable harm to Plaintiffs and the public.

100.    Although reporters from The Times and other news organizations without PFACs have continued and will continue to gather news and publish important stories about the Department and the United States military, the Policy ensures that certain stories will no longer be available to those journalists and news organizations—and to the public that relies on their reporting. As one new PFAC recipient put it when asked why he was reporting from the Pentagon: "Press have always worked at the Pentagon. . . .  Correspondents place themselves at the buildings so when a major story breaks they're there to cover it."[41]

101.    To report effectively on the Department, a reporter often must speak with over a dozen officials sitting in Public Affairs offices spread throughout the building.  For decades, the Pentagon's press-access policies reflected this physical reality by allowing reporters unescorted access in unsecured corridors so that they can move from press office to press office and ask questions on short notice as events unfolded.  The Interim Policy breaks sharply from that history and tradition.

---

[41] Cam Higby (@camhigby), X (Dec. 1, 2025, at 7:45 PM), https://x.com/camhigby/status/199565554147416562 (attached as Ex. 13).

102.    Now, to ask even one question, Barnes and other reporters must call or email for an appointment, wait for a response, get an escort, ask their question, and return to the library outside the Pentagon—only to repeat the process for the next source.  Reporters must either forgo conversations or else spend hours chasing schedulers by phone and shuttling in and out of the building.

103.    As the district court found in *NYT II*, "the access now available to PFAC holders [under the Interim Policy] . . . is not even close to as meaningful as the broad access that PFAC holders had previously been afforded," "mak[ing] it exceedingly difficult to cover the Department." *NYT II*, 2026 WL 962252, at *8.

104.    Stories based on routine unplanned interactions between journalists and Pentagon personnel on Pentagon grounds, stories built on dozens of conversations with Pentagon press officers from various parts of the Department and across the building, stories that capture the mood and atmosphere within the Pentagon during times of consequential military operations—all are examples of what Plaintiffs can no longer report.  In-person, and often spontaneous exchanges, in which reporters can judge the demeanor of government officials as they respond to questions in real time and press for more information on the spot, are different in kind and can elicit different information than inquiries by phone or by email.  And they are different from interviews scheduled with officials days or weeks in advance—to the extent requests for such interviews are granted (or even seen) in the time before a reporter has a deadline.  Without meaningful access to the Pentagon, Plaintiffs and other journalists and news organizations are deprived of unique, newsworthy information that can only be obtained in person and through such exchanges.  *Cf. ABC, Inc. v. Stewart*, 360 F.3d 90, 99 (2d Cir. 2004) ("[O]ne cannot transcribe an anguished look or a nervous tic.").

105. This loss is made more urgent by recent events that have exacerbated the importance of independent reporting, including the capture of the President of Venezuela, the Iran war, and Secretary Hegseth's firings of multiple high ranking military officials.

106. Given the urgent and irreparable nature of the harm the Interim Policy is inflicting, Plaintiffs bring this suit to challenge the Interim Policy on its face and seek immediate relief from its unconstitutional, retaliatory escort requirement that, in design and effect, is depriving Plaintiffs of meaningful access to the Pentagon.

### CLAIMS FOR RELIEF

### COUNT ONE
**Violation of the First Amendment**

107. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

108. News organizations and journalists, including Plaintiffs, have historically had regular, unescorted access to areas of the Pentagon, including to the Pentagon Press Briefing Room, Correspondents' Corridor, and to hallways throughout the building. Such access for credentialed journalists has not posed risk to the safety or security of Pentagon property or personnel.

109. "Although the government is not required to open such spaces for any speech at all, the government creates a 'nonpublic forum' when it provides 'selective access for individual speakers.'" *Ateba*, 133 F.4th at 122 (citations omitted). Areas of the Pentagon, including the Pentagon Briefing Room and Correspondents' Corridor, are nonpublic fora for First Amendment purposes. *See id.* at 121–22 (holding that White House press area was a nonpublic forum for First Amendment purposes); *see also United States v. Nassif*, 97 F.4th 968, 976–77 (D.C. Cir. 2024) (United States Capitol buildings are nonpublic fora for First Amendment purposes).

