**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE NEW YORK TIMES COMPANY, *et al.*

        *Plaintiffs,*

    v.

DEPARTMENT OF DEFENSE A/K/A DEPART-
MENT OF WAR, *et al.*,

        *Defendants.*

**Civil Case No. 26-cv-1690 (PLF)**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Susan Pelletier*
Gibson, Dunn & Crutcher LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500
SPelletier@gibsondunn.com

*Counsel for Plaintiffs The New York Times Company
and Julian E. Barnes*

*\*pro hac vice application forthcoming*

i

**TABLE OF CONTENTS**

Table of Authorities ...................................................................................................... iii

Introduction .................................................................................................................. 1

Background ................................................................................................................... 4

    A.    For more than half a century, journalists have covered the military from inside the Pentagon. ................................................................................................ 4

    B.    Department officials, including Secretary Hegseth, repeatedly criticize The Times and other media outlets for their coverage. .......................................... 7

    C.    The Pentagon takes a series of steps to restrict PFAC holders' access to punish and chill disfavored reporting, culminating in the October Policy. ................ 8

    D.    The Department's October Policy forces Plaintiffs and other journalists out of the Pentagon; the Department installs a "new Pentagon press corps." .......... 11

    E.    Plaintiffs challenge the October Policy and the Court vacates and enjoins it. .............. 13

    F.    The Department rushes to adopt the Interim Policy. ...................................... 16

    G.    The Court orders Defendants to comply with its March 20 order. ............... 17

    H.    Defendants have offered no legitimate justification for the escort requirement. .......... 18

    I.    The escort requirement is imposing severe burdens on Plaintiffs' newsgathering and reporting. ...................................................................................... 19

Legal Standard .......................................................................................................... 23

Argument .................................................................................................................. 23

    I.    Plaintiffs Are Likely to Succeed on the Merits. ............................................ 23

    A.    The Interim Policy's escort requirement violates the First Amendment. ...... 24

    B.    The Interim Policy violates the Administrative Procedure Act. .................... 36

    II.    Plaintiffs Are Suffering Irreparable Harm. ................................................... 43

    III.    The Balance of Equities and Public Interest Favor Preliminary Injunctive Relief. ................................................................................................. 44

    IV.    The Court Should Require, at Most, a Nominal Bond. .................................. 45

CONCLUSION ........................................................................................................ 46

TABLE OF AUTHORITIES

**Cases**

*ABC, Inc. v. Stewart*,
  360 F.3d 90 (2d Cir. 2004)..................................................................................................23

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013)...........................................................................................................35

*Am. Freedom Def. Initiative v. WMATA*,
  901 F.3d 356 (D.C. Cir. 2018)......................................................................................35, 36

*Am. Oversight v. Hegseth*,
  788 F. Supp. 3d 14 (D.D.C. 2025).....................................................................................45

*Am. Radio Relay League, Inc. v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008).......................................................................................36, 42

*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016)............................................................................................24

*Ateba v. Leavitt*,
  133 F.4th 114 (D.C. Cir. 2025)..............................................................................14, 31, 32

*Cable News Network, Inc. v. Trump*,
  2018 WL 9436958 (D.D.C. Nov. 16, 2018) .........................................................................43

*Cable News Network v. Am. Broadcasting Cos.*,
  518 F. Supp. 1238 (N.D. Ga. 1981).....................................................................................45

*Citizens United v. Federal Election Comm'n*,
  558 U.S. 310 (2010)...........................................................................................................44

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
  473 U.S. 788 (1985)...........................................................................................................35

*Counterman v. Colorado*,
  600 U.S. 66 (2023)......................................................................................................26, 27

*Crawford-El v. Britton*,
  93 F.3d 813 (D.C. Cir. 1996), *rev'd on other grounds,* 523 U.S. 574 (1998) .........................25

*D.C. v. U.S. Dep't of Agric.*,
  444 F. Supp. 3d 1 (D.D.C. 2020).........................................................................................42

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)...........................................................................................................37

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
  591 U.S. 1 (2020)........................................................................................................36, 40

iii

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)..................................................................................................42

*Fox v. Clinton*,
   684 F.3d 67 (D.C. Cir. 2012)....................................................................................40

*Geleta v. Gray*,
   645 F.3d 408 (D.C. Cir. 2011)..................................................................................29

*Genuine Parts Co. v. Env't Prot. Agency*,
   890 F.3d 304 (D.C. Cir. 2018)..................................................................................39

*Hassay v. Mayor*,
   955 F. Supp. 2d 505 (D. Md. 2013).........................................................................43

*Jenner & Block LLP v. U.S. Dep't of Just.*,
   784 F. Supp. 3d 76 (D.D.C. 2025)............................................................................25

*Karem v. Trump*,
   404 F. Supp. 3d 203 (D.D.C. 2019).........................................................................43

*Karem v. Trump*,
   960 F.3d 656 (D.C. Cir. 2020)........................................................................19, 26, 43

*Media Matters for Am. v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025).................................................................24, 25, 27, 31

*Michigan v. EPA*,
   576 U.S. 743 (2015)..................................................................................................36

*Miller-El v. Dretke*,
   545 U.S. 231 (2005)..................................................................................................30

*Minnesota Voters All. v. Mansky*,
   585 U.S. 1 (2018)............................................................................................24, 32, 34

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
   463 U.S. 29 (1983)........................................................................................36, 37, 40

*Nat'l Ass'n for Advancement of Multijurisdiction Prac. v. Howell*,
   851 F.3d 12 (D.C. Cir. 2017)....................................................................................24

*Nat'l Pub. Radio, Inc. v. Trump*,
   2026 WL 877434 (D.D.C. Mar. 31, 2026)...................................................4, 25, 35

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024)....................................................................................................4

*New York Times Co. v. Dep't of Def.*,
   No. 26-5113, 2026 WL 1179440 (D.C. Cir. Apr. 27, 2026)..............2, 3, 18, 23, 26

*New York Times Co. v. Dep't of Def.*,
   No. CV 25-04218 (PLF), 2026 WL 788689
   (D.D.C. Mar. 20, 2026).....................................1, 5, 7, 14, 15, 26, 27, 31, 34, 35, 43

*New York Times Co. v. Dep't of Def.*,
No. CV 25-04218 (PLF), 2026 WL 962252
(D.D.C. Apr. 9, 2026) ...............................................2, 3, 6, 17, 22, 28, 29, 31, 38, 39, 44, 45

*Nken v. Holder*,
556 U.S. 418 (2009)...............................................................................................................43

*Perry v. Sindermann*,
408 U.S. 593 (1972)...............................................................................................................35

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016).............................................................................................42

*In re Primus*,
436 U.S. 412 (1978)...............................................................................................................25

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977)....................................................................................19, 26, 42, 44

*Sinclair Broad. Grp., Inc. v. F.C.C.*,
284 F.3d 148 (D.C. Cir. 2002).............................................................................................40

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)...............................................................................................................35

*Tao v. Freeh*,
27 F.3d 635 (D.C. Cir. 1994)................................................................................................25

*Telemundo v. City of Los Angeles*,
283 F. Supp. 2d 1095 (C.D. Cal. 2003) ...............................................................................43

*Toolasprashad v. Bureau of Prisons*,
286 F.3d 576 (D.C. Cir. 2002)..............................................................................................25

*Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and
Explosives*,
437 F.3d 75 (D.C. Cir. 2006).................................................................................................40

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994)...............................................................................................................35

*United States v. Nassif*,
97 F.4th 968 (D.C. Cir. 2024)...............................................................................................32

*United States v. Stanchich*,
550 F.2d 1294 (2d Cir. 1977)................................................................................................37

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989)...............................................................................................................35

*Window Covering Manufacturers Ass'n v. Consumer Prod. Safety Comm'n*,
82 F.4th 1273 (D.C. Cir. 2023).............................................................................................42

v

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)................................................................................................23

*Yakima Valley Cablevision, Inc. v. FCC*,
  794 F.2d 737 (D.C. Cir. 1986)..........................................................................42

*Zerilli v. Smith*,
  656 F.2d 705 (D.C. Cir. 1981)...........................................................................45

**Statutes**

5 U.S.C. § 706.........................................................................................................36

**Other Authorities**

Bob Greene, *The Cartoonist vs. the General*, Wall St. J. (Apr. 5, 2026) .....................44

Spc. Brandon Dyer, *Your Guide to the Pentagon, U.S. Army* (Mar. 15, 2016) ............33

Daniel Lippman and Josh Gerstein, *Hegseth attorney's dual roles trip conflict-of-interest alarms*, Politico (May 3, 2025),
  https://www.politico.com/news/2025/05/03/parlatore-hegseth-navy-conflict-00323266, Dkt. 1-32 ...............................................................................................38

Greg Jaffe *et al.*, A *Harrowing Race Against Time to Find a Downed U.S. Airman in Iran*, N.Y. Times (Apr. 5, 2026)....................................................................41

Ian Schwartz, *Trump Blasts NYT's David Sanger: We've Had A Total Victory in Iran, Except With "Treasonous" Reporters Like You*, RealClear Politics (May 15, 2026) ............................................................................................................8, 28

Inspector Gen*., Evaluation of the Secretary of Defense's Reported Use of a Commercially Available Messaging Application for Official Business* 4 (Dec. 2, 2025), reproduced at *Read the Pentagon Watchdog's Report on Signal Use*, N.Y. Times (Dec. 4, 2025),
  https://www.nytimes.com/interactive/2025/12/04/us/signal-report-hegseth.html ..................................................................................................41

Jeffrey Goldberg, *The Trump Administration Accidentally Texted Me Its War Plans*, The Atlantic (Mar. 24, 2025).........................................................................7, 8

Julian E. Barnes et al., *Iran Could Retrieve Uranium at Site U.S. Bombed Last Year, Officials Say*, N.Y. Times (Mar. 7, 2026) ............................................41

Julian E. Barnes et al., *U.S. at Fault in Strike on School in Iran, Preliminary Inquiry Says*, N.Y. Times (Mar. 11, 2026) ....................................................41

*The Pentagon: The First Fifty Years* (Dep't of Defense 1992) ............................6, 33, 34

*Pentagon – Air Force,* Military Installations................................................................33

*Pentagon's Correspondents Corridor Renamed*, TIME (Sept. 27, 2012).......................6

Tim Weiner, *J.F.K. Turns to the C.I.A. to Plug a Leak*, N.Y. Times (July 1, 2007)........4

*Transcript, Secretary of War Pete Hegseth and Chairman of the Joint Chiefs Air Force Gen. Dan Caine Hold a Press Briefing*, U.S. Department of War (Mar. 13, 2026) ...................................................................................................34

U.S. Supreme Court, *Requirements and Procedures for Issuing Supreme Court Press Credentials* ........................................................................................19

**Rules**

Federal Rule of Civil Procedure 65 ..............................................................................45

## INTRODUCTION

Plaintiffs The New York Times Company ("The New York Times" or "The Times") and its reporter Julian E. Barnes ("Barnes") move to preliminarily enjoin unlawful aspects of a policy recently announced by the United States Department of Defense a/k/a Department of War (the "Department") restricting press access to the Pentagon (the "Interim Policy") that are currently in effect.  Specifically, The Times seeks immediate relief from a needless and retaliatory "escort" restriction imposed on credentialed journalists by the Interim Policy—a restriction that violates the Administrative Procedure Act (APA) and the First Amendment, and that is presently inflicting ongoing, irremediable harm on both Plaintiffs and the American public.  Dkt. 1-1 at 3, 7–9.

