## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, *et al.*

                *Plaintiffs*,

     v.

DEPARTMENT OF DEFENSE, *et al.*,
                 *Defendants*.

Civil Case No. 26-cv-01690-PLF

### DECLARATION OF JULIAN E. BARNES

I, Julian E. Barnes, hereby declare as follows:

1. I am over the age of 18 and make this declaration based upon my personal knowledge and experience. If called to do so, I could and would competently testify to these matters under oath.

2. I am a national security reporter with The New York Times ("The Times") and a plaintiff in the above-captioned case. I make this declaration in support of Plaintiffs' Motion for a Preliminary Injunction. This Declaration includes information that I previously attested to in multiple previous declarations filed in Case No. 25-cv-4218, at ECF Nos. 10-3, 44-1, 45, and 48-2.

*My career as a reporter.*

3. I have worked for The Times since June 2018. I reside in the District of Columbia and am assigned to The Times' Washington Bureau.

4. My work for The Times focuses on the Pentagon, United States intelligences agencies, and international security, among other subjects. I am one of seven Times reporters who held a Pentagon Facility Alternate Credential ("PFAC") issued by the Department of Defense (the

1

"Department") as recently as summer or fall 2025.  I was issued a new PFAC by the Department on or around March 24, 2026.

5.      Before I joined The Times, I covered the Pentagon for other news organizations including U.S. News and World Report, the Los Angeles Times, and The Wall Street Journal.

***My access to the Pentagon.***

6.      I first obtained a PFAC in 2004, when I worked for U.S. News and World Report. I held a PFAC continuously from 2004 until August 2025 with the exception of a period of approximately 18 months in 2016 and 2017 when I did not regularly access the Pentagon because I was based in Brussels, Belgium.  After I joined The Times in June 2018, I held a PFAC continuously until August 2025.

7.      When I first obtained a PFAC, I was required to renew it every few months.  After my initial renewals, I was required to renew it only annually.  In my experience, this was typical of reporters who held PFACs:  As long as you had been a continuous PFAC holder for an extended period of time, you would renew on an annual basis.  At no point before August 2025 was my PFAC ever denied, suspended, revoked, or not renewed.  I am also not aware of any incident involving me or any other PFAC holder that occurred during my time covering the Pentagon that placed, or was asserted to have placed, the safety or security of Department personnel or property at risk.

8.      Between 2004 and 2025, I regularly accessed the Pentagon in the course of my work as a national security and intelligence reporter.  As a reporter, there are myriad benefits to being at the Pentagon.  Being onsite at the Pentagon enabled me to attend press briefings held at the Pentagon—which are often held on short notice and sometimes announced less than an hour before they occur.  I also sometimes met with intelligence officials at the Pentagon for background

briefings or off-the-record discussions related to topics I was covering.  I attended hundreds of press briefings at the Pentagon and had countless discussions at the Pentagon with Department employees and officials.

9.    I also could and would regularly visit the Public Affairs offices of the United States military branches, which are housed at the Pentagon, to converse with Public Affairs staff and ask questions about United States military operations, the Department, or other topics pertinent to my reporting.  There are numerous Public Affairs Offices within the Pentagon.  Among others, the Department of Defense, Joint Staff, Army, Navy, Air Force, and Marine Corps each have their own Public Affairs Office within the Pentagon, each of which is staffed by separate Public Affairs officials whose job is to liaise with the media.  In addition, military intelligence agencies and combatant commands sometimes have public affairs officers within their Pentagon liaison offices. Many of the most helpful conversations with Public Affairs staff cannot be planned or scheduled in advance: Those conversations may vary depending on which staff are present or available to speak, what the latest news is, or what information was shared in an immediately preceding conversation.  In my experience, reporting from the Pentagon often necessitated speaking to upwards of a dozen officials and other personnel from different press offices in a given day, sometimes in response to rapidly developing events.

