**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>DEPARTMENT OF DEFENSE, *et al.*,<br>*Defendants.* | Civil Case No. 26-cv-01690<br><br>**DECLARATION OF<br>ROBERT BURNS** |

**<u>DECLARATION OF ROBERT BURNS</u>**

I, Robert Burns, hereby declare as follows:

1.      I am over the age of 18 and make this declaration based upon my personal knowledge and experience.  If called to do so, I could and would competently testify to these matters under oath.

*My career as a Pentagon reporter.*

2.      I retired from The Associated Press ("AP") in May 2022 after 45 years as a reporter. I served as President of the Pentagon Press Association ("PPA") from 2012 until my retirement in 2022.  Over the more than four decades I worked as a journalist, I spent more than thirty years covering national security and the Department of Defense (the "Department").  In 2013, I won the AP Gramling Journalism Award, the AP's highest honor, for my reporting on topics including the high rate of military suicides, attacks on U.S. troops by Afghan allies, and dysfunction in the Pentagon office charged with collecting the remains of wartime MIAs.

3.      I first began reporting from the Pentagon in 1990 when the AP assigned me to cover the implications of the fall of the Berlin Wall.  Thereafter, I reported broadly on national security matters, including assignments covering the White House and U.S. intelligence agencies.  In 1999,

1

I became the AP's full-time Pentagon correspondent.  I covered the Pentagon during multiple administrations spanning at least ten Secretaries of Defense.

4.    I reported from the Pentagon frequently over the course of my career.  I attended innumerable press briefings, background sessions, briefings specific to certain branches of services within the military, informal gatherings, and other engagements with civilian employees of the Department and military officials on Pentagon grounds.

*Reporters' access to and physical presence in the Pentagon.*

5.    When I began covering the Pentagon in 1990, AP maintained a small workspace in the Pentagon press room that I understood journalists had used since the building's early years. After the September 11, 2001 terrorist attack and the Pentagon's renovation, the press area was relocated, but the basic arrangement remained the same: the Department provided the physical workspace and news organizations supplied their own materials and communications equipment.

6.    In the immediate wake of the September 11, 2001 terrorist attack, the AP had three reporters at the Pentagon around the clock.  Over time, that was reduced to two.

7.    Reporting on-site at the Pentagon typically gave me and other reporters different types of opportunities to interact with government officials, including formal press briefings, whether regular or *ad hoc*.  During these briefings, representatives from the Department or specific branches of the armed services would provide information and updates to the reporters who were present and would typically take questions.  At times, these press briefings were led by the Secretary of Defense.  At other times, they were led by senior press officials or leaders from different parts of the Department or branches of the military.  These appearances routinely provided detail and nuance beyond what was included in statements issued to the public or press more broadly.

8.      While beneficial, these briefings had some practical limitations:  time for questions was limited, only a portion of substantive topics could be addressed, and questioning of senior officials often produced incomplete information that required follow-up.  Accordingly, I and other reporters routinely engaged in additional and follow-up conversations immediately before or after briefings with senior officials or their aides.  These conversations—sometimes on the record, sometimes on background, and sometimes off the record—in my experience were an essential part of obtaining the detail and clarity necessary to report accurately on defense policy and operations.

9.      Reporting on-site at the Pentagon also gave me access to short-notice and no-notice briefings.  Secretaries of Defense occasionally convened news conferences with little advance warning, sometimes to announce personnel decisions or respond to unfolding events.  Certain Secretaries of Defense, including Secretary Robert Gates, at times provided very short notice— sometimes only an hour or two—before holding a significant press conference.  Reporters who were not already in the building could miss these opportunities entirely.  Physical presence in the building was essential to covering news in real time.

10.     Reporting from the Pentagon also gave me an opportunity for semi-formal interactions with Department officials, including service-specific (*e.g.*, Army or Navy) background briefings, structured meetings outside the press room, and the like.  For example, Secretary Donald Rumsfeld would invite reporters into his office on weekend mornings for wide-ranging, off-the-record discussions.  For those kinds of discussions, being physically present in the building was the only way to attend and to know what transpired.

