**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*,<br><br>                                    *Plaintiffs*,<br><br>           v.<br><br>DEPARTMENT OF DEFENSE, *et al.*,<br>                                    *Defendants*. | Civil Case No. 26-cv-01690<br><br>**DECLARATION OF**<br>**CHRIS MEAGHER** |

**<u>DECLARATION OF CHRIS MEAGHER</u>**

I, Chris Meagher, hereby declare as follows:

1.      I am over 18 years of age and I make this declaration based upon my own personal knowledge.  If called to do so, I could and would competently testify to these matters under oath.

*My professional background.*

2.      I am a communications professional with more than a decade of experience managing communications and press relations in both the public and private sectors.  For several years prior to that, I also worked as a reporter.

3.      I served as the Assistant to the Secretary of Defense for Public Affairs from September 2022 until January 2025.  In that role, I oversaw communications for the Office of the Secretary of Defense, including public information, internal information, community relations, and press operations.  Prior to becoming Assistant to the Secretary of Defense for Public Affairs, I served as a Deputy Press Secretary at the White House and as Deputy Director for Public Affairs at the Department of Transportation, among other roles.

4.      In my experience as Deputy Press Secretary at the White House, reporters with hard passes had regular, unescorted access to press areas, corridors, and other designated areas within

1

the White House.  To my knowledge, during my time at the White House, there was never any safety or security issue that arose from credentialed reporters having that unescorted access.

### *My experience as Assistant to the Secretary of Defense for Public Affairs.*

5.      During my time as Assistant to the Secretary of Defense for Public Affairs, I interacted with reporters who held Pentagon Facilities Alternative Credentials ("PFACs") on a daily basis, and often multiple times a day.   To obtain a PFAC, a reporter would have to apply and undergo a standard background check for security purposes.  During my time at the Department, other non-governmental employees who worked in the Pentagon—including, for example, people who worked at the CVS inside the building, or at one of the restaurants at the food hall located in the Pentagon—also had PFACs and, as a result, had unescorted access to the exact same spaces that journalists with PFACs had unescorted access to.

6.      Reporters with PFACs would frequently stop by the office where I worked to talk with me and with the Defense Department's Press Secretary and Deputy Press Secretary, who both sat in the same suite of offices dedicated to the Public Affairs as I did, in what is known as the E-Ring of the Pentagon.  The press briefing room, where we typically held press briefings every Tuesday and Thursday, was directly across the hallway from my office.  The Defense Department's press operations team also had offices nearby, where we held an additional off-camera press briefing every Monday, and where reporters would frequently stop in to ask the press officers questions.  In the same vicinity, there was a designated area where reporters had offices, sat, and worked.  I frequently encountered and interacted with reporters in these areas, as well as in the hallways.

7.      There are many people who work at the Pentagon whose primary job responsibilities include speaking with the press.  During my time with the Defense Department,

they included the Press Secretary and Deputy Press Secretary, as well as a team of approximately twenty press operations personnel, each of whom was focused on a specific topical subjects such as Personnel and Readiness or Acquisition and Sustainment; or geographical regions, such as Europe and the Indo-Pacific, for example. Reporters would visit the desks of different press operations officers, depending on what questions the reporters had or the topics they wanted to discuss. For example, a reporter with questions about the war in Ukraine might visit the desks of press operations staff who made up the European Command team.

8.     Each of the armed services, including the Army, Navy, Air Force, Marine Corps, along with the Joint Staff, also had their own communications and public affairs teams, with their own offices and staff. These offices and staff were located throughout the Pentagon building, including in different wings and on different floors from where my office was located, and from where reporters had office space. Reporters frequently visited these public affairs offices as part of their work—and doing so required that they be able to move through hallways in the Pentagon unescorted.

9.     Throughout my time working for the Defense Department, reporters with PFACs always had unescorted access to the Pentagon. Of course, that meant they still had to enter and exit through the same security as everyone else to enter the building, and it does not mean they were able to access private offices or secure locations where sensitive or classified information was kept, viewed, or discussed. In my experience, that kind of information was kept, viewed, or discussed only in rooms called "Sensitive Compartmented Information Facilities," or "SCIFs," that had special information security protocols and required special access. For example, my office was a SCIF, which meant that reporters could not simply walk in at their leisure. They had to leave their phones outside the door and could come in only if I granted them entry, and I would do so

3

only after ensuring that no sensitive or classified information was visible or accessible. Similarly, on occasions when we would invite press into the office of the Secretary of Defense, we would take precautions before any reporters entered to ensure that no sensitive or classified information was visible or accessible.