110. As the Supreme Court has recognized, the government may reserve a nonpublic forum "for its intended purposes, communicative or otherwise, as long as the regulation on speech

37

is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Minn. Voters All.*, 585 U.S. at 11–12 (quotation marks omitted). The Interim Policy satisfies neither of these requirements.

111. Because the Interim Policy is "an effort to suppress" speech and newsgathering on Pentagon grounds by members of the press, including Plaintiffs, whose reporting and perceived viewpoint the Department disfavors, the Interim Policy violates the First Amendment. *Id.*

112. Defendants' statements criticizing The Times and other reporters, the sequences of events, and the Interim Policy's substance all make clear that it, like the October PFAC Policy before it, was designed and implemented to carry out Department officials' viewpoint discriminatory motive. The Interim Policy's purpose is to exclude from the Pentagon those reporters that will engage in independent newsgathering and reporting—not merely unquestioningly repeat official Department statements—and to allow Department officials to exclude reporters whose coverage they dislike. That viewpoint-discriminatory motive animated the October Policy and was only aggravated by Plaintiffs' successful legal challenge to that policy. It alone renders the Interim Policy unlawful. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (even when the government may act "for any number of reasons," it "may not rely . . . on a basis that infringes [a person's] constitutionally protected interests—especially, his interest in freedom of speech"); *Nat'l Pub. Radio, Inc.*, 2026 WL 877434, at *1 ("As the Supreme Court and D.C. Circuit have observed on more than a dozen occasions, the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'" (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013))); *see also Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 365 (D.C. Cir. 2018)

(the government violates the First Amendment if it "change[s] the nature of a forum in order to deny access to a particular speaker or point of view").

113.    The Interim Policy is also not viewpoint neutral on its face because it permits journalists to ask certain questions and to report information based on on-the-record conversations with press officials but prohibits certain questions as well as reporting based on unnamed sources or other Department personnel.  In doing so, the Interim Policy expressly targets and discriminates against the editorial viewpoint of reporters and news organizations, like Plaintiffs, who engage in independent journalism rather than toe the Department's line.

114.    The Interim Policy also violates the First Amendment because its provisions are not reasonable "in light of the purpose served by the forum."  *NYT I*, 2026 WL 788689, at *15 (citation omitted).  Its provisions significantly interfere with reporters' ability to report on the Department and the U.S. military quickly, accurately, and comprehensively, even though facilitating such reporting is the purpose of the forum.

115.    Barring credentialed reporters from the Pentagon unless they are accompanied by an escort is unreasonable because it imposes significant burdens on reporters' newsgathering at the Pentagon given the physical layout of the building.  The escort requirement is also wholly unnecessary in view of the long history and tradition of unescorted press access, the absence of any security or safety risk posed by such access, and the absence of any safety or security concerns associated with the thousands of civilian employees in various roles who move around the Pentagon without an escort every day.

116.    It is also unreasonable to prohibit and threaten to penalize journalists for agreeing to speak to Department-affiliated sources on background, off-the-record, or confidentially.  Relying on unnamed sources is a common and constitutionally protected journalistic practice that

reporters frequently engage in, including at the request of official sources, for reasons having nothing to do with an intent to induce the disclosure of "unauthorized" information.

117.   The Interim Policy is also unreasonable and violates the First Amendment because it vests Department officials with standardless and "boundless discretion" to determine whether a PFAC shall be denied, revoked, or not renewed for an "intentional inducement of unauthorized disclosure." *City of Lakewood*, 486 U.S. at 764.  Because every bona fide reporter sometimes speaks to sources on background, not for attribution, or on some other condition of anonymity, all reporters may presumptively lose their PFACs under the Interim Policy.  The Department gets to decide when the "presumption" created by a journalist's "offer of anonymity or privacy protection" is satisfactorily rebutted.  And the Interim Policy lacks objective, workable standards to guide Department officials in making that decision.  As the district court concluded in *NYT II*, the provision's "'safe harbors' explicitly leave open the possibility that '[a]sking questions' on certain topics and to certain officials could trigger the revocation or denial of a PFAC." *NYT II*, 2026 WL 962252, at *6.

118.   Similarly, the Interim Policy also vests Department officials with unbridled discretion to deny a PFAC holder an escort for any reason or no reason at all, thereby giving Department officials the ability to deny a PFAC holder access to the Pentagon on an ad hoc basis.