This is the second time Plaintiffs have been forced to file suit to challenge Defendants' unlawful efforts to restrict their constitutionally protected newsgathering and reporting.  This Court already found that an earlier Pentagon press credentialing policy the Department promulgated in October 2025 (the "October Policy") violated Plaintiffs' First and Fifth Amendment rights by, among other things, vesting Department officials with unbridled discretion to revoke a reporter's press credential for any reason, including expressly because a reporter asked questions or other-wise sought information that Department officials did not approve.  *See generally New York Times Co. v. Dep't of Def.*, No. CV 25-04218 (PLF), 2026 WL 788689, at *12, *14, *17 (D.D.C. Mar. 20, 2026) ("*NYT I*").  As the Court found, the October Policy was viewpoint discriminatory and issued for the impermissible purpose of "weed[ing] out disfavored journalists—those who were not, in the Department's view, 'on board and willing to serve'" by reporting only the Department's official line—"and replac[ing] them with news entities that are."  *Id.* at *14.

Rather than comply with the Court's order vacating the unconstitutional provisions of the October Policy and ordering the Department to restore The Times's longstanding, credentialed access to the Pentagon, Defendants retaliated instead.  The very next business day, Defendants

hastily announced the Interim Policy in an obvious attempt to evade the Court's ruling in *NYT I* and strip The Times's Pentagon Facility Alternative Credentials ("PFACs") of their value by, among other things, closing "effective immediately" the dedicated workspace in the Pentagon where the press has worked for half a century, and prohibiting credentialed journalists from entering the Pentagon unless they are invited to a press conference or have secured a pre-arranged interview or meeting—and even then, only if they are minded at all times by an official escort. *New York Times Co. v. Dep't of Def.*, No. CV 25-04218 (PLF), 2026 WL 962252, at *7 (D.D.C. Apr. 9, 2026) ("*NYT II*"). That "is not even close to as meaningful as the broad access that PFAC holders had previously been afforded." *Id.* at *8. Indeed, it is far more restrictive than the access afforded to thousands of other nongovernmental employees, including shop clerks and food service vendors, who work from the Pentagon every day. *See* Declaration of Julian E. Barnes ("Barnes Decl.") ¶ 10. And, as a practical matter, it makes reporting from the Pentagon—where journalists need the ability to move from press office to press office and gather information in real time—largely pointless. *See NYT II*, 2026 WL 962252, at *8 (finding that the Interim Policy's restrictions make it "exceedingly difficult to cover the Department"); *see also New York Times Co. v. Dep't of Def.* (D.C. Cir. Stay Op.), No. 26-5113, 2026 WL 1179440, at *6 (D.C. Cir. Apr. 27, 2026) (Childs, J., dissenting) ("Reporters can hardly verify sources, gather information, or speak candidly with Department personnel with an escort looming over their shoulders.").

Plaintiffs sought and obtained an order enjoining enforcement of the Interim Policy on the ground that it violated the Court's prior order vacating and enjoining the October Policy's unconstitutional provisions. *See generally NYT II*, 2026 WL 962252. The Department appealed and sought a stay allowing it to implement the Interim Policy's escort requirement while that appeal is pending. *See* D.C. Cir. Stay Op., 2026 WL 1179440, at *3. In entering that stay, the D.C. Circuit

did not address the requirement's lawfulness; the majority of the divided three-judge motions panel based its decision solely on the conclusion that the Department was likely to demonstrate that the escort requirement fell outside the scope of the Court's initial injunction. *See id.* Though the remainder of the Interim Policy is enjoined, the escort requirement is in effect. By this Motion, Plaintiffs seek preliminary injunctive relief from that aspect of the Interim Policy.

The Interim Policy cannot survive on the merits. It is retaliatory, unreasonable, and patently arbitrary and capricious. It marks a radical departure from the longstanding tradition of press access to the Pentagon that has enabled journalists to, among other things, not only attend press conferences but also to ask follow-up questions of officials afterwards, and to move among the numerous press offices located in different parts of the building. That access, for decades, has served the interests of the press, the public, and the Department without posing any risk to the safety or security of the Pentagon or the United States. And by dramatically curtailing press access to the Pentagon, the Interim Policy ensures that certain newsworthy information—obtained through unplanned interactions between credentialed journalists and Department officials on Pentagon grounds, or through conversations with multiple press officials in different press offices— will be simply unavailable to The Times and, accordingly, the public.

These harms are unjustified and unreasonable. And that is the point. The Interim Policy is not some measured, good-faith effort to address a legitimate security or safety concern. It is a transparent attempt to evade a court order, punish The Times for its editorial viewpoint and for vindicating its constitutional rights, and achieve the same unlawful, speech-suppressive aims the Department tried and failed to realize through its unconstitutional October Policy. *See NYT II*, 2026 WL 962252, at *4. The sequence of Defendants' actions and their own statements place the purpose and effect of the Interim Policy—like its predecessor—in stark relief: to restrict coverage

of the Department and its leadership by independent journalists and news organizations, like Plaintiffs, willing to publish stories that Defendants dislike.

Whatever power the government may have to act, it cannot act for a constitutionally impermissible purpose. Defendants impetuously adopted an Interim Policy that imposes needless, unreasonable restrictions on access to and use of a nonpublic forum to achieve viewpoint discriminatory and patently retaliatory ends. In doing so, Defendants defy the tradition and experience of nearly a century—a tradition that spans presidential administrations, wars, and other military engagements—and violate the First Amendment as well as the APA. Government officials can neither "use the power of the State to punish or suppress disfavored expression" nor "do indirectly what [they are] barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188, 190 (2024); *see also Nat'l Pub. Radio, Inc. v. Trump*, 2026 WL 877434, at \*1 (D.D.C. Mar. 31, 2026). And because Plaintiffs, as well as the public that relies on them for independent, fact-based reporting about the Department and U.S. military, suffer irreparable harm each day any provision of the Interim Policy is in effect, a preliminary injunction should issue.

**BACKGROUND**

**A. For more than half a century, journalists have covered the military from inside the Pentagon.**

Since the Pentagon opened in 1942, Department officials have afforded qualified members of the press, including reporters with The Times, access to the Pentagon to report on the military and other defense activities. Dkt. 1-23. Hanson W. Baldwin, a Times reporter who won a Pulitzer Prize in 1943 for his coverage of World War II, for example, routinely visited the Pentagon to gather news and speak with Department sources. Tim Weiner, *J.F.K. Turns to the C.I.A. to Plug a Leak*, N.Y. Times (July 1, 2007), attached as Ex. 1 to the Declaration of Theodore J. Boutrous

4

Jr. ("Boutrous Decl."). Many decades later, press access to the Pentagon enabled real-time eye-witness reporting on the Department's response to the terrorist attacks of September 11, 2001, including the attack on the Pentagon itself—coverage the Department has lauded. Dkt. 1-23. The ability of journalists to cover the military from inside the Pentagon benefits the American people, in part, because it gives Department officials the ability to correct misinformation and get accurate information to journalists and, in turn, to the public quickly when there is a crisis. As the Department conceded in *NYT I*, reporters' longstanding presence in the Pentagon has served the interests of the public and posed no security or safety risk to Pentagon property or personnel. *See NYT I*, 2026 WL 788689, at *3; *Compare* Plaintiffs' SUMF, *NYT I*, Dkt. 10-36 ("SUMF, *NYT I*") at 3 (¶ 11) (Jan. 5, 2026) with Defendants' SUMF, *NYT I*, Dkt. 22-2 at 2 (¶ 11) (Jan. 30, 2026) (agreeing this fact is undisputed).[1] And, until 2025, the Department did not attempt to condition that access on the perceived viewpoint of journalists and news organizations, or the content of their reporting. SUMF, *NYT I* at 4 (¶¶ 19–21).

For decades, credentialed journalists have had unescorted access to the Pentagon Press Briefing Room and the corridors linking the numerous press offices within the building, among other areas. Barnes Decl. ¶¶ 8–10; *see also* Dkt. 1-22. This access permitted reporters to engage with Department representatives and personnel in the timely, iterative manner needed for real-time, comprehensive reporting. Journalists from The Times and other media outlets could, for example, "stake out Jim Mattis, a defense secretary in President Trump's first term, when he picked up his clothes at an in-house dry cleaners and have an off-the-record chat as he walked back to his office, shirts slung over his shoulder" or "might bump into the chairman of the Joint Chiefs of Staff at a Pentagon Starbucks and have a conversation that could turn into a story." Dkt. 1-22.

---

[1] All citations in this brief to the *NYT I* SUMF are to facts that Defendants did not dispute.

5

Since the 1970s, the Pentagon also provided reporters with dedicated office space in the building, known as Correspondents' Corridor, where reporters set up desks and TV network booths. *See, e.g.*, *Pentagon's Correspondents Corridor Renamed*, TIME (Sept. 27, 2012), Boutrous Decl. ¶ 4, Ex. 2; Decl. of Robert Burns ("Burns Decl.") ¶ 5; Decl. of Pete Williams ("Williams Decl.") ¶ 19. As discussed below, even after Secretary Hegseth began imposing restrictions on PFAC holders' access to the Pentagon in 2025, unescorted access for PFAC holders remained. *NYT II,* 2026 WL 962252, at *7. The Department did not impose an escort requirement applicable to PFAC holders in all areas of the Pentagon until the Court's ruling in *NYT I* required the Department to restore to The Times, specifically, the access it previously had. *Id.*

The longstanding ability of credentialed journalists to move through areas inside the Pentagon unescorted is consistent with the layout and other unique features of the Pentagon. The Pentagon is a large office building, Barnes Decl. ¶ 10, not an "all-classified military command post," Burns Decl. ¶ 14. It "includes areas that resemble a mall and are often crowded with visitors and non-military employees." Barnes Decl. ¶ 10. These areas have long been staffed by thousands of nongovernment employees—including contractors, food-service workers, and representatives of other branches of the government or other nations—many of whom move around the Pentagon unescorted each day. *Id.*; Alfred Goldberg, *The Pentagon: The First Fifty Years* 131–34, 158 (Dep't of Defense 1992), Boutrous Decl. ¶ 5, Ex. 3. In addition, members of the public are welcomed into the Pentagon for tours and other events. Barnes Decl. ¶ 10. And, of particular relevance to journalists, "[e]ach of the armed services, including the Army, Navy, Air Force, Marine Corps, along with the Joint Staff, also [have] their own communications and public affairs teams, with their own offices and staff" that are "located throughout the Pentagon building, including in

6

different wings and on different floors . . . ."  Decl. of Chris Meagher ("Meagher Decl.") ¶ 8; *see also* Barnes Decl. ¶ 9.

### B. Department officials, including Secretary Hegseth, repeatedly criticize The Times and other media outlets for their coverage.

On November 12, 2024, President-elect Donald Trump named Defendant Pete Hegseth as his nominee for Secretary of Defense.  Hegseth was confirmed as Secretary of Defense on January 24, 2025.  Since he was nominated, Secretary Hegseth and other Department officials have continually criticized and threatened the press for publishing stories they consider unflattering.