10.    I think there is a common misperception that access to the Pentagon necessarily means access to secure areas or places where classified or other sensitive information is discussed. To the contrary, the Pentagon is a large building that includes areas that resemble a mall and are often crowded with visitors and non-military employees.  For example, there is a food court, a pharmacy, a sit-down restaurant, a bank, a dry cleaner, and a chocolate shop in the Pentagon.  Parts of the Pentagon feature displays of historical information of potential interest to tourists and

members of the general public, and tour groups are common. In my experience, Department officials are not discussing classified matters in corridors or similarly unsecure locations in the building. A reporter's mere presence in the building is therefore unlikely to give that reporter access to inadvertent disclosures of classified or sensitive information

11. Being at the Pentagon and, in particular, the ability to have face-to-face conversations with Pentagon officials and staff, has been integral to my reporting about the Department, national security, and United States intelligence agencies.

12. In my view, the longstanding tradition of press access to the Pentagon and to its personnel has helped provide the American public with a more in-depth, nuanced understanding of the United States military that has been beneficial to the press, the public, and to the Pentagon itself. I think that the American public has greater respect for the military because Pentagon leadership has in the past fostered a culture of permitting and even facilitating press access, which has led to a better understanding of military operations among the public.

### The Department's October 2025 policy leads to the loss of my PFAC.

13. In May 2025, the Department announced new restrictions on reporters' physical access to certain parts of the Pentagon. As a result of those restrictions, even with my PFAC, I was no longer able to access spaces within the Pentagon that I had previously accessed routinely for years. Even with those new restrictions on physical access, however, I continued to report regularly from the Pentagon because it significantly benefitted my reporting to be in the building— both in order to cover formal proceedings, like press conferences, and to converse with Department personnel.

14. In or around August 2025, I learned that Department leadership was preparing to issue additional new restrictions relating to the press and, specifically, new rules relating to

4

reporters' PFACs. I found this deeply concerning. In particular, I was concerned that under those new rules, the Department and its leadership would have free rein to suspend or revoke PFACs on the basis of what journalists and news organizations reported, and that if they disliked something I had written for The Times, they would find a basis to suspend or revoke my PFAC.

15. As I explained in a prior declaration, *see* Case No. 25-cv-4218, at ECF No. 10-3, my PFAC lapsed on August 31, 2025. I decided not to renew it at that time because I was concerned about the new rules that I understood were going to be put in place by the Department. The Department announced a new PFAC policy in September 2025, and then an updated policy in October 2025, that confirmed my concerns: The new policy gave Department officials broad discretion to suspend or revoke reporters' PFACs (or to refuse to renew or issue PFACs) if it did not approve of information that a reporter had "solicited," obtained, attempted to obtain, or published. In October 2025, the Department revoked the PFACs of all reporters who did not agree to sign an "Acknowledgment" attesting that they "underst[ood]" the new policy. I gave my lapsed PFAC to my colleague at The Times, John Ismay, who handed in my PFAC, along with his, to the Department on October 15, 2025. All of the reporters at The Times who held PFACs turned them in on October 15, 2025.

### *The Department reissues my PFAC but imposes an onerous new "escort" requirement.*

16. On March 20, 2026, I learned that the district court had granted Plaintiffs' Motion for Summary Judgment and ordered the Department to reinstate the PFACs previously held by me and my colleagues at The Times. I was enthusiastic about the prospect of regaining access to the Pentagon, which is extremely valuable to my work as a reporter. I immediately sent an email to the Pentagon Press Office inquiring about how to pick up my reinstated PFAC so that I could

access the Pentagon on the next business day, Monday, March 23.  Lawyers for The Times also sent inquiries asking how reporters from The Times could obtain their reinstated PFACs.

17.    I received an email from the Pentagon saying I could pick up my PFAC on Tuesday, March 24, between 6:00 am and 6:00 pm Eastern time from the Pentagon Press Office. When I arrived around 8:00 am on Tuesday, March 24, a Pentagon public affairs officer told me that despite the email I received they could not give me a pass. Instead, there was a set time between noon and 3:00 pm that the badge office would issue Times reporters new PFACs. The public affairs officer told me this information was supposed to have been included in another email but had inadvertently been omitted. I left and returned to the Pentagon visitor center at approximately 1:00 pm. I was escorted to the badge office where four other Times reporters were waiting to obtain their PFACs. That same afternoon, I was notified by a public affairs officer that the Department of Defense ("Department") had issued a revised "interim" policy (the "Interim Policy") governing PFACs and reporters' access to the Pentagon. When I arrived at the Pentagon visitor center I was handed a copy of the Interim Policy.