11.     Finally, physical presence at the Pentagon also enabled informal interactions.  Over time, reporters built professional relationships with mid-ranking and senior officials and could occasionally obtain helpful context or an understanding or sense of developing issues.  On occasion,

3

for example, trusted officials would indicate that a reporter "might want to stay a little late today," signaling that significant news might emerge. Such cues did not convey sensitive information, but they reflected long-established professional trust. These sorts of informal interactions proved invaluable to me and other reporters, press outlets, and the Department, by ensuring news was timely reported with appropriate precision and nuance.

12. Physical presence also provided intangible situational awareness. Activity within the building—the tone of conversations, movements of personnel, or general atmosphere—often indicated that something significant was occurring before it was publicly announced. After the 2000 attack on a U.S. Navy ship, for example, I sensed the seriousness of the situation immediately upon entering the Pentagon. Remote reporting could not have provided me with that context or allowed me to prepare to report on unfolding events in the same manner.

13. In all, years of reporting from the Pentagon showed me that access for credentialed journalists to the building's unclassified areas is an essential part of keeping the American public informed. To require that journalists be accompanied by a government minder would severely damage their ability to do independent reporting. In my judgment, it would effectively be the same as banning reporters from the building because it would stifle, if not prohibit, the free interaction between reporters and officials that is essential to journalism in a democracy.

14. In addition, the idea that the Pentagon is an all-classified military command post is mistaken. It is the headquarters of a civilian-led government agency, the Department of Defense, with well-known security boundaries that in my experience have always been scrupulously respected by journalists. Across my decades in the Pentagon, reporters, including myself, respected physical and professional boundaries within the building. For example, the National Military Command Center and most of the Joint Chiefs area were off limits, and reporters did not

enter offices without invitation. These longstanding rules were in my long experience at the Pentagon and as President of the PPA consistently adhered to. I never observed or heard of a reporter attempting to enter a restricted area improperly.

15. Well-settled professional norms also governed reporter conduct within the Pentagon. For example, reporters wore Pentagon Facilities Alternate Credentials or, as they are more colloquially known, press badges. If at any time a reporter's press badge was not visible, the Pentagon's internal police force would remind the reporter to display it. These reminders were cordial, and reporters followed them without issue.

### *The Pentagon credentialing process.*

16. Throughout my time at the Pentagon, the credentialing process for Pentagon reporters was straightforward and, as I recall, consistent. Because the process was never an issue of concern or contention, it is difficult to recall its exact metes and bounds over my more than thirty years covering the Pentagon. That said, my recollection is that the process generally required reporters to provide a letter confirming their employment and assignment and to undergo standard background checks. Later—in or around the 2000s—the Department asked reporters to sign a one-page form that set forth some basic, noncontroversial information and building security requirements relating to PFACs. That form stated, for example, that PFACs "must be visible and worn above the waist at all times while in the Pentagon" and that "[l]ost PFACs should be immediately reported to the Public Affairs Operations." After September 11, 2001, certain security offices were reorganized, but these changes did not materially affect credentialing for journalists.

17. As President of the PPA, I expect that I would have been aware of any credentialing issues affecting reporters or news organizations. I am not aware of any instance in which a qualified Pentagon reporter's credential was denied, suspended, revoked, or not renewed based on

any security or safety issue. I am also not aware of any instance in which a qualified Pentagon reporter's credential was denied, suspended, revoked, or not renewed based on the content of their reporting. That is true even of reporting that was critical of Department or other government officials or pertained to the disclosure of sensitive, secret, or confidential information. To the best of my knowledge and recollection, credentials were revoked only when a reporter was no longer actively reporting from the Pentagon.