10. Reporters were clear which areas of the Pentagon they could access and which they could not, and they respected those boundaries. Furthermore, they could not access sensitive or classified spaces without being allowed entry. I cannot recall ever being aware of an incident where a reporter entered an office or secure area that they were not permitted or invited to enter.

11. I found it very beneficial to have reporters working in the Pentagon. In my experience, it was helpful to be able to assemble reporters quickly for impromptu press briefings, particularly in response to breaking news. For example, in early 2023 there was an incident in which high-altitude balloons, widely reported to potentially be originating from China, were shot down over U.S. airspace. We quickly assembled the reporters who were already in the building and provided them with an update at a press briefing. That enabled us to disseminate accurate, relevant information quickly and efficiently to a broad swath of reporters—and to the American public.

12. I also found regular, informal interactions between Defense Department staff and reporters to be mutually beneficial. It was useful for my staff and I to hear what questions reporters had and what topics they were interested in, and to get a sense of what stories they were in the process of reporting. Those conversations enabled my staff and I to help correct any misunderstandings early in the reporting process and anticipate stories that might be controversial for the Department. In-person interactions also allowed us to build relationships with reporters that were built on trust and rapport. This was important because it helped give reporters confidence

4

that the information we were providing was accurate and gave them opportunities to confirm and verify the accuracy of that information.  Building that kind of trust would be more difficult, if not impossible, without regular, face-to-face interaction.

13.    In my experience, the Department of Defense was (and, presumably, still is) constantly competing with misinformation propagated by foreign adversaries, particularly with regard to overseas conflicts.  When credentialed reporters like The New York Times, among others, have a regular presence in the Pentagon, it helps the Department effectively counter misinformation and prevent it from spreading.   For example, there was one instance in which our team learned that a reporter was incorrectly attributing an overseas strike to the United States based on misinformation.  My colleague was able to run down the hallway, find that reporter, and provide the reporter with accurate information so that they would not report incorrect information to the public.  We would not have been able to do that so quickly and effectively if the reporter had not been working in the Pentagon.

14.    I am not aware of any safety or security incident at the Pentagon caused by a credentialed journalist having unescorted access to the building.  In my experience, when reporters did obtain sensitive information in the course of their reporting, it was not because they happened to be in the building.  Also, when reporters obtained such information, in my experience, they treated it with the utmost seriousness, engaged with us, and were willing to listen to any concerns we may have had about national security or risks to American servicemembers, and sometimes held off on reporting stories or certain portions of stories as a result of those conversations.

15.    Many of the reporters who report on the Defense Department, U.S. military, and national security are former servicemembers themselves, have family members who are servicemembers, or have previously reported from active war zones, which gives them a

5

heightened appreciation for what our servicemembers do, the dangers that they face, and the potential life and death impact that releasing classified information into the public domain could have. I consistently found that the reporters who worked at the Pentagon had the utmost respect for the U.S. military and its servicemembers and that they made every effort to do their jobs in a way that would not create any safety or security concerns.

16.    In my opinion, the Department of Defense has a responsibility to the American people to ensure that a broad and diverse array of reporters have access to accurate, real-time information about the Department and U.S. military operations. An enormous percentage of the American public's tax dollars are dedicated to the Department of Defense, and every single day leaders at the Department make decisions about whether, when, and how to put servicemembers' lives at risk. The public has a right to know how its money is being spent and how those decisions are being made. For that reason, I believe that the Department of Defense has an obligation to be as transparent as possible with the American public. Regular, unescorted access to the Pentagon for credentialed members of the press is an important means of effectuating and protecting those principles, and it can be done without sacrificing safety or security.

### The Department's Interim Policy

17.    I am familiar with the Interim Policy regarding PFACs and reporters' access to the Pentagon that the Department of Defense put in place in March 2026. As I understand that policy, it prohibits reporters with PFACs from accessing the main Pentagon building unless they first make an appointment to speak with a specific official or attend a specific event, obtain approval, and obtain an escort who will accompany them at all times while they are in the building. This is a dramatic departure from the way things worked when I was Assistant to the Secretary of Defense for Public Affairs.

18.    The escort requirement under the Interim Policy strikes me as a cumbersome, inefficient, wasteful use of taxpayer resources, and designed to deter reporters from being in the Pentagon at all.  Additionally, I believe that the current leadership of the Department of Defense is acting against its own self-interest—and against the interests of the U.S. military and the American public—by implementing this policy.  I fear that the Department will be less prepared, less effective, and less able to communicate with the American people as a result of these restrictions on credentialed reporters' Pentagon access.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated:  May 21, 2026


_____, _____



_____

Chris Meagher