119.   Because the Interim Policy's escort and "intentional inducement of unauthorized disclosure" provisions, in practice, vest the Department with discretion to exclude any journalist it wants from the Pentagon on an ad hoc basis, the Interim Policy is unreasonable and violates the First Amendment. *See City of Lakewood*, 486 U.S. at 764; *Minn. Voters All.*, 585 U.S. at 21–22 (holding that a state's "indeterminate prohibition" on certain apparel in polling places—nonpublic forums—was unreasonable and therefore violated the First Amendment including because it failed

to include "objective, workable standards" for enforcement); *see also Ateba*, 133 F.4th at 125 (explaining that "the exercise of unbridled discretion to deny access to a nonpublic forum is unreasonable" (citing *WMATA*,  901 F.3d at 364, 372)).

120.    The Interim Policy was not prompted by any specific security or safety concern or security incident involving a PFAC holder and does not serve any actual, legitimate interest in ensuring the security or safety of Department personnel, property, or information.

121.    The Policy violates the First Amendment facially and as applied to Plaintiffs.

122.    Defendants' adoption of the Interim Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

123.    The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

124.    The Court should declare specified provisions of the Interim Policy contrary to law and vacate and enjoin Defendants from implementing those provisions of the Policy or any similar policy.

## COUNT TWO
## Violation of the First Amendment (Retaliation)

125.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

126.    The First Amendment prohibits the government from retaliating against someone because of that person's exercise of First Amendment rights.

127.    Unlawful retaliation occurs when someone "engage[s] in conduct protected under the First Amendment," the government takes a "retaliatory action" "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again," and there is "a causal link between the exercise of a constitutional right and the adverse action."  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quotation marks omitted).

128.   The Times and Barnes engaged in protected First Amendment activity when news-gathering and reporting about issues of public importance, as well as when they sued the Department to challenge the lawfulness of the October Policy.  *See Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025); *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 94 (D.D.C. 2025); *In re Primus*, 436 U.S. 412, 431 (1978).

129.   The Interim Policy—and, especially, its provisions that deprive Plaintiffs of the access that previously accompanied their press credentials—is "retaliatory conduct [that] would likely deter a person of ordinary firmness" from engaging in the activities the Interim Policy was enacted to punish.  *Media Matters for Am.,* 138 F.4th at 580–81.  As the district court found in *NYT II*, the escort requirement and closing of Correspondents' Corridor harm Barnes's and other Times reporters' newsgathering by making it substantially harder for them to interview Department officials and decreasing the number of individuals they are able to speak with to report on a story—a unique and important form of newsgathering that has served the public for decades.  *NYT II*, 2026 WL 962252, at *8.  "Reporters can hardly verify sources, gather information, or speak candidly with Department personnel with an escort looming over their shoulders."  *New York Times Co. v. Dep't of Def.*, No. 26-5113, 2026 WL 1179440, at *6 (D.C. Cir. Apr. 27, 2026) (Childs, J., dissenting).  Stripping away this access is a harsh punishment that is intended to chill and deter the "uninhibited, robust, and wide-open debate that the First Amendment is intended to protect."  *Counterman v. Colorado*, 600 U.S. 66, 78 (2023) (citations omitted).

130.   That Plaintiffs have continued to vigorously gather and report newsworthy information about the Department despite the Interim Policy does not lessen its chilling effect.  Government retaliation for engaging in protected First Amendment conduct constitutes a "concrete harm in and of itself" when the "retaliatory conduct would likely deter a person of ordinary

firmness from the exercise of First Amendment rights." *Media Matters for Am.*, 138 F.4th at 580–81 (quotation marks omitted). The Interim Policy sends a message to Plaintiffs and other journalists that they must adapt their journalistic and editorial choices to suit the Department's preferences, and not seek to vindicate their constitutional rights, if they are ever to regain the access to the Pentagon they historically had. "That is enough to show that a person of ordinary firmness would be chilled from freely exercising his or her First Amendment rights[,]" even if The Times has refused to heed that message. *Nat'l Pub. Radio, Inc.*, 2026 WL 877434, at *15.