During the debate over Secretary Hegseth's nomination, The Times and other news organizations reported extensively on his background including allegations of past sexual assault, excessive drinking, and infidelity, as well as questions about his lack of experience.  SUMF, *NYT I*, at 6 (¶ 34).  As the Department conceded in *NYT I*, "Secretary Hegseth and Department officials openly complained about reporting they perceive[d] as unfavorable to them and the Department."  *See NYT I*, 2026 WL 788689, at *2; SUMF, *NYT I* at 6 (¶ 35).

Following Secretary Hegseth's confirmation, the Department began to impose increasingly stringent and unprecedented restrictions on journalists covering the Department and its leadership.  Jeffrey Goldberg, *The Trump Administration Accidentally Texted Me Its War Plans*, The Atlantic (Mar. 24, 2025), Boutrous Decl. ¶ 6, Ex. 4.  Around February 2025, the Department announced that it was requiring several news outlets—specifically, The Times, NBC News, Politico, National Public Radio, CNN, The Hill, and The War Zone—to leave their dedicated workspaces in the Pentagon as part of a new so-called "rotation" system.  Dkt. 1-38.  The Department's decision to require specified news outlets to give up their dedicated workspaces in the Pentagon press room was criticized, including by former Defense Department officials.  SUMF, *NYT I* at 6 (¶ 37).

Department officials continued to attack the Pentagon press corps, including The Times, because of the content of their reporting. Their attacks intensified in March of 2025, when Jeffrey Goldberg of The Atlantic revealed in a story that Secretary Hegseth and other top officials had inadvertently included him in a group chat on the messaging platform Signal that disclosed details regarding imminent U.S. airstrikes in Yemen. Jeffrey Goldberg, *The Trump Administration Accidentally Texted Me Its War Plans*, The Atlantic (Mar. 24, 2025), Boutrous Decl. ¶ 6, Ex. 4; Dkt. 1-36. That same month, The Times reported that Secretary Hegseth also had shared details about U.S. plans to strike Yemen in a second private Signal group chat that included Defendant Parlatore and Secretary Hegseth's wife and brother. Dkt. 1-32, 1-34. Following this reporting, Defendant Parnell, the Pentagon's Chief Spokesman, called The Times "garbage," and Secretary Hegseth accused The Times of "slashing and burning people to ruin their reputations," adding: "Not gonna work with me." Dkt. 1-34, 1-37. Both Parnell and Hegseth specifically criticized The Times's choice of sources for its reporting, including the use of anonymous sources and The Times's purported refusal to give adequate weight to sources suggesting that the June 2025 strike on Iran was a complete success. Dkt. 1-31, 1-34, 1-37. In late summer 2025, Department leadership even publicly asserted that recent coverage should be "punished." Dkt. 1-28, 1-29. And just last week, the President called The Times's war reporting "sort of treasonous." Ian Schwartz, *Trump Blasts NYT's David Sanger: We've Had A Total Victory in Iran, Except With "Treasonous" Reporters Like You*, RealClear Politics (May 15, 2026), Boutrous Decl. ¶ 7, Ex. 5.

**C. The Pentagon takes a series of steps to restrict PFAC holders' access to punish and chill disfavored reporting, culminating in the October Policy.**

On May 23, 2025, Secretary Hegseth issued "Updated Physical Control Measures for Press/Media Access Within the Pentagon." Those measures restricted credentialed journalists'

8

access to specific areas of the building, including in the vicinity of his office, and required jour-nalists to be accompanied by official "escorts" when visiting certain areas.  Dkt. 1-40.  These changes were not precipitated by any security or safety incident involving a PFAC holder.  SUMF, *NYT I* at 3 (¶ 11).  According to the "Memorandum for Resident and Visiting Press Assigned to the Pentagon," these "updated security measures" were instead purportedly "needed to reduce the opportunities for in-person inadvertent and unauthorized disclosures."  Dkt. 1-40; *see also* Dkt. 1-26.  These restrictions coincided with other efforts by the Department to restrict the flow of news-worthy information to the public, both via the press and via Congress.  Dkt. 1-21, 1-30.

On September 18, 2025, Parnell issued a "Memorandum for Senior Pentagon Leadership" purporting to implement the Department's Updated Physical Control Measures.  The September 18 Policy required PFAC holders to sign an Acknowledgement that they could lose their PFAC if Department officials deemed them a security risk.  Dkt. 1-4.  Such a determination could be made for any reason, including expressly if a journalist attempted to "improperly obtain" Department information or was "found in physical possession of" such information "without reporting it."  *Id.* at 14.  After the Department's announcement sparked widespread confusion and concern among news organizations and journalists who cover the Pentagon, on September 28, 2025, Parlatore—Secretary Hegseth's private attorney and Senior Advisor, *see* Dkt. 1-24—circulated a revised ver-sion of the Acknowledgement. Dkt. 1-6.  The revised version continued to vest Department offi-cials with uncabined "discretion[]" to immediately suspend a PFAC based on a determination that a journalist posed a "security or safety risk."  *Id.* at 1–2.  And it provided that "direct communica-tions with specific [Department] personnel or general appeals, such as public advertisements or calls for tips" would constitute "solicitation" in violation of the Department's policy.  Dkt. 1-6 at 2.  News organizations and PFAC holders from numerous media outlets, including The Times,

9

informed Pentagon leadership that the revised version was incompatible with their First Amendment rights and responsibilities as members of the press to engage in independent journalism, and that they could not sign the Acknowledgement.  SUMF, *NYT I* at 9–10 (¶ 53).

Over those objections, on October 6, 2025, the Department issued a substantially similar final policy (the "October Policy").  Dkt. 1-3.  The October Policy reiterated the Department's view that "members of the news media do not possess a legal right to access the Pentagon" and that "such access is a privilege subject to the discretion of government authorities," *id.* at 3.  It provided that a PFAC "may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property," and that "[s]uch determination may be based on factors including, but not limited to, the unauthorized access, attempted unauthorized access, or unauthorized disclosure of" classified or unclassified information "based on a reasonable assessment informed by the unique facts and circumstances of each case." *Id.* at 13.

To the extent the October Policy discussed any of the non-exhaustive grounds for suspension or revocation of a PFAC, it focused on solicitation of information from Department sources. Specifically, the October Policy stated that if a journalist "solicit[s] the disclosure of such information or otherwise encourages [Department] personnel to violate laws and policies concerning the disclosure of such information," the Department may deem the journalist a "security or safety risk." *Id.* at 13.  With respect to what constitutes improper "solicitation" in the Department's view, the October Policy stated that "solicitation" in violation of the Policy "may include direct communications with specific [Department] personnel or general appeals, such as public advertisements or calls for tips . . ."  and it cited "an advertisement or social media post by an individual journalist

or social media outlet that directly targets [Department] personnel to disclose non-public information without proper authorization" as an "example" of what "would constitute a solicitation that could lead to revocation" of a PFAC. *Id.* at 13–14. The October Policy took an expansive approach to what "non-public information" the Department may view as being off limits, and if "solicited," obtained, or published could result in the denial, suspension, or revocation of a reporter's PFAC. That information "may include, but is not limited to, information protected by the Privacy Act, information that is law enforcement-sensitive, and certain operational security information." *Id.* at 7. And purportedly "[t]o ensure the safety of U.S. personnel," the October Policy instructed journalists "who find themselves in possession of information that appears to be [classified national security information] or [controlled unclassified information]" to "discuss those materials with the [Pentagon Press Operations] prior to publication." *Id.*

The final version of the October Policy retained the Acknowledgement requirement, mandating that PFAC holders affirm they "understand[]" the Department's policies. *Id.* at 15.

**D. The Department's October Policy forces Plaintiffs and other journalists out of the Pentagon; the Department installs a "new Pentagon press corps."**

The vast majority of journalists and news outlets represented in the Pentagon Press Association (PPA), including The Times, The Wall Street Journal, The Washington Post, CNN, and Fox News, refused to sign the Acknowledgement. SUMF, *NYT I,* at 12 (¶ 69). Instead, they informed Pentagon officials that they believed the October Policy, and the Department's insistence that they sign the Acknowledgement, violated their First Amendment rights, and that doing so would be inconsistent with their role as independent journalists. *Id.* ¶ 53. As a result, on October 15, 2025, they were compelled to turn in their PFACs. *Id.* ¶ 70.

Department officials made clear that this outcome was intended. Secretary Hegseth responded to news organizations' expressing they could not work under the October Policy by posting to his official X account an emoji of a hand waving goodbye. Dkt. 1-25. Parnell similarly celebrated the Department's success in driving independent news outlets, including The Times, from the Pentagon, posting to X that "Americans have largely abandoned digesting their news through the lens of activists who masquerade as journalists in the mainstream media," and "[w]e look forward to beginning a fresh relationship with members of the new Pentagon press corps." Dkt. 1-20.

Within days of the new policy, Parnell took to his official X account to "announce the next generation of the Pentagon press corps." *Id.* New PFAC recipients included the National Pulse, which was described by its editor-in-chief as "an industry mag/site for MAGA world"; Laura Loomer, an "influential pro-Trump activist"; and former congressman Matt Gaetz, President Trump's one-time pick for Attorney General of the United States, who is now affiliated with One America News. Dkt. 1-12, 1-16. Many had expressed ideological support for the Trump administration or indicated that they did not intend to report critically on the Pentagon. Dkt. 1-16. For example, Libby Emmons, the editor-in-chief of Human Events and The Post Millennial who requested four passes for her staff after "receiv[ing] an unsolicited invitation to apply for credentials," stated that "[t]here should be a place for reporting on what they are doing without always trying to expose the dark underbelly," and Tim Pool, who disclosed that his outlet would be getting a credential, explained that his is "not an investigative news organization" and he did "not intend to maintain a significant presence in the Pentagon." *Id*. In describing these "[n]ew media outlets" willing to accede to the Department's "media access policy," Parnell wrote that they "circumvent the lies of the mainstream media and get real news to the American people," and "[t]heir reach and

12

impact collectively are far more effective and balanced than the self-righteous media who chose to self-deport from the Pentagon"—journalists "in the mainstream media" whom Parnell described as "activists who masquerade as journalists." Dkt. 1-20. The following week, the Department held its first in-person press events at the Pentagon since the October Policy went into effect, which included a press briefing and a "meet-and-greet" event with Secretary Hegseth. Dkt. 1-15.

In the weeks after the October Policy was adopted, the Department made clear how it would be applied, distinguishing between favored and disfavored content and speakers. For example, the Department took the view that a tip line frequently published alongside Washington Post stories relating to the Department violates the Policy because it "targets military personnel and [Department] employees." Dkt. 1-18. But when Loomer posted on X in connection with announcing her new PFAC that "I have developed a Rolodex of sources and if you have any tips, feel free to contact the Loomered Tip Line: the most influential Tip Line in all of DC," Department Press Secretary Kingsley Wilson stated that Loomer did not violate the policy. Dkt. 1-18, 1-19. This explanation came on the heels of another statement from Wilson in which she asserted that "we have seen a lot of the mainstream media continue to lie." Dkt. 1-16. In another instance, at the first official press conference held by Wilson on December 2, 2025, James O'Keefe, founder of the conservative group Project Veritas, noted that he had surreptitiously recorded a high-level Pentagon official making unguarded statements that were plainly unapproved by Department leadership—newsgathering then ostensibly prohibited by the October Policy. Dkt. 1-11, 1-33. Wilson, however, praised O'Keefe's work, which appeared to expose a critic of President Trump, noting: "That's why the work you all do is so important." *Id*.