18.    After my colleagues and I arrived at the badge office, we were given PFACs by Press Office staff. The new PFACs were different from the ones we had previously held. The Pentagon Press Office staff explained that, pursuant to the Interim Policy, the cards they were issuing to us would no longer give us access to the Pentagon: While our previous PFACs, once scanned, had enabled us to enter through the turnstiles at the Pentagon entrance, we were told that the new PFACs that were issued to us on March 24, 2026 did not.

19.    The Pentagon Press Office staff also told me and my colleagues from The Times that we, along with all other reporters, would no longer be allowed into the Pentagon without an escort from the Department, and that an escort would be provided only for pre-arranged interviews,

press conferences, or other specified types of events.  We were also told that we would need to submit a request to attend such events at least one day in advance in order to obtain an escort, and that the request would need to be approved by the Department's Office of Public Affairs.

20.     The Pentagon Press Office staff also explained to me and my colleagues from The Times that our PFACs would enable us to access a new press area located in the Pentagon library, which is on the Pentagon grounds but in a separate building.  My colleagues and I asked how we could access the library because, to our knowledge, the only way to access it on foot is through a corridor that we were told we could no longer walk through.  The Pentagon Press Office staff indicated that they were unsure how we could access the library.  They suggested we could use a Pentagon shuttle bus but, as we pointed out, PFAC holders did not have permission to ride on the shuttle bus.  Ultimately, the Pentagon Press Office staff told us we needed to come back the next day for further instructions on how to access the library.  We were later told that PFAC holders would be given permission to ride on the shuttle bus.

21.     It was readily apparent to me that the Pentagon Press Office was unprepared for the changes effectuated by the Interim Policy.  It was clear to me that these new rules had been implemented hastily and in response to the Court's March 20, 2026 ruling that required reinstatement of our PFACs.

22.     The Interim Policy states that the Correspondents' Corridor—the area in the Pentagon where reporters used to work—is closed effective immediately. Within days of the Interim Policy's announcement, I saw what I understand to be a photograph of the entrance to the Correspondents' Corridor which shows that the old signage, which said "Correspondents' Corridor," has been torn down.

7

23.    For more than 20 years, I have regularly accessed the Pentagon in the course of my work as a reporter.  To my knowledge, this is the first time that the Department has ever barred reporters with PFACs from entering the Pentagon without an escort, a reservation, or an invitation to a specific press conference or event.  No longer being able to access the Public Affairs Offices in the main Pentagon building is particularly frustrating for me.  Before the Department implemented new PFAC rules and restrictions, the staff of these various Public Affairs Offices were frequent sources of information for my reporting.  Those are individuals who are expressly authorized to talk to the press.  In fact, it is in their job description.

24.    To the best of my knowledge, the Department of Defense does not have a team of escorts who are readily available to facilitate reporters' access to the Pentagon.  In my experience, a reporter with a credential must request an interview or meeting with a particular official or Public Affairs Office that he or she wishes to visit and, if that interview or meeting is granted, he or she will be provided an escort for that specific interview or meeting.  As a practical matter, this means that each separate conversation requires a separate appointment:  If I wanted to speak with the Public Affairs staff for the Air Force, for example, then I would need to make an appointment and pre-arrange an escort from that office; if I then wanted to speak to someone from the Joint Staff, I would need to leave the Pentagon (or return to the Library) and make a new appointment in order to obtain a separate escort from *that* office.  This is time-consuming and burdensome, and it has substantially reduced my amount of interaction with staff from the Public Affairs Offices.