18.     During my tenure reporting from the Pentagon, I published a number of stories that were sensitive or could be seen as critical of the Department. For example, in the mid-2010s, I published a series of articles about systemic problems in the Air Force's nuclear missile enterprise, including inspection failures, morale issues, training deficiencies, and misconduct. Although that reporting covered extraordinarily sensitive issues and was, at least initially, unwelcome by some officials, I never experienced any threats—direct or indirect—to my credential or access to the Pentagon, and I never perceived any risk that my reporting would trigger retaliation. In fact, the Department later undertook reviews and instituted reforms to address issues identified in my reporting.

*The Department's new access policy will damage the public's interest.*

19.     As with the original policy, I have grave concerns about the Department's latest policy and what it portends for national defense coverage, the Department, and the American public. Although I am confident that reporters covering the Department will continue working to uncover and report on important stories to the best of their abilities whether or not physically present at the Pentagon, I also know based on my own experience that the restriction or elimination of meaningful press access to the Pentagon—which the new policy appears designed to accomplish—harms the American public. It results in reporters with different areas of focus and

6

varied experience being unable to ask timely follow-up questions, attend short-notice briefings, and engage in the informal and semi-formal interactions that have long provided important context.

20.    It is also likely that reporting on issues of importance that might otherwise be ignored will be curtailed or eliminated as a consequence of the new policy.  For example, when I was covering the Pentagon, I spent an unusual amount of time reporting on how to recover remains of missing service members.  It was a significant issue to service members' families, though not necessarily a subject of Department press announcements.  But being in the building without extremely burdensome limitations allowed me to have in-depth conversations with individuals responsible for this work and to learn the details and nuances of this and other topics.  In short, effectively excluding a wide range of Defense-beat reporters from the Pentagon or limiting their access will cause their reporting on the Department to lose the depth, scope, and accuracy that comes from observing events as they unfold and speaking directly with officials.

21.    The public will also lose out.  The Department of Defense is the largest federal agency, responsible for global operations, substantial public expenditures, and a wide range of military, personnel, and policy decisions.  Understanding the scope of the Department's activity requires sustained interaction with the officials who carry out this work—sustained interactions that will be inhibited if not completely eliminated by the escort requirement.  With all experienced Pentagon reporters subject to those restrictions, both the sort of institutional knowledge and the coincident relationships they have are at risk of being lost.  If that occurs, reporting will be considerably impoverished to the detriment of the public.  Simply reiterating official statements amounts to little more than stenography and leaves the public less safe and secure and with a narrower and less textured understanding of critical issues and events.

22.    During my career, officials expressed to me on a number of occasions that interactions with reporters across a variety of news organizations helped them understand what issues were receiving attention and why. In other words, it served as a kind of intelligence-gathering tool for the Department. In addition, regular formal and informal interactions allowed the Department to clarify misunderstandings, provide additional context, better anticipate how policy decisions might be interpreted publicly, and help ensure its own voice was heard. These exchanges—after briefings, through periodic background discussions, and so forth—were an important part of how the Department kept its finger on the pulse of reporting and shaped its communications to all cross sections of the American public. The escort requirement is almost certain to eliminate these types of interactions.

23.    Reporting made possible by physical access to the Pentagon also helped identify structural and personnel issues that the Department was prompted to address and improve. For example, my reporting on issues within the Air Force's nuclear missile enterprise, although perhaps unwelcome by Department leadership at the time, contributed to the Department's decision to undertake broad reviews and ultimately to reform. Along similar lines, during my travels with Secretaries of Defense to military bases, servicemembers would sometimes approach me or other reporters to express appreciation for our work. There are many other such examples, all of which underscore that sustained, informed, and sometimes critical press coverage can illuminate problems and support improvements in readiness, morale, and policy.

24.    In sum, the longstanding press access structure at the Pentagon has benefitted reporters, the Department, and the public. The escort policy makes accurate reporting more difficult, makes America less informed and less safe—particularly in times of crisis—and ultimately harms both the Department and the American public whom the Department serves.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of May 2026 in   Reston, Virginia

Robert Burns