131.    The causal link between Plaintiffs' protected activity and the Department's actions is apparent from the face of the Interim Policy, the sequence of events leading up to its adoption, and the Department's own statements, as detailed above. The timing and substance of the Interim Policy and Defendants' statements discussing it confirm that it was meant to punish Plaintiffs for obtaining relief in *NYT I*. The Department's retaliatory motive is further exposed by its changing and implausible *post hoc* justifications for the Policy. Defendants found it necessary to close press workspaces and eliminate all unescorted access to the Pentagon only once Plaintiffs prevailed in their suit and the district court ordered that The Times' reporters' access be restored. Nothing else changed in the three days following the district court's order. The obvious and inescapable conclusion is that Defendants acted to target and inflict harm on Plaintiffs, making things worse for them than if they had never challenged the Department's unlawful policy at all.

132.    More broadly, the Interim Policy is also the latest in a series of access restrictions meant to punish media outlets, including The Times specifically, for coverage Department officials disliked. Defendants' numerous statements condemning and threatening The Times based on its stories and use of certain sources, and their celebratory statements when Times reporters lost their PFACs in October, confirm this intent. The district court in *NYT I* found "voluminous,"

43

"undisputed" evidence that the October policy targeted "'mainstream media' whose reporting it views as unfavorable" and that the Interim Policy carried that motive forward and violated the same "constitutional principles." *See NYT I*, 2026 WL 788689, at *13-14; *NYT II*, 2026 WL 962252, at *9. And Defendants' statements in the time since issuing the Interim Policy make clear their continued desire to impair The Times's ability to report on the Department.

133. Defendants' adoption of the Interim Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

134. The Interim Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

135. The Court should declare specified provisions of the Interim Policy contrary to law, and vacate and enjoin Defendants from implementing those provisions of the Policy or any similar policy.

### COUNT THREE
#### Violation of the Due Process Clause

136. Plaintiffs incorporate by reference the allegations of the preceding paragraphs of the Complaint.

137. The Due Process Clause of the Fifth Amendment provides that "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Times and its reporters, including Barnes, have both a liberty and a property interest in their PFACs.

138. The Interim Policy's escort and "intentional inducement of unauthorized disclosure" provisions violate the Due Process Clause's prohibition on vague laws because they "authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). The Interim Policy does not provide Department officials with clear

44

standards to guide them when determining that a journalist's PFAC shall be suspended, revoked, or not renewed for "intentionally induc[ing]" an "unauthorized disclosure," or when a journalist's request for access may be denied, thereby empowering Department officials to do what they want, depending on their own predilections. For instance, the Interim Policy does not establish any criteria for when reporters will not be provided an escort to access to the Pentagon. And because the Interim Policy treats any grant of "anonymity or privacy" as a presumptive basis to revoke, deny, or not renew a PFAC, it functionally authorizes Department officials to target almost any independent reporting by a PFAC holder. *Id.* at 62.

139.    Likewise, the Interim Policy fails to provide adequate notice to Plaintiffs and other journalists and news organizations of the activity that will result in the denial of an escort or the revocation, denial or non-renewal of a PFAC pursuant to the "intentional inducement of unauthorized disclosure" provision of the Interim Policy. As the district court concluded in *NYT II*: That provision's "safe harbors" provide, for example, "that asking questions about any subject to a Department official who is "authorized to speak with the press" is permissible. . . . But how is a journalist to know who is authorized to speak? That uncertainty and lack of clarity is precisely what this Court held to be unacceptable." *NYT II*, 2026 WL 962252, at *6.

140.    Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

141.    The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

142.    The Court should declare specified provisions of the Interim Policy contrary to law, and vacate and enjoin Defendants from implementing those provisions of the Policy or any similar policy.

## COUNT FOUR
**Violation of the Administrative Procedure Act (Arbitrary & Capricious Action)**

143.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

144.    The Administrative Procedure Act "requires agencies to engage in 'reasoned decisionmaking." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).  Agencies fall short of that when, among other things, they fail to "examine the relevant data and articulate a satisfactory explanation for [their] action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted).  The Department's adoption of the Interim Policy squarely violates this requirement.