### E. Plaintiffs challenge the October Policy and the Court vacates and enjoins it.

The Times and Barnes filed suit on December 4, 2025, challenging provisions of the October Policy as unconstitutional. *NYT I*, 25-cv-4218-PLF (D.D.C.). The parties cross-moved for

13

summary judgment.  Plaintiffs submitted evidence demonstrating that the October Policy was motivated by a viewpoint-discriminatory intent to censor independent reporting and that their exclusion was causing them irreparable First Amendment injury.  SUMF, *NYT I.*  The Department submitted nothing to indicate that it had any legitimate security or safety concern related to members of the press being present in the Pentagon.  To the contrary, Defendants conceded in their response to Plaintiffs' Statement of Undisputed Material Facts that for decades, credentialed reporters' access had posed no security risks, and that the October Policy was not motivated by any specific security concerns or incident.  SUMF, *NYT I* at 3 (¶ 11).

On March 20, 2026, following full briefing and a hearing, the Court granted Plaintiffs' motion for summary judgment and denied Defendants' cross-motion for summary judgment.  *NYT I*, 2026 WL 788689, at *2.  The Court held that provisions of the Department's October Policy violated the First and Fifth Amendments.  The Department had conceded that the Pentagon's press spaces were a nonpublic forum and, accordingly, that any restrictions it imposed on access to and use of that forum could be neither unreasonable nor viewpoint discriminatory.  *See id.* at *12; *Ateba v. Leavitt*, 133 F.4th 114, 123 (D.C. Cir. 2025).  The Court found that the challenged provisions were both.  In particular, it concluded that even if the October Policy was "facially viewpoint neutral," its "purpose and its effect" was "to chill speech that the Department perceives as unfavorable or biased." *NYT I*, 2026 WL 788689, at *14–15 (alterations omitted).

The Court reached its conclusion that the October Policy was viewpoint discriminatory based on "voluminous" undisputed evidence, including that "Department officials openly complained about reporting" related to "Secretary Hegseth's background and qualifications" that they "perceived as unfavorable"; that "in the weeks and months leading up to the issuance of the Policy," senior Department officials derided media outlets as "scum" and "garbage" and "called for

14

their 'severe punishment'"; and that after implementing the Policy, Department officials accused journalists and news organizations, like The Times, of being "'propagandists' who 'stopped telling the truth' and who 'continue to lie,'" while simultaneously praising those willing to submit to the October Policy as "the absolute best people" who were "on board and willing to serve our commander-in-chief."  *Id*. (alterations omitted).  The Court further found that the Department was interpreting the October Policy to prohibit certain conduct by disfavored news organizations while permitting substantially identical conduct by media outlets it preferred.  *Id.*  "In sum, the undisputed evidence reflect[ed] the [October] Policy's true purpose and practical effect: to weed out disfavored journalists—those who were not, in the Department's view, 'on board and willing to serve'—and replace them with news entities that are. That is viewpoint discrimination, full stop." *Id.* at *14 (citation omitted); *see also id*. ("The record evidence supports the conclusion that the [October] Policy discriminates not based on political viewpoint but rather based on editorial viewpoint—that is, whether the individual or organization is willing to publish only stories that are favorable to or spoon-fed by Department leadership.").

In assessing the constitutionality of the October Policy and weighing the injunction factors, the Court found that "[t]he regular presence of PFAC holders at the Pentagon … pos[es] no security or safety risk to Department property or personnel," *id*. at *5—a fact expressly conceded by the Department.  SUMF, *NYT I* at 3 (¶ 11). It squarely rejected the Department's "assertion that vacatur" of the October Policy's unlawful provisions "would 'compromise the safety of the Pentagon'" as "unfounded."  *NYT I*, 2026 WL 788689, at *18.

15

The Court vacated the unconstitutional provisions of the October Policy as to all regulated parties, enjoined Defendants from enforcing those provisions against Plaintiffs, and ordered Defendants to immediately reinstate PFACs to Barnes and the six other Times journalists who held valid credentials prior to the October Policy's adoption.

## F.  The Department rushes to adopt the Interim Policy.

The Court issued its March 20 order on a Friday.  The following Monday, March 23, Defendants announced the Interim Policy.  In an email to counsel for The Times, Parlatore provided a copy of that "revised policy," which consisted of a "Pentagon Reservation In-Brief for Media Members" (the "In-Brief"), an accompanying "Memorandum for Senior Pentagon Leadership" from Parnell (the "Memorandum"), and an Appendix.  Dkt. 1-1, 1-2.

The Interim Policy states that "[e]ffective immediately, the Correspondents' Corridor is closed" and that PFAC holders will be able to access "[a] new press workspace . . . in an annex facility outside the Pentagon" once it is "operational[.]"  Dkt. 1-1.  Even before it announced the Interim Policy, over the weekend following the Court's March 20 order, Defendants dismantled Correspondents' Corridor, even tearing down the sign above the entryway.  Barnes Decl. ¶ 22.  The Interim Policy further states that "[i]n the interim, PFAC holders" will be able to access the Pentagon only "for scheduled press briefings, press conferences, and interviews arranged through the public affairs offices," and only if they are "escort[ed] by authorized [Department] personnel at all times."  Dkt. 1-1 at 3.  Under the Interim Policy, "all journalist access to the Pentagon will require [an] escort[,]" and "[w]hen in the Pentagon," PFAC holders "must remain with [their] escort at all times."  Id.  The Interim Policy allows for an escort only when a reporter is invited for press events, "scheduled press briefings [or] press conferences," or secures an "interview[] arranged through public affairs offices."  Id. at 3, 7–8.  No more than "three visiting media members from the same media outlet" may obtain "escort privileges."  Id. at 7–8.  The Interim Policy also

16

retained specific aspects of the October Policy that the Court had vacated, including provisions that allowed the Department to revoke, deny, or not renew the PFAC of any reporter who purport-edly "intentional[ly] induce[d]" the "unauthorized disclosure" of information. *Id*. at 14.

The same day Parlatore sent the Interim Policy to The Times, Parnell also announced it in a post on X. Dkt. 1-42. Parnell's post attributed the Interim Policy to the Court's order that The Times's PFACs be reinstated. The post asserted that the Department had determined the Interim Policy was necessary to ensure Pentagon security in light of the Court's order—stating that "[i]n assessing the Department's security posture following the court's removal of all security screening authority, the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen credential holders for security risks." *Id.*

**G. The Court orders Defendants to comply with its March 20 order.**

On March 24, 2026, Plaintiffs moved to compel compliance with the Court's order. Following a March 30 hearing, the Court granted that motion on April 9, 2026. Concluding that an agency may not reinstate the same "unlawful policy under the guise of taking 'new action[,]'" *NYT II*, 2026 WL 962252, at *4, the Court determined that the Interim Policy had the same uncon-stitutional motive of "dictat[ing] the information received by the American people" that rendered the October Policy invalid and that Defendants' effort to "cut off all PFAC holders' meaningful access" violated the Court's injunction "requir[ing] the Department to restore the plaintiffs' access to the Pentagon." *Id.* at *9 (emphasis omitted). The Court rejected the "justification offered by the Department for this sudden change"—that its earlier order had purportedly "'remove[d] . . . all security screening authority' and that 'unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen credential holders for security risks'"— as "nonsense." *Id*. at *7 ("The Court did not 'remove' or 'excise' the Department's authority to screen PFAC holders."). The Court enjoined the Department from enforcing the Interim Policy against Times

17

journalists and ordered that Barnes and other Times reporters be allowed "to access the Pentagon in a manner commensurate with the access provided to PFAC holders on March 20, 2026, following [the Court's prior order]." *NYT II* Order, Dkt. 54, at 3.

Defendants appealed the Court's March 20 merits order as well as its April 9 enforcement order and sought a stay pending appeal that would allow it to implement the escort requirement. A divided motions panel of the D.C. Circuit granted that stay request, concluding that Defendants were likely to succeed in demonstrating that the escort requirement was not within the scope of the Court's original merits order and thus could not be enjoined through a motion to enforce that order. D.C. Cir. Stay Op., 2026 WL 1179440, at *3. The panel expressly emphasized the narrowness of the relief it was granting; it did not address the Interim Policy's lawfulness, noting that "because the challenge to the Interim PFAC Policy was presented in a motion to compel compliance," the Court did not have the opportunity to determine whether "the escort requirement independently violates the First or Fifth Amendment." *Id.* Though the escort requirement is currently in effect as a result of the stay order, Defendants are currently enjoined from enforcing other aspects of the Interim Policy.

### H. Defendants have offered no legitimate justification for the escort requirement.

As Defendants admitted in *NYT I*, the regular presence of PFAC holders at the Pentagon poses no security or safety risk to Department property or personnel. *NYT I* SUMF at 3 (¶ 11); *see also* Meagher Decl. ¶ 10 ("I cannot recall ever being aware of an incident where a reporter entered an office or secure area that they were not permitted or invited to enter."). And credentialed journalists' unescorted access to the Pentagon has never been an impediment, specifically, to the Department's information security. As former Assistant Secretaries of Defense for Public Affairs in both Democratic and Republican administrations confirm, "the notion that [someone] would have access to sensitive or classified information simply by being in the building without an escort is

18

absurd." Williams Decl. ¶ 21. "Access to such information is tightly restricted and controlled; it is strictly forbidden to discuss classified matters in Pentagon hallways or other unsecure places." *Id.* Sensitive information is "kept, viewed, or discussed only in rooms called 'Sensitive Compartmented Information Facilities' or 'SCIFs,' that [have] special information security protocols and required special access." Meagher Decl. ¶ 9. Sensitive areas like the National Military Command Center and most of the Joint Chiefs area are off limits. Williams Decl. ¶ 12; Meagher Decl. ¶ 9; *see also* Burns Decl. ¶ 14.

Prior to Secretary Hegseth's tenure, the Pentagon's approach to press access mirrored that of other government institutions. Congress, the White House, the Supreme Court, the Department of Justice, and the Department of State all permit credentialed press to move about unrestricted parts of their buildings without escorts. *See, e.g.*, U.S. Supreme Court, *Requirements and Procedures for Issuing Supreme Court Press Credentials* (last visited May 21, 2026), Boutrous Decl. ¶ 8, Ex. 6; Williams Decl. ¶ 12; *Sherrill v. Knight*, 569 F.2d 124, 126–27 & n.3 (D.C. Cir. 1977); *see also Karem v. Trump*, 960 F.3d 656, 660 (D.C. Cir. 2020).

## I. The escort requirement is imposing severe burdens on Plaintiffs' newsgathering and reporting.

The Interim Policy has made it practically impossible for Plaintiffs to do the kind of independent reporting from inside the Pentagon that the public has long depended upon. Reporters have been relegated to the Pentagon library, which is not in the actual Pentagon building. Dkt. 1-1. And the escort requirement makes it impossible for credentialed journalists to have a regular, continuous presence inside the Pentagon, as they previously had for decades. As Barnes explains, since the Interim Policy has gone into effect, "a reporter with a credential must request an interview or meeting with a particular official or Public Affairs Office that he or she wishes to visit and, if that interview or meeting is granted, he or she will be provided an escort for that specific interview

19

or meeting." Barnes Decl. ¶ 24. "As a practical matter this means that each separate conversation [within the Pentagon] requires a separate appointment." *Id.* Thus, even assuming reporters can get an escort on relatively short notice, the escort requirement adds considerable, unnecessary friction and delay that makes certain kinds of reporting impossible.