25.    The escort requirement has made it exceedingly challenging to speak with press officials and other personnel in person, and to otherwise cover the Department and the U.S. military from Pentagon grounds.

26.     For example, I submitted a request on March 27, 2026 to interview a Department official.  Three days later, on March 30, I was notified that the Department had approved my interview request for the following day, March 31.  The press officer later requested that interview be on background—meaning the official would not be on the record. The interview was set for 12:45 p.m., but the press officer recommended I arrive at 12:15 p.m. to navigate security. The press officer entered the information for the visit into the Pentagon system, and I received an automatic confirmation.  When I arrived at the Pentagon at 12:10 p.m. on March 31 and showed my driver's license and PFAC to the attendant at the Visitor Center security area, he advised me that anyone with a PFAC could only enter through corridor 8—despite the fact that I had arranged for the escort to meet me in the visitor center.  The interview was eventually postponed, and I was immediately escorted out of the building.

27.     I have only visited the Pentagon one other time since March 23, 2026, when I pre-arranged a background interview with a Department official.  I was escorted into the Pentagon by a staff member from the relevant office.  When the interview concluded, I was escorted out of the building.  I had no opportunity to visit any of the Public Affairs Offices located at the Pentagon or to converse with anyone other than my escort and the specific person I had arranged to interview.

28.     Colleagues of mine from The Times, including Greg Jaffe and Helene Cooper, have attended press conferences at the Pentagon since they obtained their reinstated PFACs.  I understand they have been required to arrive at least an hour early and to wear wristbands—in addition to the two other identification cards they were already required to wear within the Pentagon—and that their wristbands have been checked repeatedly throughout the scheduled events.  This process is the same as the process that was in place for reporters that did not hold a PFAC before the district court issued its March 20, 2026 order.  I also understand that, on at least

9

one occasion, reporters from The Times were told that they could not use the bathrooms without being accompanied by an escort because it would present a security risk.

29.    These experiences have confirmed my view that the escort requirement is burdensome and impractical.  Going through a sometimes-lengthy process of scheduling official appointments in order to ask even one or two questions to an official—even assuming that request is granted and that official does not have to reschedule—does not allow for meaningful engagement with Department personnel on a timeline consistent with news reporting.  While I used to be able to walk from press office to press office throughout the day, I now would have to return to the library, call or email for an appointment, and wait for a response and approval, and for arrangement for and arrival of an escort. That means I will be spending hours of my day just waiting and walking back and forth—assuming I can get ahold of press offices and individuals and arrange interviews and be approved for an escort at all. That process will dramatically interfere with my ability to meaningfully engage with anyone from the Department on Pentagon grounds, or to obtain the information necessary to inform the public in a timely manner.

30.    It also seems to me that the Interim Policy serves no discernible purpose.  Neither I nor my colleagues pose any risk to the safety or security of the Pentagon.  And to the extent that the purpose of the Interim Policy is to prevent the disclosure of classified or sensitive information, I do not understand how it will accomplish that goal.  The areas of the Pentagon that journalists were previously able to access unescorted were not areas in which classified or sensitive information is discussed.

31.    In my view, the escort requirement imposed by the Interim Policy makes the reinstated PFACs that were issued to me and my colleagues essentially worthless.  All reporters, whether or not they hold a PFAC, can access the Pentagon if they obtain pre-approval to attend a

10

specific press conference, event, or for a pre-arranged interview. The point of a PFAC is to give journalists who regularly cover the Department, the United States military, and national security the ability to regularly work from the Pentagon. Under the Interim Policy, that is no longer the case. And, as a result of it, I rarely go to the Pentagon at all anymore.

32.     Because of the Interim Policy's unnecessary and burdensome escort requirement, I and other reporters whose job it is to provide independent and probing coverage of the Pentagon and the United States military are being prevented from engaging in routine, lawful newsgathering and reporting onsite. That requirement is thus causing significant harm to reporters like me who cover national security and the Pentagon, to news organizations like The Times, and to the American public.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20 day of May 2026 in ___Washington, D.C.___.

_____
Julian E. Barnes