145.    The Interim Policy is both arbitrary and capricious.  5 U.S.C. § 706(2)(A).

146.    Judge Friedman issued his ruling granting summary judgment in favor of Plaintiffs and vacating and enjoining the unconstitutional provisions of the Department's October Policy on a Friday.  To avoid complying with that ruling, the Department, led on information and belief by Cmdr. Parlatore, scrambled over the weekend to hastily cobble together the Interim Policy, issuing it on the Monday following Judge Friedman's ruling.  And as the rushed "immediate" closure and quick destruction of Correspondents' Corridor, among other things, evidence, the Interim Policy's goal was not to address any legitimate security considerations or implement in good faith the district court's ruling following a reasoned analysis.  Instead, the Interim Policy was designed to retaliate against Plaintiffs and evade Judge Friedman's ruling.

147.    Neither Cmdr. Parlatore nor any other Defendant collected any facts, conducted any investigation, or undertook any assessment over the weekend before the Interim Policy was

46

issued. And as the Department's total lack of preparedness to implement the Interim Policy underscores, it was drafted hastily and without even adequate communication within the Department.

148.   The total lack of any reasoned deliberation is apparent from the face of the Interim Policy. For example, contrary to the Interim Policy's primary claim, the Court did not vacate "security screening provisions." It left security requirements in place no less stringent than the ones the Department has used for decades without issue—including a background check requirement. And the security concerns the Interim Policy purports to rely upon are the very ones that the district court in *NYT I* found unsupported based on Defendants' inability to produce any evidence of potential security or safety risk. By premising the Interim Policy on pretext, falsehood, and unsupported concerns, the Department failed to engage in reasoned decisionmaking.

149.   Further, in adopting the Policy, the Department failed to consider less burdensome "alternative way[s] of achieving [its] objectives." *State Farm*, 463 U.S. at 48; *see also, e.g.*, *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986) ("The failure of an agency to consider obvious alternatives has led uniformly to reversal.").

150.   The Department also took into account impermissible factors in crafting the Interim Policy. As the Court found, the purpose of the Interim Policy, including its escort requirement, was to nullify the Court's order and to carry forward its discrimination against disfavored viewpoints and content. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (Courts "cannot ignore the disconnect between the decision made and the explanation given" as they are "not required to exhibit a naiveté from which ordinary citizens are free." (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.))). Agency action is arbitrary and capricious if the agency, as here, "relied on factors" it is not empowered "to consider." *State Farm*, 463 U.S. at 43. As detailed above, Defendants acted with the aim of retaliating against Plaintiffs

and excluding them and other reporters whose coverage Department officials dislike from the Pentagon; viewpoint discriminatory and retaliatory objectives are not permissible considerations for the agency to take into account in formulating its action.

151.  Any belated effort by the Department to provide a factual basis and rationale for the Interim Policy cannot save it. *Post hoc* rationalizations are "impermissible." *Dep't of Homeland Sec.*, 591 U.S. at 22.

152.  In all these respects, the Interim Policy violates the Administrative Procedure Act.

153.  Defendants' adoption of the Policy constitutes final agency action reviewable under the APA, 5 U.S.C. § 706.

154.  The Policy has caused Plaintiffs irreparable harm and is causing ongoing irreparable harm to Plaintiffs as well as the public.

155.  The Court should declare specified provisions of the Interim Policy contrary to law, and vacate and enjoin Defendants from implementing those provisions of the Policy or any similar policy.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs respectfully request an order:

a.  Declaring that the provisions of the Interim Policy targeting Plaintiffs' protected newsgathering and speech and all actions implementing those provisions are unlawful and unconstitutional;

b.  Vacating and preliminarily and permanently enjoining the Defendants from implementing or seeking to enforce those provisions of the Interim Policy or any similar policy;

c.  Ordering Defendants to reinstate access to Barnes and The Times' other reporters commensurate with that provided to PFAC holders on October 25, 2025;

48

d.  Entering judgment in favor of Plaintiffs;

e.  Awarding Plaintiffs their reasonable costs and attorney's fees in accordance with law; and

f.  Issuing any other relief that the Court deems just and proper.

Dated: May 18, 2026

Respectfully submitted,

*/s Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Susan Pelletier*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500
SPelletier@gibsondunn.com

*Counsel for Plaintiffs The New York Times Company and Julian E. Barnes*

*\*pro hac vice application forthcoming*

49