First, the unescorted access that PFACs previously afforded is necessary given that reporting from the Pentagon often requires a journalist to speak with over a dozen officials sitting in public affairs offices spread throughout the building. As former Assistant Secretary of Defense for Public Affairs Meagher explains, "[t]here are many people who work at the Pentagon whose primary job responsibilities include speaking with the press," such as "the Press Secretary and Deputy Press Secretary, as well as a team of approximately twenty press operations personnel, each of whom was focused on a specific topical subject[] such as Personnel and Readiness or Acquisition and Sustainment; or geographical regions, such as Europe and the Indo-Pacific." Meagher Decl. ¶ 7. Further, "[e]ach of the armed services, including the Army, Navy, Air Force, Marine Corps, along with the Joint Staff also" has "their own communications and public affairs teams, with its own offices and staff" that are "located throughout the Pentagon building, including in different wings and on different floors. . . . " *Id.* at ¶ 8. In Meagher's experience, "[r]eporters would visit the desks of different press operations officers" and "public affairs offices as part of their work," "depending on what questions the reporters had or what they wanted to discuss." *Id.* at ¶¶ 7–8. But "[d]oing so required that [reporters] be able to move through hallways in the Pentagon unescorted." *Id.* at ¶ 8.

Now, to ask even one in-person question of an official in the Pentagon, Barnes and other credentialed reporters must obtain an appointment, get an escort, ask their question, and return to the library located in a separate building—only to repeat the process for the next official. Barnes

20

Decl. ¶¶ 20, 24.  In order to replicate the volume of in-person conversations and interviews that PFAC holders routinely engaged in at the Pentagon before September 2025, a PFAC holder would need to spend several hours a day just requesting interviews, waiting for approvals, and walking back and forth between the Pentagon and the off-site library.  *Id.* at ¶ 29.  The escort requirement is therefore burdensome and impractical—and it dramatically interferes with reporters' ability to obtain information from officials at the Pentagon whose job it is to speak to members of the press, or to report such information to the public, in a timely manner.  This breaks sharply from the history and tradition in place at the Pentagon for decades, which reflected the physical reality of the building by allowing reporters to simply walk, unescorted, from press office to press office and ask questions of officials as events unfolded.

The escort requirement also interferes with reporting by cutting off the routine access and unplanned, spur-of-the-moment discussions that have long been a critical component of covering the Pentagon effectively.  As former Assistant Secretary of Defense for Public Affairs Williams explains, when journalists were in the building, they "had easy access to press conferences and briefings, including those called on short notice."  Williams Decl. ¶ 19.  "[F]or urgent stories, journalists had the ability to confirm information and get answers to questions quickly."  *Id.*  This benefits not only the journalists, but the Department and public: "[f]or the Department, it is valuable to have press in the building when newsworthy things happen to ensure that accurate information is being disseminated."  *Id.*  Moreover, as Meagher explains, "regular, informal interactions between Defense Department staff and reporters [were] mutually beneficial."  Meagher Decl. ¶ 12.  The Department learns "what questions reporters had and what topics they were interested in" and can "help correct any misunderstandings early in the reporting process."  *Id.* at ¶ 12.  This is critical today, when the Department is "competing with misinformation propagated by foreign

21

adversaries, particularly with regard to overseas conflicts." *Id.* at ¶ 13 (citing example of how in-person contact allowed Department officials to correct a reporter's incorrect attribution of which nation ordered an airstrike). When credentialed reporters "have a regular presence in the Pentagon, it helps the Department effectively counter misinformation and prevent it from spreading." *Id.* As one member of the "next generation" press corps put it when asked why he was reporting from the Pentagon: "Press have always worked at the Pentagon. . . . Correspondents place themselves at the buildings so when a major story breaks they're there to cover it." Dkt. 1-14. Allowing report-ers to enter the building only for prescheduled events, and only when minded by an escort, evis-cerates that benefit.

Although reporters from The Times and other news organizations have continued and will continue to gather newsworthy information and publish stories about the Department and the United States military, the Interim Policy ensures that certain important reporting can no longer be done, depriving the public of essential information. Barnes Decl. ¶¶ 13, 19, 23. As the Court found in *NYT II*, "the access now available to PFAC holders [under the Interim Policy] . . . is not even close to as meaningful as the broad access that PFAC holders had previously been afforded," "mak[ing] it exceedingly difficult to cover the Department." *NYT II*, 2026 WL 962252, at *8. Stories based on routine unplanned interactions between journalists and Pentagon personnel at the Pentagon, stories built on dozens of conversations with Pentagon press officers from various parts of the Department and across the building, stories that capture the mood and atmosphere within the Pentagon during times of consequential military operations—are all examples of what Plain-tiffs can no longer report. Barnes Decl. ¶¶ 9–12. In-person and often spontaneous exchanges, in which reporters can judge the demeanor of government officials as they respond to questions in real time and press for more information on the spot, are different in kind and can elicit different

information than inquiries by phone or by email, *id*. ¶¶ 9, 11, or from interviews scheduled with officials days or weeks in advance, *id*. ¶ 19. Without meaningful access to the Pentagon, Plaintiffs and other journalists and news organizations are deprived of unique, newsworthy information that can only be obtained in person and through such exchanges. *Cf. ABC, Inc. v. Stewart*, 360 F.3d 90, 99 (2d Cir. 2004) ("[O]ne cannot transcribe an anguished look or a nervous tic."). And this loss is made all the more urgent by events that have exacerbated the importance of independent reporting about the U.S. military, including the ongoing war in Iran.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits.

The Interim Policy's prohibition on unescorted access to the Pentagon for credentialed journalists like Barnes is currently in effect and being implemented by the Department. *See* D.C. Cir. Stay Op., 2026 WL 1179440, at *1–3 (staying the Court's April 9, 2026, order "to the extent that it entitles journalists to access the Pentagon unescorted" solely on the ground that it is likely the "escort requirement was not contemplated by the [October] 2025 policy"). Because the Interim Policy, including specifically its escort requirement, violates the First Amendment on its own terms and fails to satisfy the most basic requirements for lawful agency action under the Administrative Procedure Act, preliminary injunctive relief is warranted.

23

### A. The Interim Policy's escort requirement violates the First Amendment.

The First Amendment's guarantees of free speech and a free press stand as a bulwark against government attempts to dictate the content and editorial viewpoint of news coverage both by prohibiting unreasonable, viewpoint discriminatory restrictions on access to the fora where journalists do their jobs and by prohibiting retaliation for newsgathering and reporting the government dislikes. The Interim Policy jumps both guardrails. It was promulgated to punish Plaintiffs not only for (in Secretary Hegseth's words) "scrutiniz[ing] every good act in order to find a violation," Dkt. 1-10, but also for vindicating their constitutional rights in litigation. And even were it not blatantly retaliatory—and it is—the Interim Policy's escort requirement would still fail First Amendment scrutiny because it is an obvious "effort to suppress expression merely because public officials oppose the speaker's view" and is patently unreasonable "in light of the purpose served by the forum." *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 12–13 (2018) ("*Mansky*"). For these reasons, Plaintiffs are likely to succeed on the merits of their First Amendment claim.

> 1. *The Interim Policy was promulgated to retaliate against Plaintiffs for exercising their First Amendment rights in ways the Department dislikes.*

Unlawful retaliation occurs when the plaintiff "engaged in conduct protected under the First Amendment," the government takes some retaliatory action "sufficient to deter a person of ordinary firmness in [the plaintiff's] position" from engaging in protected conduct in the future, and there is "a causal link between the exercise of a constitutional right and the adverse action" taken against the plaintiff by the government. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025) (quoting *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)). The record readily establishes each of these elements.

24

First, that The Times and Barnes engaged in core protected First Amendment activity is beyond reasonable dispute. Plaintiffs' "reporting on public issues [is] quintessential First Amendment activit[y]." *Media Matters for Am.*, 138 F.4th at 584. So was their lawsuit challenging the Department's October Policy. *See Nat'l Ass'n for Advancement of Multijurisdiction Prac. v. Howell*, 851 F.3d 12, 20 (D.C. Cir. 2017) ("[T]he Petition Clause of the First Amendment . . . protects the rights of individuals to access the courts for the resolution of legal disputes." (citation omitted)); *see also Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 94 (D.D.C. 2025) ("courtroom advocacy on behalf of [one's] chosen causes . . . is [at] the very core of the First Amendment's protection of 'litigation as a vehicle for effective political expression and association'" (quoting *In re Primus*, 436 U.S. 412, 431 (1978)).

Second, there can be no doubt that the Interim Policy and, specifically, its imposition of an escort requirement, is an adverse action sufficient to deter other journalists and news organizations of "ordinary firmness" from exercising and seeking to vindicate their First Amendment rights in the future in ways that Defendants disfavor. *See Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996) (explaining that the purpose of this element is to screen out mere *de minimis* harms such as "a supervisor frowning at an employee in retaliation"), *rev'd on other grounds,* 523 U.S. 574 (1998). A "small 'pecuniary loss[],'" *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002), and "even an act of retaliation as trivial as failing to hold a birthday party for a public employee [] when intended to punish her for exercising her free speech rights," can support a First Amendment retaliation claim, *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994) (citation omitted). Here, the Department's retributive actions are far from trivial; they strike at the very core of the First Amendment's protections for a free press. *See Media Matters for Am.*, 138 F.4th at 581 (retaliatory government investigation of media outlet and investigative journalist imposes

25

"special burdens" including "on their newsgathering activities"); *see also Nat'l Pub. Radio, Inc.*, 2026 WL 877434, at \*23–24 (executive order directing federal agencies to exclude two media organizations from receiving federal funding "in retaliation for saying things that [the President] does not like" violated the First Amendment and was "particularly perilous because the targeted speakers are members of the press, which receives special solicitude under the First Amendment").

The closure of Correspondents' Corridor and the prohibition on credentialed journalists entering the Pentagon without an escort render Plaintiffs' PFACs—credentials in which they have a liberty interest protected by the Due Process Clause and First Amendment, *see Karem*, 960 F.3d at 660; *Sherrill*, 569 F.2d at 130–31—effectively worthless. As the Court found in *NYT II*, these aspects of the Interim Policy make it substantially harder for Barnes and other credentialed journalists with The Times to speak with Department officials—a unique and fundamental form of newsgathering that has served the public interest for decades. 2026 WL 962252, at \*8–9. As Judge Childs put it: "Reporters can hardly verify sources, gather information, or speak candidly with Department personnel with an escort looming over their shoulders." D.C. Cir. Stay Op., 2026 WL 1179440, at \*6 (D.C. Cir. Apr. 27, 2026) (Childs, J., dissenting). And by requiring a credentialed journalist to obtain an official escort even to step foot in the Pentagon, the Interim Policy necessarily forecloses any ability for Times reporters to engage in impromptu discussions or interview Department officials when events arise unexpectedly or unfold rapidly. Stripping Plaintiffs of the longstanding access their PFACs had afforded them is harsh punishment; it more than qualifies as an adverse government action.

Such retaliatory conduct by the Department is likely to deter a person of ordinary firmness from the exercise of First Amendment rights. Indeed, that is the point. By punishing The Times

and its reporters for uncompromisingly covering the Department and for vindicating their constitutional rights to do so, the Interim Policy sends a message designed to "discourage the 'uninhibited, robust, and wide-open debate that the First Amendment is intended to protect.'" *Counterman v. Colorado*, 600 U.S. 66, 78 (2023) (citations omitted). When government officials respond to what they see as unflattering coverage by using increasingly aggressive means to stymie independent reporting, a person of ordinary firmness may think twice before publishing similar stories. *See, e.g., id.* at 75 ("Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries."). And when government officials respond to a court order by doubling down to make the successful plaintiffs' situation worse, others may seek to avoid inviting such punishment by simply not asserting their rights at all. That Plaintiffs through other means of reporting have continued and will continue to vigorously gather and report newsworthy information about the Department is irrelevant; "[t]he objective 'ordinary firmness' test," *Media Matters*, 138 F.4th at 581, is plainly satisfied by the Department's conduct even if Plaintiffs have shown themselves to be extraordinarily firm. Above all else, the Interim Policy makes clear Defendants will not respect court orders or attempt to comply with constitutional mandates but, instead, will ensure disfavored journalists and news organizations will suffer adverse consequences for challenging the Department and its leadership.

Third and finally, Defendants themselves have made clear the causal connection between the Interim Policy and their disdain for Plaintiffs' journalism and insistence on vindicating their First Amendment rights. The Department enacted the October Policy to force disfavored journalists and news organizations, including The Times, to heel or, failing that, to force them out of the Pentagon in favor of media entities who were, in the Department's view, "on board and willing to serve." *NYT I*, 2026 WL 788689, at *14. After the unconstitutional provisions of that earlier

27

policy were vacated and the Department was ordered to restore to Plaintiffs the same access to the Pentagon they had possessed for decades, the Department refused and retaliated instead.

The Interim Policy is yet another measure taken by Defendants to punish media outlets, including The Times specifically, for coverage Department officials dislike.  As detailed above, Defendants relentlessly complained about negative press coverage in the lead-up to the October Policy.  *Supra* Background §§ B, C.  And Department officials have continued to make clear their disdain for The Times's coverage—among many other examples, calling it unpatriotic and "garbage"—and repeatedly threatened retaliation for such coverage.  *See*, *e.g.*, Dkt. 1-9 (Hegseth calling The Times "unpatriotic"); Dkt. 1-37 (Parnell claiming a Times article "undermines our mission" and that "[t]he days of the Pentagon just allowing these fake narratives to spread is over"); *id*. (asserting the recent news coverage should be held "accountab[le]"); Dkt. 1-10 (Secretary Hegseth, addressing the ongoing war in Iran, telling the "American media" that when they engage in "relentlessly negative coverage" of the Pentagon, they do not "choos[e] wisely," and comparing the "legacy Trump-hating press" to the biblical "Pharisees" who "held counsel against [Jesus]" and were wrong to "scrutiniz[e] every good act in order to find a violation"); *see also* Ian Schwartz, *Trump Blasts NYT's David Sanger: We've Had A Total Victory in Iran, Except With "Treasonous" Reporters Like You*, RealClear Politics (May 15, 2026), Boutrous Decl. ¶ 7, Ex. 5 (President Trump, last week, responding to a question from a Times reporter about the war in Iran by stating: "We've had a total victory, except by people like you that don't write the truth. . . .  I actually think it's sort of treasonous what you write.  But you at The New York Times and CNN, I would say are the worst.").

Moreover, the Interim Policy *itself* acknowledges that it was a clap back to the Court's order.  Dkt. 1-1 at 1.  It was thrown together over a weekend to, as Parlatore put it at the time,

"us[e] more words to say the same thing." *NYT II*, 2026 WL 962252, at *5; *see NYT I*, Dkt. 37-7 at 5. The Interim Policy lashes out at the Court, twice accusing it of "mischaracterizations," and Parlatore elsewhere publicly complained of the Court's supposed "creative misinterpretations." Dkt. 1-1 at 1–2, 10; *NYT I*, Dkt. 37-7 at 5. The Interim Policy also blatantly distorts the order, falsely claiming that it eliminated the Department's "ability to screen PFAC holders for security risks." Dkt. 1-1 at 1–2, 10. And its "interim" status, *id.* at 1, is another tell that the Interim Policy's purpose was not to establish a new access regime consistent with the Court's order and constitutional demands, but to keep The Times out while the Department appealed and, it hoped, it could reinstate its old policy. *See NYT II*, 2026 WL 962252, at *8 ("The Court's [March 20] Order requires the Department to <u>restore</u> the plaintiffs' access to the Pentagon. Rather than comply with that Order, the Department has cut off <u>all</u> PFAC holders' meaningful access to the Pentagon.").

The Department's retaliatory intent is further confirmed by its changing and implausible justifications and conduct surrounding its adoption of the Interim Policy. "[S]hifting and inconsistent justifications are 'probative of pretext.'" *See Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) (citation omitted). The Interim Policy claims the escort requirement is justified because the Court supposedly stripped the Department of the power to screen PFAC holders. Dkt. 1-1 at 2. It did no such thing, as the Court already had made emphatically clear. And, regardless, every Times PFAC holder had already been screened and had worked in the building for years. Barnes Decl. ¶ 23. Further, the Interim Policy purports to explain the Department's decision to close Correspondents' Corridor over the weekend after the Court's order as fulfilling a "commitment" to "upgrade the space used by PFAC holders to a different area that provides WiFi access and cellphone service"—never mind that the "new press workspace" was not yet available when the Department

shuttered the old one "[e]ffective immediately."  Dkt. 1-1 at 2.  The only impetus for closing Correspondents' Corridor before the alleged new workspace was ready was to thwart the Court's order restoring Plaintiffs' access to the Pentagon.  And Defendants' other vindictive conduct in the aftermath of the Court's order also confirms its retaliatory motive: for example, in the days following the Court's order, for an 8 a.m. press conference, it required reporters to arrive an hour early and wear three separate forms of visible identification that officials repeatedly checked, and it barred reporters from using the bathroom, even with an escort.  Barnes Decl. ¶ 28.

Defendants' pretextual explanation for the Interim Policy has continued to shift.  When seeking a stay of the order enjoining the Interim Policy's escort requirement from the D.C. Circuit, the Department offered, for the first time, a newfound "security" rationale: that unescorted reporters inside the Pentagon might observe "activity patterns," which "could be used to identify individuals with access to specific sensitive information," which reporters could then theoretically use to time their approaches to ask those individuals about that information.  *NYT I*, Dkt. 58-1 at 3.  Even if this *post hoc* explanation were not speculative nonsense (it is), it "reeks of afterthought."  *Miller-El v. Dretke*, 545 U.S. 231, 246 (2005).  In *NYT I*, the Department conceded in summary judgment that PFAC holders had worked in the Pentagon unescorted for decades without posing any safety or security risk.  *See, e.g.*, *supra* Background §§ E, G.  And the Department did not conjure this new, alternative explanation until the Court correctly rejected its earlier claims and it needed a new litigation argument.  The Department does not pretend to have done any study of security needs inside the building.  Far from a valid rationale, its slap-dash explanation is powerful proof of pretext.  If unescorted credentialed journalists truly posed an information-security risk—and they do not, *see, e.g.*, *supra* Background §§ E, G—the Department surely would not have

ignored that risk until the Court required Plaintiffs, in particular, to have their access to the Pentagon restored.  In fact, because Times journalists were the *only* journalists named in the injunction ordering the Department to reinstate PFACs, the immediate purpose of the Interim Policy was to keep The Times, and only The Times, out of the building; the new Pentagon press corps were simply collateral damage.  The obvious—and only real—explanation for Defendants' announcement of the Interim Policy is that they wanted to exclude The Times from the building and to ensure that Plaintiffs did not benefit from their successful lawsuit.

This is retaliation, pure and simple.  *See Media Matters for Am.*, 138 F.4th at 581 (finding that a "government campaign of retaliation" against media organization for the content of their reporting satisfied First Amendment retaliation standard).  Based on a fraction of this record, the Court in *NYT I* found "voluminous," "undisputed evidence" that the October Policy targeted "'mainstream media' whose reporting it views as unfavorable."  2026 WL 788689, at *14.  That viewpoint antipathy did not vanish over a weekend, and the Court correctly found that the Interim Policy carried the Department's improper, viewpoint-discriminatory motive forward and violated the same "constitutional principles."  *NYT II*, 2026 WL 962252, at *9.  The Department adopted the Interim Policy to punish media outlets—and, in particular, The Times—for reporting on it in a fact-based, unflinching way.  And when the Department's first effort failed, it immediately tried again with the flimsiest of pretexts.  For that reason alone, the Interim Policy, including its escort requirement, violates the First Amendment.

      2.   *The escort requirement is an unreasonable and viewpoint discriminatory restriction on access to and use of a nonpublic forum.*

The escort requirement independently violates the First Amendment by imposing restrictions on access to and use of the Pentagon's traditional press areas, a First Amendment nonpublic forum, that are neither reasonable in light of the purpose of that forum nor viewpoint neutral.

31

"A nonpublic forum is government property 'that is not by tradition or designation a forum for public communication,' such as a government office building," but that the government has opened to private speakers. *Ateba*, 133 F.4th at 121–22 (citation omitted). As the Court held and the Department conceded in *NYT I*, *see* 2026 WL 788689, at \*12, the Pentagon's press areas, including the press briefing room, corridors, and the now-shuttered Correspondents' Corridor, are a nonpublic forum. *See Ateba*, 133 F.4th at 121 (White House); *United States v. Nassif*, 97 F.4th 968, 976–77 (D.C. Cir. 2024) (United States Capitol). The government may not restrict access to or use of a nonpublic forum however it pleases. To satisfy the First Amendment, such restrictions must "not [be] an effort to suppress expression merely because public officials oppose the speaker's view" and must be "reasonable in light of the purpose served by the forum." *Mansky*, 585 U.S. at 12–13. The escort requirement fails both tests.

a. *The Interim Policy is unreasonable in light of the purpose served by having journalists inside the Pentagon.*

The purpose of having journalists inside the Pentagon is to facilitate newsgathering and reporting on the Department and the U.S. military for the benefit of the American public. The long, unbroken history of unescorted access to the Pentagon's press areas for credentialed reporters is consistent with that purpose; the Interim Policy flatly contradicts it. Reporting regularly from inside the building without advance permission, and without being minded at all times by an official escort, allows journalists to attend breaking-news conferences and briefings, speak with a range of sources, including informally, and walk from public affairs office to public affairs office to speak with various officials whose job it is to engage with members of the press. *See supra* Background § A; Barnes Decl. ¶¶ 8–11, 29; Burns Decl. ¶¶ 7–12. Such access is not extraordinary. It is consistent with the traditional access credentialed members of the press have had not only in

the Pentagon but in other federal buildings, including the Supreme Court and the Justice Department, where reporters can move through specified areas without escorts. *See supra* Background § H; Williams Decl. ¶ 11–14. As the Department conceded in *NYT I*, for decades "[t]he regular presence of PFAC holders at the Pentagon has enhanced the ability of journalists and news organizations, including [The Times], to keep Americans informed about the United States military, while posing no security or safety risk to Department property or personnel." *NYT I*, Dkt. 10-36 at ¶ 11; *id.*, Dkt. 22-2 at ¶ 11. And as former Pentagon Public Affairs officials attest, it is good for the Department too. Meagher Decl. ¶¶ 11–12; Williams Decl. ¶¶ 7–10. But the escort requirement severely restricts PFAC holders' access to and use of the Pentagon's press areas for newsgathering and reporting. Far from being reasonable, the escort requirement is fundamentally incompatible with the design, history, and purpose of the forum.

To be clear, the escort requirement is demonstrably unnecessary. Any suggestion by the Department that unescorted access to the Pentagon—the very same access that credentialed reporters have had for decades—poses a threat to national security is nonsense. The Pentagon is not a sealed fortress. Until recently the largest office building in the world, the Pentagon is "a city in itself with over 23,000 employees." *Pentagon – Air Force,* Military Installations (last visited May 21, 2026), Boutrous Decl. ¶ 9, Ex. 7 at 2. It has always been staffed by thousands of people, not all government employees, in the "protective services, cleaning force, [and] maintenance force (electricians, plumbers, carpenters, etc.)," as well as "contractors, consultants, representatives of other government agencies . . . , representatives of foreign governments, representatives of congressional committees, cafeteria workers, and employers of Concourse concessions." Alfred Goldberg, *The Pentagon: The First Fifty Years* 158 (Dep't of Defense 1992), Boutrous Decl. at ¶ 5, Ex. 3. Today the Pentagon has a "food court, a pharmacy, a sit-down restaurant, a bank, a dry

cleaner, and a chocolate shop" staffed by non-Department employees who are provided PFACs and are not required to have official escorts to move through the building. Barnes Decl. ¶ 10. And "[e]very year, approximately 100,000 people," from students to foreign officials, "are taken on a tour through the labyrinth of hallways and corridors" on tours, for events, or to visit employees. Spc. Brandon Dyer, *Your Guide to the Pentagon, U.S. Army* (Mar. 15, 2016), Boutrous Decl. ¶ 10, Ex. 8 at 2. None of this undermines national security. Sensitive areas, like SCIFs, the "National Military Command Center[,] and most of the Joint Chiefs area," are (and have always been) off limits. *See supra* Background § H; Williams Decl. ¶ 12; Meagher Decl. ¶¶ 9–10. And credentialed reporters have consistently respected those limits. Williams Decl. ¶ 10; Meagher Decl. ¶ 10; Burns Decl. ¶ 14. The Department's purported security concerns are belied by the fact that from the beginning, "[p]ress correspondents also had offices" in the Pentagon. Alfred Goldberg, *The Pentagon: The First Fifty Years* 158 (Dep't of Defense 1992), Boutrous Decl. ¶ 5, Ex. 3.

### b. *The Interim Policy was issued to suppress disfavored views.*

The Interim Policy is also unconstitutional because it is an effort to "suppress expression merely because public officials oppose [a] speaker's view." *Mansky*, 585 U.S. at 12–13. Like the October Policy it replaced, the Interim Policy is intended to deter independent journalism that does not uncritically accept and repeat the Department's official pronouncements. Defendants have made clear they want to be covered by what they call the "patriotic" press rather than those they wrongly characterize as the "Trump-hating press"—those "on board and willing to serve" the current administration. *See Transcript, Secretary of War Pete Hegseth and Chairman of the Joint Chiefs Air Force Gen. Dan Caine Hold a Press Briefing*, U.S. Department of War (Mar. 13, 2026), Boutrous Decl. ¶ 11, Ex. 9; Dkt. 1-10; *NYT I*, 2026 WL 788689, at *14.

Defendants' statements criticizing The Times and other news organizations, the sequence of events leading up to the Interim Policy, and the policy's substance all make clear that, like the

34

October Policy before it, the Interim Policy was designed to carry out Defendants' viewpoint discriminatory motive. The Interim Policy's purpose is to exclude from the Pentagon those reporters that will engage in independent newsgathering and reporting—not merely parrot official Department statements. That viewpoint-discriminatory motive animated the October Policy and was only aggravated by Plaintiffs' successful legal challenge to it. It alone renders the Interim Policy, with its abrupt imposition of severe restrictions on access to and use of the forum, unlawful. *See Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 365 (D.C. Cir. 2018) (the government violates the First Amendment if it "change[s] the nature of a forum in order to deny access to a particular speaker or point of view"). Indeed, even when the government may act "for any number of reasons," it "may not rely … on a basis that infringes [a person's] constitutionally protected interests—especially, his interest in freedom of speech." *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see also Nat'l Pub. Radio, Inc.*, 2026 WL 877434, at *1 ("As the Supreme Court and D.C. Circuit have observed on more than a dozen occasions, the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'" (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013)).

The Department cannot save the Interim Policy by calling it "facially neutral." A neutrally written policy is still unconstitutional when it is "based on the desire to suppress a particular point of view." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 812 (1985); *see NYT I*, 2026 WL 788689, at *14. Courts have long recognized that facially neutral restrictions can be viewpoint discriminatory. See *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 645 (1994); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("The government's purpose"—*i.e.*, "whether the government has adopted a regulation of speech because of disagreement with the message it

35

conveys"—"is the controlling consideration"). After all, "[a] government bent on frustrating an impending demonstration might pass a law demanding two years' notice before the issuance of parade permits." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011). "Even if th[at] hypothetical measure on its face appeared neutral as to content and speaker, its purpose to suppress speech and its unjustified burdens on expression would render it unconstitutional." *Id.* Therefore, when the government restricts access to or use of a forum "with the intent of suppressing" certain speakers' viewpoints, that "surely would violate the First Amendment" and be "unconstitutional as applied" to those speakers, and the "mere recitation of viewpoint-neutral rationales (or the presentation of a viewpoint-neutral guideline) … [would] not immunize [the government action] from scrutiny." *WMATA*, 901 F.3d at 365.

### B. The Interim Policy violates the Administrative Procedure Act.

Plaintiffs also are likely to succeed on the merits because, in addition to being "contrary to a constitutional right," 5 U.S.C. § 706(2)(B), the Interim Policy, including its escort requirement, is patently arbitrary and capricious agency action that violates the APA. 5 U.S.C. § 706(2)(A).

The APA "requires agencies to engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). To comport with that requirement, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). In addition, an agency must "consider responsible alternatives to its chosen policy," "give a reasoned explanation for its rejection of such alternatives," *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008) (citations omitted), and forgo reliance on factors it is not empowered "to consider," *State Farm*, 463 U.S. at 43. With the Interim Policy, the Department failed at every step.

36

The Court's March 20 ruling granting summary judgment in favor of Plaintiffs and vacating and enjoining the unconstitutional provisions of the Department's October Policy was issued on a Friday.  Compl. ¶ 146.  To avoid complying with it, Defendants, led by Parlatore, scrambled over the weekend to hastily cobble together the Interim Policy, issuing it on the Monday following the Court's ruling.  *Id.*  Defendants necessarily drafted the Interim Policy without collecting facts, investigating, or engaging in any considered assessment.  *Id.*  And as the rushed "immediate" closure and quick destruction of Correspondents' Corridor evidence, the purpose of the Interim Policy was not to address any legitimate security considerations or attempt to implement in good faith the Court's ruling following a reasoned analysis.  *Id.*  Instead, as detailed above, it was designed to punish Plaintiffs for their past reporting, editorial viewpoint, and their vindication of their constitutional rights, and to evade the Court's order.  *Id.*  None of this bears any resemblance to "reasoned decisionmaking"; it cannot be squared with the APA's requirements.

First, the Department considered impermissible factors in drafting and promulgating the Interim Policy's escort requirement.  Courts are "not required to exhibit a naivete from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)).  And here, the Department's words and deeds throw their "bad faith" and "improper behavior" into stark relief.  *Id.* at 781.  As set forth above, the Department's invented after-the-fact "security" concerns are plainly pretextual; the Interim Policy is a transparent effort to retaliate against Plaintiffs for exercising their First Amendment rights.  *Supra* § I.A.  Indeed, it is difficult to imagine a clearer example of capriciousness than a government agency enacting a policy virtually overnight so that it can nullify a court order and continue targeting entities and individuals for exercising core constitutional rights.  Needless

37

to say, the Department is not empowered to consider, or act upon, such factors.  On this basis alone, the Interim Policy is arbitrary and capricious.

Second, the Department failed to examine relevant data and to articulate a satisfactory explanation for the Interim Policy's escort requirement.  *State Farm*, 463 U.S. at 43.  That the Interim Policy was not the product of a reasoned consideration of relevant facts is evident, first and foremost, from the fact that its architect, Parlatore, threw it together over a weekend.  He is an attorney and since March of 2025 has served as a Special Advisor to Secretary Hegseth, while simultaneously maintaining his private practice at Parlatore Law Group.[2]  Parlatore has no meaningful experience as a press or public affairs official for the Department or any other government agency; nor does his own record when it comes to protecting information security within the Department suggest he is qualified to quickly and independently craft Pentagon policy addressed to that issue.[3]  Parlatore's singular role in drafting the Interim Policy is itself indicative of arbitrary and capricious agency action.

---

[2] *See* Parlatore Law Group, https://parlatorelawgroup.com/ (last visited May 21, 2026), Boutrous Decl. ¶ 12, Ex. 10.

[3] While Parlatore serves as a Senior Advisor to the Secretary, it is not clear whether he has a top-secret clearance and he has continued to represent clients, including foreign governments, as a private attorney in disputes against the government; as a result, his "frequent presence in the Defense secretary's office" and participation in meetings with the Secretary and his senior staff has raised concerns within the Department as well as in Congress.  *See* Daniel Lippman and Josh Gerstein, *Hegseth attorney's dual roles trip conflict-of-interest alarms*, Politico (May 3, 2025), https://www.politico.com/news/2025/05/03/parlatore-hegseth-navy-conflict-00323266, Dkt. 1-32; *see also* Dkt. 1-8 (Congressman Crow questioning Secretary Hegseth about Parlatore's lack of a security clearance and work in private practice, including on behalf of foreign governments). Further, as The Times reported, Parlatore, along with Secretary Hegseth's wife and brother, were included in a private Signal group chat in which the Secretary had shared details about imminent U.S. plans to strike Yemen.  *See* Dkt. 1-35.

Nor does the Department's purported explanation for the escort requirement indicate an informed decisionmaking process. Far from it. The Department first claimed that it had "assess[ed] [its] security posture following the Court's vacatur of the [October] PFAC Policy's security screen provisions" and "determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen PFAC holders for security risks." Dkt. 1-42 at 2. But that is "nonsense." *NYT II*, 2026 WL 962252, at *7. "The Court did not 'remove' or 'excise' the Department's authority to screen PFAC holders." *Id.* It simply reinstated the prior security regime—including its background check requirement—that had served the Department effectively for decades. *Id.* The purported impetus for the Interim Policy, including its escort requirement, is straightforwardly nonexistent.

To the extent the Department claims that the Interim Policy's escort provisions (including, for instance, the unexplained and arbitrary three-escorts-per-news-outlet limit) were necessitated by a return to the status quo, that claim defies common sense and is utterly devoid of factual support. As the Court made clear in *NYT II*, the Department offered "no evidence whatsoever" in support of the Interim Policy that indicated "the facts . . . changed in the weeks since th[e] Court issued its summary judgment decision." *Id.* In other words, nothing supported any supposed need for the Department's new measures. To the contrary, the facts cut the other way. "Based on the undisputed facts," the Court found that "[t]he regular presence of PFAC holders at the Pentagon has enhanced the ability of journalists and news organizations to keep Americans informed about the U.S. military *while posing no security or safety risk to Department property or personnel*." *Id.* (citations omitted). The declarations of prior Pentagon press officials reinforce this point. *See, e.g.,* Williams Decl. ¶¶ 6–10, 16, 19–22; Meagher Decl. ¶¶ 4, 8–15, 18. Yet the Department ignored all contrary evidence available to it in clear violation of the APA. *See*, *e.g.*, *Genuine Parts*

39

*Co. v. Env't Prot. Agency*, 890 F.3d 304, 313 (D.C. Cir. 2018).  Premising agency action on false-hoods as well as unsupported assertions is the antithesis of reasoned decisionmaking.

The duration of the Interim Policy, including the escort requirement, is likewise unexplained and unjustified.  The Interim Policy provides that the escort requirement will be enforced only "[u]ntil" the Interim Policy's "new security screening standards" are "fully implemented" and a "new press workspace" is "established."  Dkt. 1-1 at 3.  But the Interim Policy is completely silent on why the (nonexistent) evils that the escort requirement seeks to address would be resolved by the confluence of those two factors.  Of course, this makes sense in view of the Interim Policy's goal to defy a court order and punish The Times.  But short of that improper, retaliatory motive, it is inexplicable.  It is particularly hard to understand why the supposed need for an escort that exists when a reporter is working from the library—a building separate from the Pentagon—would dissipate when a "new press workspace"—"an annex facility" that will also be located "outside the Pentagon"—is opened.  Nor is it evident why the Department needs "new security screening standards" at all given those it has long had in place, standards that the Department steadfastly ignores but that have indisputably worked to protect the security and safety of the Department for decades.  With respect to both issues, the Interim Policy offers no coherent explanation.  Indeed, the Department simply has nothing to say.  But courts "do not . . . simply accept whatever conclusion an agency proffers merely because the conclusion reflects the agency's judgment." *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (quoting *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006)).  Instead, "to survive judicial review in a case arising under § [706(2)(A)], an agency action must be supported by 'reasoned decisionmaking.'" *Id.*  Nothing like that occurred here.

The lack of any reasoned decisionmaking is also evident from the Interim Policy's obvious under- and over-inclusiveness.  Severe incongruity between the means an agency chooses and the ends it seeks to achieve highlights a lack of "rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43; *see also, e.g.*, *Sinclair Broad. Grp., Inc. v. F.C.C.*, 284 F.3d 148, 162 (D.C. Cir. 2002) (noting line drawing is problematic when "the lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory problem").  Here, Defendants made a *post hoc* attempt to justify the escort requirement by claiming a need to stop journalists from accessing classified or other nonpublic information.  Such *post hoc* rationalization is impermissible.  *Dep't of Homeland Sec.*, 591 U.S. at 21.  But, in any event, that rationale fails on its face.  Being present in the Pentagon without an escort does not give journalists access to classified information.  *See, e.g.*, Williams Decl. ¶¶ 10, 21; Meagher Decl. ¶¶ 8–9, 13.  And keeping journalists out of the Pentagon will not prevent them from obtaining information the Department does not want them to have, Williams Decl. ¶ 21; Meagher Decl. ¶ 13, as a litany of reporting post-dating Defendants' unconstitutional efforts to keep The Times out of the Pentagon amply demonstrates.  *See, e.g.*, Julian E. Barnes et al., *U.S. at Fault in Strike on School in Iran, Preliminary Inquiry Says*, N.Y. Times (Mar. 11, 2026), Boutrous Decl. ¶ 13, Ex. 11; Greg Jaffe *et al.*, A *Harrowing Race Against Time to Find a Downed U.S. Airman in Iran*, N.Y. Times (Apr. 5, 2026), Boutrous Decl. ¶ 14, Ex. 12; Julian E. Barnes et al., *Iran Could Retrieve Uranium at Site U.S. Bombed Last Year, Officials Say*, N.Y. Times (Mar. 7, 2026), Boutrous Decl. ¶ 15, Ex. 13.  Nor does the Department make any attempt to reconcile its sudden purported need for stringent restrictions on unescorted access for credentialed journalists with the fact that other PFAC holders, including the many non-Department employees who work at restaurants and similar locations in the building, have unescorted access to the same areas that PFAC holding journalists can no longer

41

go.  Barnes Decl. ¶ 10.  In short, to the extent the Department's information security policies are inadequate or are not being followed by Department personnel, including Defendants themselves,[4] the Interim Policy's escort requirement does nothing to address that underlying regulatory problem.

Third and relatedly, Defendants failed both to consider reasonable alternatives to the escort requirement and to explain why they rejected them.  *Am. Radio Relay League*, 524 F.3d at 242.  Nowhere in the Interim Policy does the Department mention any alternatives, much less explain why they were inadequate.  *See Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 (D.C. Cir. 1986).  That will not do.  Agencies must explain why departure from a longstanding policy is warranted.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Courts have found agency action arbitrary and capricious when only one of these flaws is present, including after significant efforts on an agency's part.  *See, e.g.*, *Window Covering Manufacturers Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1281–82, 1286 (D.C. Cir. 2023) (finding safety standard failed the substantial evidence test, which is identical to the arbitrary and capricious standard, even after agency received 2,060 written comments, heard oral comments at a hearing, responded to comments, and made specific cost-benefit findings, because agency nevertheless erred in its cost-benefit analysis and in setting the Final Rule's effective date).  But here, the Interim Policy's escort requirement is at best the result of negligible effort, and it fails

---

[4] For instance, the Department's own Office of Inspector General found in December 2025 that Secretary Hegseth had "sent sensitive, nonpublic operational information" relating to planned U.S. military strikes in Yemen over a Signal chat on his personal cell phone, "risk[ing] potential compromise of sensitive [Department] information" in violation of Department policies.  *See* U.S. Dep't of Def. Off. of Inspector Gen*., Evaluation of the Secretary of Defense's Reported Use of a Commercially Available Messaging Application for Official Business* 4 (Dec. 2, 2025), reproduced at *Read the Pentagon Watchdog's Report on Signal Use*, N.Y. Times (Dec. 4, 2025), https://www.nytimes.com/interactive/2025/12/04/us/signal-report-hegseth.html.

42

the requirements of reasoned decisionmaking many times over.  Preliminary relief should issue accordingly.  *See D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) ("The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay.").

## II.    Plaintiffs Are Suffering Irreparable Harm.

Plaintiffs satisfy the second element of the preliminary-injunction test because the "loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable harm." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citation and quotations omitted).  A journalist "arbitrarily excluded from sources of information" suffers just that kind of irreparable First Amendment harm.  *Sherrill*, 569 F.2d at 129–30.

This "is not merely an abstract, theoretical injury." *Karem v. Trump*, 404 F. Supp. 3d 203, 217 (D.D.C. 2019).  Journalists' livelihoods and "First Amendment interest[s] depend[] on [their] ability to freely pursue 'journalistically productive conversations.'" *Id.*  But Plaintiffs currently lack the access to pursue those conversations in the Pentagon.  As detailed above, the escorted access the Interim Policy still purports to allow severely diminishes Plaintiffs' ability to effectively work, obtain information, and access sources in the Pentagon.  *See supra* Background § I.  And because "the news is time-sensitive and occurs spontaneously, that lack of access cannot be remedied retrospectively." *Karem*, 404 F. Supp. 3d at 217; *see also NYT I*, 2026 WL 788689, at \*17 (finding that Barnes's and Times's inability to have conversations in the Pentagon constituted irreparable harm).  "The Court cannot restore [their] access to . . . conversations in the . . . press facilities that have already been had."  Oral Ruling, *Cable News Network, Inc. v. Trump*, 2018 WL 9436958 (D.D.C. Nov. 16, 2018).  Plaintiffs therefore have suffered, and continue to suffer, irreparable harm.

### III.     The Balance of Equities and Public Interest Favor Preliminary Injunctive Relief.

The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The "significance of [Plaintiffs'] constitutional interests" in meaningful access "outweigh[s]" any possible governmental interest here. *Karem*, 404 F. Supp. 3d at 218; *see also Telemundo v. City of Los Angeles*, 283 F. Supp. 2d 1095, 1103–04 (C.D. Cal. 2003) ("equitable considerations . . . weigh in favor of" injunctive relief where the injury implicates media plaintiffs' "First Amendment rights"). The "enforcement of an unconstitutional law is always contrary to the public interest." *Karem v. Trump*, 960 F.3d at 668. There is nothing on the other side of the ledger. "[T]he government is in no way harmed by issuance of an injunction that prevents [it] from enforcing unconstitutional restrictions." *Hassay v. Mayor*, 955 F. Supp. 2d 505, 517 (D. Md. 2013) (citation and quotation marks omitted). And as the Court found in *NYT II*, the Interim Policy does not address any security risks and it is "nonsense" for the Department to suggest otherwise. 2026 WL 962252, at *7. The facts foreclose any invocation of national security: credentialed reporters had unescorted access to the Pentagon for decades until March 2026, with no security incidents. And the Department had no concerns about this unescorted access when the *new* Pentagon press corps, the ones "on board and willing to serve" the administration were given PFACs. *See supra* Background §§ C–E. There is no basis to believe that national security is suddenly at risk because The Times's prior access was ordered to be reinstated.

What is more, "the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary" and that reporters and news organizations "not be arbitrarily excluded from sources of information." *Sherrill*, 569 F.2d at 129–30; *see also Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 339 (2010) ("The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a

44

precondition to enlightened self-government and a necessary means to protect it."). That public interest is particularly weighty here, where the government seeks to restrict the ability of independent journalists to cover the U.S. military at a time of war. *Cf.* Bob Greene, *The Cartoonist vs. the General*, Wall St. J. (Apr. 5, 2026), Boutrous Decl. ¶ 16, Ex. 14 (reflecting on then-General Dwight D. Eisenhower's understanding during World War II that "the U.S. military was powerful and confident enough, and was fighting a righteous enough war, that permitting criticism of itself in the press was not a sign of weakness, but of strength and wisdom"). "[T]his case is really about," as the Court recognized in *NYT II*, "the attempt by the Secretary of Defense to dictate the information received by the American people, to control the message so that the public hears and sees only what the Secretary and the Trump Administration want them to hear and see." 2026 WL 962252, at *9. By hampering Plaintiffs' ability to report on the Department, the Interim Policy "weaken[s]" their "function as a vital source of information," leaving the public that relies on The Times's reporting "less able to make informed political, social, and economic choices." *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981). "The Constitution demands better. The American public demands better, too." *NYT II*, 2026 WL 962252, at *9. "[T]he public interest [will be] significantly benefitted, and in no way harmed, by the granting of" preliminary injunctive relief. *Cable News Network v. Am. Broadcasting Cos.*, 518 F. Supp. 1238, 1246 (N.D. Ga. 1981).

## IV.    The Court Should Require, at Most, a Nominal Bond.

Defendants are not entitled to a significant bond under Federal Rule of Civil Procedure 65(c). Given that Defendants will not "be forced to absorb any costs as a result of an injunction," the Court should at most "order Plaintiff to post a bond of $1.00." *Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 32 (D.D.C. 2025).

45

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request a hearing within 21 days, and that the Court enter an order granting a preliminary injunction in their favor.

Dated:   May 22, 2026

Respectfully submitted,

*/s/* Theodore J. Boutrous, Jr.

GIBSON, DUNN & CRUTCHER LLP
Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Susan Pelletier*
Gibson, Dunn & Crutcher LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500
SPelletier@gibsondunn.com

*Counsel for Plaintiffs The New York Times Company and Julian E. Barnes.*

**pro hac vice application forthcoming*

46