**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE NEW YORK TIMES COMPANY, *et al.*,

     *Plaintiffs*,

     v.

DEPARTMENT OF DEFENSE, a/k/a
DEPARTMENT OF WAR, *et al.*,

     *Defendants*.

Civil Action No. 26-1690 (PLF)

**<u>DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ....................................................................................................................... 3

LEGAL STANDARD................................................................................................................ 10

ARGUMENT............................................................................................................................ 10

I.      Plaintiffs Are Likely to Fail on the Merits...................................................................... 10

        A.      The Interim Policy's escort requirement complies with the First
                Amendment........................................................................................................ 10

                1.      The Interim Policy reasonably regulates conduct in the Pentagon's
                        press areas and does not discriminate based on viewpoint. ..................... 11

                2.      Plaintiffs are not likely to show that the escort requirement is
                        retaliatory. .......................................................................................... 18

                        a.      Plaintiffs are not likely to prove a retaliatory motive for the Interim
                                Policy ..................................................................................... 19

                        b.      Even if Plaintiffs showed some retaliatory motive, Defendants would
                                have issued the Interim Policy anyway............................................ 25

                        c.      Plaintiffs are unlikely to show that the escort requirement would deter
                                a person of ordinary firmness from exercising First Amendment
                                rights...................................................................................... 27

        B.      Plaintiffs are not likely to show that adoption of the Interim Policy was
                arbitrary and capricious...................................................................................... 29

II.     Plaintiffs Fail to Show Immediate and Irreparable Harm................................................. 35

III.    The Balance of the Equities and Public Interest Do Not Favor Plaintiffs. ......................... 37

CONCLUSION......................................................................................................................... 39

## TABLE OF AUTHORITIES

**CASES**

*Alpine Secs. Corp. v. Fin. Indus. Regul. Auth.*,
121 F.4th 1314 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2751 (June 2, 2025) ........................ 37

*Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*,
816 F. Supp. 3d 27 (D.D.C. 2026) ...................................................................................... 20

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*,
901 F.3d 356 (D.C. Cir. 2018), *cert. denied*, 587 U.S. 1039 (2019) ............................. 15, 17, 18

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) .............................................................................................. 18

*Ateba v. Jean-Pierre*,
2023 WL 5748567 (D.D.C. Sept. 6, 2023) ............................................................................ 29

*Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025), *cert. denied*, 146 S. Ct. 822 (Nov. 24, 2025) ................. *passim*

*Bailey v. Fed. Bureau of Prisons*,
Civ. A. No. 24-1219 (PLF), 2024 WL 3219207 (D.D.C. June 28, 2024),
*ordered issued by*, 2024 WL 3227051 (D.D.C. June 28, 2024) ................................................ 25

*Bowman Transp. Inc. v. Ark.-Best Freight Sys.*,
419 U.S. 281 (1974) ................................................................................................... 30, 32, 34

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ............................................................................................................... 11

*Bryant v. Gates*,
532 F.3d 888 (D.C. Cir. 2008) .............................................................................................. 11

*Burlington Truck Lines v. United States*,
371 U.S. 156 (1962) .............................................................................................................. 29

*China Telecom (Ams.) Corp. v. FCC*,
57 F.4th 256 (D.C. Cir. 2022) .............................................................................................. 29

*CIA v. Sims*,
471 U.S. 159 (1985) .............................................................................................................. 16

*Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of the Treasury*,
45 F.4th 324 (D.C. Cir. 2022) .............................................................................................. 25

*Competitive Enter. Inst. v. U.S. Dep't of Transp.*,
  863 F.3d 911 (D.C. Cir. 2017) ................................................................................................ 34

*Conserve Sw. Utah v. U.S. Dep't of the Interior*,
  ---F. Supp. 3d---, 2026 WL 569034 n.7 (D.D.C. Mar. 1, 2026) ............................................. 30

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
  473 U.S. 788 (1985) .................................................................................................... 11, 12, 15

*Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*,
  331 F.3d 918 (D.C. Cir. 2003) ................................................................................................ 39

*Doe v. District of Columbia*,
  796 F.3d 96 (D.C. Cir. 2015) .................................................................................................. 26

*Esch v. Yeutter*,
  876 F.2d 976 (D.C. Cir. 1989) ................................................................................................ 30

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .......................................................................................................... 29, 35

*Flynt v. Rumsfeld*,
  355 F.3d 697 (D.C. Cir. 2004) ...................................................................................... 12, 14, 37

*Haig v. Agee*,
  453 U.S. 280 (1981) ................................................................................................................... 2

*Harmon v. Thornburgh*,
  878 F.2d 484 (D.C. Cir. 1989) ........................................................................................... 21, 22

*Hartman v. Moore*,
  547 U.S. 250 (2006) .......................................................................................................... 18, 25

*Holder v. Humanitarian L. Proj.*,
  561 U.S. 1 (2010) .................................................................................................................... 33

*Houston Cmty. Coll. Sys. v. Wilson*,
  595 U.S. 468 (2022) ................................................................................................................ 19

*Immigr. & Naturalization Serv. v.*
  *Legalization Assistance Project of the L.A. Cnty. Fed'n of Lab.*,
  510 U.S. 1301 (1993) .............................................................................................................. 39

*Karem v. Trump*,
  404 F. Supp. 3d 203 (D.D.C. 2019) ........................................................................................ 36

*Khalid v. Transp. Sec. Admin.*,
   172 F.4th 866 (D.C. Cir. 2026) ................................................................. 30, 33

*McCutcheon v. FEC*,
   496 F. Supp. 3d 318 (D.D.C. 2020) ................................................................. 37

*Media Matters for Am. v. Fed. Trade Comm'n*,
   No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) ...................... 20, 24, 25

*Media Matters for Am. v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025) ....................................................................... 18

*Michigan v. EPA*,
   576 U.S. 743 (2015) ........................................................................................ 31

*Minn. Voters All. v. Mansky*,
   585 U.S. 1 (2018) ............................................................................................ 11

*Mobil Oil Expl. & Producing Se., Inc. v. United Distrib. Cos.*,
   498 U.S. 211 (1991) ........................................................................................ 34

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*,
   463 U.S. 29 (1983) ............................................................................... 29, 30, 32

*Munaf v. Geren*,
   553 U.S. 674 (2008) ........................................................................................ 10

*N.Y. Times Co. v. U.S. Dep't of Def.*,
   No. 26-5113, 2026 WL 1179440 (D.C. Cir. 2026) ("*NYT I*") ........................ *passim*

*N.Y. Times Co. v. Dep't of Def.*,
   ---F. Supp. 3d---, 2026 WL 788689 (D.D.C. 2026) ("*NYT II*") ...................... 15, 27

*N.Y. Times Co. v. Dep't of Def.*,
   ---F. Supp. 3d---, 2026 WL 962252 (D.D.C. 2026),
   *appeal filed & stay granted by* No. 26-5113, 2026 WL 1179440 (D.C. Cir. Apr. 27, 2026)... 23

*NAACP v. Donovan*,
   737 F.2d 67 (D.C. Cir. 1984) ................................................................. 10, 21, 22

*Nat'l Ass'n of Clean Air Agencies v. EPA*,
   489 F.3d 1221 (D.C. Cir. 2007) ...................................................................... 29

*Nieves v. Bartlett*,
   587 U.S. 391 (2019) ................................................................................. *passim*

*Nken v. Holder*,
556 U.S. 418 (2009).................................................................................................. 10

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983).................................................................................................... 12

*Pers. Watercraft Indus. Ass'n v. Dep't of Com.*,
48 F.3d 540 (D.C. Cir. 1995)..................................................................................... 34

*Price v. Garland*,
45 F.4th 1059 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 2432 (May 1, 2023) .......... 14

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016).................................................................................... 35

*Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*,
548 F. Supp. 3d 185 (D.D.C. 2021),
*on reconsideration by*, 754 F. Supp. 3d 56 (D.D.C. 2024)......................................... 16

*Ridley v. Mass. Bay Transp. Auth.*,
390 F.3d 65 (1st Cir. 2004)........................................................................................ 15

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977).................................................................................... 35

*Standefer v. United States*,
447 U.S. 10 (1980)...................................................................................................... 4

*U.S. Cellular Corp. v. FCC*,
254 F.3d 78 (D.C. Cir. 2001)...................................................................................... 34

*U.S. Telecom Ass'n v. FCC*,
359 F.3d 554 (D.C. Cir. 2004).................................................................................... 34

*United States v. Hansen*,
599 U.S. 762 (2023)..................................................................................................... 4

*United States v. McGuinness*,
33 M.J. 781 (N.M.C.M.R. 1991) .................................................................................. 3

*United States v. Morison*,
844 F.2d 1057 (4th Cir. 1988) ..................................................................................... 3

*United States v. Nassif*,
97 F.4th 968 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 552 (Nov. 12, 2024) ........... 11

*United States v. Wallington,*
  889 F.2d 573 (5th Cir. 1989) ............................................................................... 3

*United States v. Williams,*
  553 U.S. 285 (2008) ........................................................................................ 4, 5

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................................................. 10

**STATUTES**

5 U.S.C. § 706 .................................................................................................... 29

10 U.S.C. § 892 ................................................................................................. 3, 5

10 U.S.C. § 2674 ....................................................................................... 3, 26, 31

18 U.S.C. § 2 ......................................................................................................... 4

18 U.S.C. § 793 ................................................................................................. 3, 5

18 U.S.C. § 1905 ................................................................................................... 3

**REGULATIONS**

32 C.F.R. § 234.3 ................................................................................................. 3

32 C.F.R. § 234.4 ................................................................................................. 3

Exec. Order No. 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) .............................. 16

**INTRODUCTION**

The Pentagon contains vast quantities of extremely sensitive information. Keeping military secrets secret is essential to maintaining a military that can effectively protect the United States. Unauthorized disclosure of certain categories of sensitive information is illegal.

Before October 2025, journalists, including PFAC holders, regularly gained access to 377781military secrets they were not authorized to access. Defendants adopted a policy that sought to reduce unauthorized disclosure to journalists of sensitive, controlled or classified information. After the Court set aside key portions of that October 2025 policy, Defendants adopted a new policy on March 23, 2026 ("the Interim Policy" or "Policy") that sought to serve the same interest in protecting military secrets through distinct mechanisms, including limiting all journalists to escorted access within the Pentagon. The escort requirement applies to all journalists who hold PFACs, regardless of viewpoint or affiliation.

The escort requirement is currently in effect because the D.C. Circuit stayed this Court's previous injunction of the requirement. *N.Y. Times Co. v. U.S. Dep't of Def.*, No. 26-5113, 2026 WL 1179440 (D.C. Cir. 2026) ("*NYT I*"). Plaintiffs nonetheless ask the Court to enter a new preliminary injunction against the requirement. The Court should deny Plaintiffs' motion.

The First Amendment does not entitle—and has never entitled—all people an unfettered right, on terms they demand, to access sensitive government spaces or to obtain sensitive government information—especially in the context of national security. Nor does it afford journalists special rights to access government spaces or information. But Plaintiffs The New York Times Company and Julian Barnes demand just that: access to nonpublic government spaces and the ability to circumvent reasonable government restrictions on the solicitation and distribution of sensitive national-security information. The First Amendment does not give them that right.

The D.C. Circuit has already determined that this escort requirement "furthers important national security interests" and stayed this Court's last injunction against enforcing it. *NYT I*, 2026 WL 1179440, at *2 (citing *Haig v. Agee*, 453 U.S. 280, 307 (1981)). And the Policy validly furthers those interests by applying to any PFAC holder wishing to gain access to the Pentagon's press areas, without discriminating based either on the person's viewpoint or the content of his speech.

The Interim Policy complies fully with First Amendment public-forum doctrine. And it was adopted for a legitimate purpose—limiting the improper disclosure of sensitive and classified information, a purpose that Defendants have consistently asserted at multiple points through the development of the Policy and in the prior litigation. Plaintiffs claim that the Interim Policy was imposed in retaliation for their First Amendment activities, but that claim is belied by the record— which makes clear that the current challenged policy was issued in response to a previous court order. That is an ordinary and permissible purpose, far from the anathema Plaintiffs claim. *See id.* at *3 ("Under settled law, an agency may respond to an adverse ruling by adopting a revised policy[.]").  Those non-retaliatory grounds are more than sufficient to justify the Interim Policy and its effects, meaning that Plaintiffs cannot show they were subjected to unlawful retaliation. Further, those explanations provide the requisite reasoning sufficient to satisfy arbitrary-and-capricious review under the Administrative Procedure Act (APA). The Interim Policy is lawful; emergency relief is thus unwarranted.

Moreover, Plaintiffs cannot show irreparable harm from Defendants' use of the escort policy to manage security risks. Individuals associated with the Times have accessed the Pentagon multiple times—with an escort—since the inception of the policy in March 2026. And scores of other reporters have similarly attended media events, press conferences, interviews, and other similar events since that date. Escorts are readily available and have been promptly provided for

2

such activities. Indeed, to Defendants' knowledge, no PFAC holder has been unable to enter the Pentagon because of an inability to arrange an escort. The burdens imposed by the requirement are, essentially, nonexistent. And they certainly cannot support an irreparable-harm finding at the preliminary-injunction stage.

Consistent with the D.C. Circuit's decision to stay the Court's previous injunction against the escort requirement, the Court should deny Plaintiffs' motion for preliminary injunction.

## BACKGROUND

The Pentagon is the nation's military headquarters and is subject to the "jurisdiction, custody, and control" of the Secretary of War, who has "responsibility for" its "operation, maintenance, and management." 10 U.S.C. § 2674(a). Sensitive areas, including the National Military Command Center and Sensitive Compartmented Information Facilities ("SCIFs"), are located throughout the building. Meagher Decl. ¶ 9, ECF No. 6-19; Williams Decl. ¶ 12, ECF No. 6-20. Pursuant to his authority to prescribe "rules and regulations" he "considers appropriate to ensure the safe, efficient, and secure operation" of the Pentagon, the Secretary has restricted access to the Pentagon. 10 U.S.C. § 2674(c)(1); *see* 32 C.F.R. §§ 234.3, 234.4.

Congress has enacted criminal statutes that prohibit Department personnel from disclosing certain kinds or categories of information that flows through the Pentagon. 18 U.S.C. § 793(d)-(e), part of the Espionage Act, prohibits the willful communication of information relating to the national defense to any person not entitled to receive it. *See, e.g.*, *United States v. Morison*, 844 F.2d 1057, 1063-67 (4th Cir. 1988). 18 U.S.C. § 1905 prohibits government employees from knowingly disclosing confidential information. *See, e.g.*, *United States v. Wallington*, 889 F.2d 573, 576-79 (5th Cir. 1989). And Article 92 of the Uniform Code of Military Justice, 10 U.S.C. § 892, prohibits military personnel from violating information security regulations. *United States*

3

*v. McGuinness*, 33 M.J. 781, 784-85 (N.M.C.M.R. 1991). As with other criminal offenses, aiding and abetting, inducing, or soliciting violations of these statutes is illegal. *See* 18 U.S.C. § 2; *Standefer v. United States*, 447 U.S. 10, 18 n.11 (1980); *United States v. Hansen*, 599 U.S. 762, 783 (2023); (addressing criminal solicitation and facilitation); *United States v. Williams,* 553 U.S. 285, 298 (2008) ("Many long established criminal proscriptions—such as laws against conspiracy, incitement, and solicitation—criminalize speech (commercial or not) that is intended to induce or commence illegal activities.").

Restrictions on press access to military installations, including the Pentagon, are longstanding. For example, during World War II, war correspondents were required to agree to "submit for censorship all statements, written material, and photography intended for publication or release" and to accept that their credentials "were revocable at any time." War Correspondents Instruction, Sections 1, 7.

In October 2025, the Department implemented a new policy designed to protect the security of restricted information within the Pentagon. ECF No. 1-3. The policy imposed an escort requirement for parts of the Pentagon outside portions of three corridors on the second floor of the Pentagon, and it advised PFAC holders that areas authorized for unescorted access would likely change in the coming months, as the Department planned to move PFAC holders to a larger space that, unlike the Correspondents Corridor, "provides WiFi access and cell phone service." *Id.* at 6. Plaintiffs did not challenge that escort requirement. *See* Compl. ¶¶ 60-134, *N.Y. Times Co. v. Dep't of Def.*, Civ. A. No. 25-4218 (D.D.C.) ("*First NYT Litigation*"), ECF No. 1.

Substantively, the October Policy set out the requirements for maintaining a PFAC and reiterated longstanding requirements of the Department to safeguard both classified national security information (CNSI) and controlled unclassified information (CUI). The October policy

4

focused on preventing reporters from gaining unauthorized access to CNSI and CUI. In particular, the October policy provided that a PFAC "may be denied, revoked, or not renewed if a person is reasonably determined to pose a security or safety risk to [Department] personnel or property." ECF No. 1-3 at 9.[1] Under that standard, a PFAC could be revoked if the Department concluded that the reporter had attempted to improperly solicit CNSI or CUI from Department employees or otherwise encouraged Department personnel to violate laws and policies concerning disclosure of such information. *Id.*; s*ee id.* at 7, 13-14; *see also* 18 U.S.C. § 793(d)- (e); 10 U.S.C. § 892. PFAC holders were required to read and sign the updated in-brief form outlining information security requirements, new physical control measures, and the Department's expectations of their compliance with safety and security requirements. ECF No. 1-3 at 15. The October policy was in effect from October 2025 through March 2026.

Plaintiffs challenged the October 2025 policy in December 2025, arguing that various provisions regarding denial, revocation, and non-renewal of PFACs were unconstitutionally vague, afforded the Department unbridled discretion, discriminated based on viewpoint and content, failed to provide adequate pre-revocation process, placed unconstitutional conditions on Plaintiffs' First Amendment rights, and violated the APA. *First NYT Litigation*, Compl. They sought relief from the policy and reinstatement of PFACs they held before the policy was implemented, which they had surrendered because of fears about the implementation of the new policy and unwillingness to sign the updated in-brief form. *Id.* at 40.

The Court entered summary judgment for Plaintiffs, concluding that the October policy was unconstitutionally vague and that it imposed unreasonable and viewpoint-discriminatory

---

[1] Pinpoint citations to documents with inconsistent pagination refer to the ECF-generated page numbers.

restrictions on access to the Pentagon. *First NYT Litigation*, ECF No. 35 at 16-35. The Court accordingly vacated the challenged provisions of the October policy, enjoined enforcement of those provisions against Plaintiffs, and ordered the Department to reinstate Plaintiffs' PFACs. *First NYT Litigation*, ECF No. 34.

On March 23, 2026, shortly after the Court's order vacating portions of the October policy, the Department adopted the Interim Policy in an effort to protect the Pentagon's information security while making changes to respond to and allay the Court's concerns with the challenged portions of the October policy. ECF No. 1-1 at 2-3. In particular, the Interim Policy revised the provisions governing solicitation of CNSI and CUI and the provisions regarding denial, revocation, and non-renewal of PFACs that the Court had concluded were unconstitutionally vague and viewpoint discriminatory. *Id.* at 14-16.  The Interim Policy also announced that, as the October policy previewed, the on-site office space available to journalists would be moved from the former Correspondents Corridor to another space, located on the Pentagon grounds but outside the building itself, until a new press workspace is established. *Id.* at 7, 19. And the Interim Policy explained that "unescorted access to the Pentagon cannot be responsibly maintained" under present conditions, but PFAC holders can continue to access the Pentagon with an escort. *Id.* at 3; *see id.* at 7-9. Under the Interim Policy, a number of news outlets whose journalists had previously surrendered their PFACs returned to the Pentagon. *See* Ex. 2, Decl. of Joel Manuel Valdez ¶ 3 ("Valdez Decl.").

The escort requirement responded to a change that the Department had observed when many journalists surrendered their PFACs under the October policy. Before the October policy was implemented, the Department regularly learned that PFAC holders had obtained sensitive or classified information—"often monthly, and sometimes multiple times per month." Ex. 3, Decl.

of Sean Parnell ¶ 4 ("Parnell Decl."). That frequency raised "concern[s] about the security of information within the Pentagon." *Id.* ¶ 5. When many journalists surrendered their PFACs after the October policy took effect, the frequency with which the Department learned journalists had obtained controlled or classified information dropped dramatically. *Id.* ¶ 8. Without the ability to observe activity patterns in sensitive spaces and time their inquiries accordingly, journalists' systematic receipt of controlled and classified information substantially decreased. *Id.* ¶¶ 8-9.

Plaintiffs first sought relief from portions of the Interim Policy, including the escort requirement, by arguing in their earlier lawsuit that the Interim Policy amounted to noncompliance with the Court's summary judgment order. *First NYT Litigation*, ECF No. 37. On April 9, the Court agreed, declaring that certain provisions of the Interim Policy violated the order and enjoining the Department from enforcing the escort requirement and other provisions of the Interim Policy against Plaintiffs. *First NYT Litigation*, ECF No. 54. On April 13, the Court stayed its order as to the escort requirement and closure of the previous workspace for journalists for fourteen days to allow for an immediate appeal. *First NYT Litigation*, ECF No. 59.

The D.C. Circuit granted the Department's motion for a stay pending appeal of the Court's injunction against enforcement of the escort requirement, over Judge Childs's dissent. *NYT I*, 2026 WL 1179440. The court of appeals credited the Department's explanation that prior to the October policy, "journalists obtained 'sensitive or classified' information 'often monthly, and sometimes multiple times per month,' including information concerning 'operational plans' and 'intelligence assessments,' " and that unescorted Pentagon access was " 'a significant contributing factor' to that pattern because it enabled reporters to 'observe activity patterns' and identify potential sources of sensitive information." *Id.* at *2. And the court of appeals concluded that the government would likely prevail on appeal because "an agency may respond to an adverse ruling by adopting a revised

7

policy," and the escort requirement "is a new, generally applicable requirement that is not invalid for violating the district court's summary judgment order or the constitutional principles underlying it." *Id.* at *3. The dissent would have concluded that the Interim Policy's escort requirement was invalid because its motive was to "evade" the Court's summary judgment ruling. *Id.* (Childs, J., dissenting); *see id.* at *6.

The escort requirement has been continuously in effect since the D.C. Circuit's stay order on April 13, 2026. Plaintiffs submit an account of the initial functioning of the escort policy from Plaintiff Barnes, which is inaccurate and incomplete in several respects. Valdez Decl. ¶¶ 12-18. In the weeks the requirement has been in effect, several New York Times journalists—in addition to Plaintiff Barnes—"have accessed the Pentagon approximately seven times since March 23, 2026." *Id.* ¶ 5. Other than for one interview that was rescheduled for a scheduling conflict, *see id.* ¶ 17, Times PFAC holders "have been able to access the Pentagon for journalistic activities on every occasion they have sought to do so," *id.* ¶ 5. Since March 23, 60 reporters—either holding or picking up PFACs—have "repeatedly accessed the Pentagon" for journalistic reasons, including to attend media events, press conferences, interviews, media roundtables, and other similar events. *Id..* ¶ 6. Indeed, under the Policy, one escort may accompany up to "ten people at a time" attending media events "to ensure there is never a shortage of escorts." *Id.* ¶ 7. The Pentagon has held 24 in-person media events since March. *See id.* ¶ 6. And it has held five press briefings in that time, each attended by approximately 60 reporters and utilizing multiple escorts to facilitate attendance. *See id.* Under the Interim Policy, "no PFAC holder has been unable to enter the Pentagon because of an inability to arrange an escort." *Id.*

Plaintiff Barnes alleges confusion in the Policy's administration, but those assertions are incorrect and incomplete. The Department clearly communicated to Mr. Barnes' counsel "that

Major Andrea Kelly in the Pentagon Press Office would be his point of contact for scheduling pickup" of Mr. Barnes's PFAC. *Id.* ¶ 14. Plaintiff Barnes then attempted to retrieve his PFAC "without having communicated or coordinated with Major Kelly or other Pentagon staff." *Id.* Mr. Barnes then reports confusion on March 24, 2026, over how he could access the Pentagon library, but, the next day, Pentagon staff "provided Barnes with photos and Google Maps screenshots showing how to access the library." *Id.* ¶ 15. Mr. Barnes incorrectly asserts that PFAC holders did not have permission to ride the Pentagon shuttle bus; to the contrary, "Mr. Barnes and his colleagues were informed that PFAC holders could use the shuttle bus, and that signage would be updated to reflect as much." *Id.* ¶ 16. Mr. Barnes alleges that the escort requirement resulted in the cancellation of an interview he had planned, but the interview was instead postponed "because of a routine scheduling conflict wholly unrelated to the Interim Policy." *Id.* ¶ 17. And Mr. Barnes asserts that the Pentagon has imposed a burden on his activities by requiring journalists to wear wristbands and to limit restroom breaks at press briefings. Use of wristbands, though, reflects standard security protocols unrelated to the Interim Policy. *See id.* ¶ 18. And restroom limitations during press briefs simply reflect that escorts are required to proceed to the restrooms, which are in a restricted corridor. *See id.* To avoid any delay in obtaining an escort, Pentagon staff recommended that reporters use restrooms "half an hour" before a press briefing. *See id.*

Plaintiffs challenged the Interim Policy in this lawsuit on May 18, 2026. Compl. On May 22, Plaintiffs moved for a preliminary injunction barring enforcement of the escort requirement against them on the grounds that the escort requirement retaliates and discriminates against their viewpoints in violation of the First Amendment and that it violates the APA. ECF No. 6-1.[2]

---

[2] Plaintiffs do not seek interim relief on their complaint's third claim, that Defendants violated the Due Process Clause of the Fifth Amendment by depriving the New York Times and Barnes of both a liberty and property interest in their PFACs. *See* Compl. ¶¶ 136–42 (Count Three).

## LEGAL STANDARD

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded" as a matter "of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted). A plaintiff must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Against the federal government, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    Plaintiffs Are Likely to Fail on the Merits.

#### A.    The Interim Policy's escort requirement complies with the First Amendment.

Plaintiffs are not likely to succeed in showing that the Interim Policy and its escort requirement violate the First Amendment. The escort requirement legitimately and reasonably advances the intended purposes of the Pentagon's press areas. And it does so in a way that is viewpoint neutral—both facially and in effect. Moreover, Plaintiffs cannot show that Defendants adopted the Policy to retaliate against Plaintiffs' exercise of First Amendment-protected activity, because they cannot show that the protected activity—Plaintiffs' lawsuit challenging the October Policy—resulted in any retaliatory action against Plaintiffs. Instead, the Policy is a reasonable response to this Court's earlier ruling. *See NAACP v. Donovan*, 737 F.2d 67, 72 (D.C. Cir. 1984)). Nor can Plaintiffs show that Defendants lack any nonretaliatory basis for the Policy. The escort requirement is thus wholly constitutional; Plaintiffs are unlikely to succeed in showing it violates the First Amendment.

### 1. The Interim Policy reasonably regulates conduct in the Pentagon's press areas and does not discriminate based on viewpoint.

The Interim Policy's facially neutral escort requirement, which applies to all journalists who hold PFACs, readily complies with the First Amendment's public-forum doctrine. Members of the press have no right of special access to government facilities or to information beyond that afforded to the general public. *See Branzburg v. Hayes*, 408 U.S. 665, 684 (1972). The Pentagon's press areas[3]—as a nonpublic forum, the kind of forum over which the government exercises the greatest degree of control—are exactly the kind of sensitive government property that merits that heightened degree of control.

"A nonpublic forum is government property 'that is not by tradition or designation a forum for public communication,' such as a government office building." *Ateba v. Leavitt*, 133 F.4th 114, 121-22 (D.C. Cir. 2025) (quoting *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018)), *cert. denied*, 146 S. Ct. 822 (Nov. 24, 2025). The "government is not required to open such spaces for any speech at all." *Id.* at 122. Once the government provides "selective access for individual speakers," though, it creates a nonpublic forum. *Id.* (quoting *Bryant v. Gates*, 532 F.3d 888, 895 (D.C. Cir. 2008)). In such spaces, the government enjoys the authority to impose stronger restrictions than in other public fora, such as limiting access to entities the government "consider[s] appropriate," *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 805 (1985), and by "strictly regulat[ing]" access to public spaces by, *e.g.*, requiring that individuals book a time to visit and submit to security inspection, *United States v. Nassif*, 97 F.4th 968, 977 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 552 (Nov. 12, 2024). Press areas at, for example, the White House are "limited

---

[3] Plaintiffs challenge the Interim Policy's requirement that access to the Pentagon's "press briefing room, corridors, and the now-shuttered Correspondents' Corridor" be permitted only with an escort. ECF No. 6-1 at 32.

11

to journalists who satisfy the White House's admission criteria and secure either a hard pass or a day pass to enter, subject to space availability." *Ateba*, 133 F.4th at 122.

The government may "reserve" a nonpublic forum "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* at 123 (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983)). " 'Control over access to a nonpublic forum can be based' even 'on subject matter and speaker identity so long as' it meets the requirements of reasonableness and viewpoint neutrality." *Id.* (quoting *Cornelius*, 473 U.S. at 806). Indeed, the First Amendment does not create "any per se right of access" to government activities "simply because such access might lead to more thorough or better reporting." *Flynt v. Rumsfeld*, 355 F.3d 697, 703 (D.C. Cir. 2004) (citation omitted). Those principles underscore why the escort requirement is constitutional.

Plaintiffs agree that the Interim Policy is "facially neutral," ECF No. 6-1 at 35, so they do not challenge its facial viewpoint neutrality. Plaintiffs instead challenge the reasonableness of the escort requirement and argue that the requirement was issued to suppress disfavored views.

*First*, the reasonableness of the escort requirement "easily pass[es] constitutional muster." *Ateba*, 133 F.4th at 123. To meet the standard, "a restriction 'need not be the most reasonable or the only reasonable restriction.' " *Id.* (quoting *Cornelius*, 473 U.S. at 808). Courts give "the government substantial leeway to regulate access to a nonpublic forum" and uphold "a range of restrictions that were justified in light of the forum's purpose." *Id.* Defendants have laid out reasonable security justifications for the escort requirement—which, as Defendants have explained in the related litigation and further explain here, helps the Department minimize the risk that reporters might be able to "observe activity patterns" and "identify potential sources of sensitive

12

information," thus increasing the likelihood that journalists might obtain "sensitive or classified" information "monthly" or even "multiple times per month." *NYT I*, 2026 WL 1179440, at *2; *see also* Parnell Decl. ¶¶ 4, 6, 9, 11.

Plaintiffs primarily argue that the escort requirement is "fundamentally incompatible with the design, history, and purpose of the forum" because—in Plaintiffs' telling—it "severely restricts PFAC holders' access to and use of the Pentagon's press areas for newsgathering and reporting" by limiting holders' ability to "[r]eport[] regularly from inside the building without advance permission," attend "breaking-news conferences and briefings, speak with a range of sources," and "walk from public affairs office to public affairs office." ECF No. 6-1 at 32-33. But the purpose of Pentagon's press areas has *never* been to permit journalists unfettered access to spaces throughout the building, especially where access might result in the dissemination of controlled unclassified or classified information. *See* Decl. of Julian E. Barnes ¶¶ 10-12, ECF No. 6-17 (noting that the Pentagon has previously facilitated press access to certain portions of the building, like "unsecure locations," where "classified matters" are not typically discussed); *see also* Parnell Decl. ¶ 10; ECF No. 1-3 at 6 (unchallenged provision of October Policy limiting unescorted access to specific portions of the building). The escort requirement preserves access: Journalists can, and frequently do, readily enter the building to have face-to-face interviews, meetings, and conversations and to attend press briefings. *See* Valdez Decl. ¶¶ 5-6. "[N]o PFAC holder has been unable to enter the Pentagon because of an inability to arrange an escort." *Id.* ¶ 6. The requirement simply adds a reasonable restriction, without revoking access, that lessens the risk that such access might result in the dissemination of sensitive information. The escort requirement fulfills exactly those purposes—consistent with the longstanding purpose of opening the Pentagon's press areas

13

to reporters for newsgathering while ensuring that such practices do not result in the unauthorized release of sensitive information.

The First Amendment does not require that the government make a reporter's job easier or better. *See Flynt*, 355 F.3d at 703. And it certainly does not tie the government's hands when it identifies a security risk and implements reasonable, content-neutral regulations—far short of a total bar on access to the forum—to mitigate that risk. All it requires is that restrictions on a nonpublic forum—the most restrictive kind of forum under free-speech doctrine—reasonably limit access to the forum. *See Ateba*, 133 F.4th at 123-124; *see also Price v. Garland*, 45 F.4th 1059, 1072-73 (D.C. Cir. 2022) (noting that the reasonableness standard "is a relatively low bar" and upholding a permit-and-fee scheme applied to filmmaking activity in national parks (citation omitted)), *cert. denied*, 143 S. Ct. 2432 (May 1, 2023). The escort requirement easily clears that bar.

Plaintiffs further argue that the requirement is unnecessary and unreasonable because, in essence, many other people have "unescorted access to the Pentagon." ECF No. 6-1 at 33. That argument is wholly irrelevant. It ignores that Defendants' basis for the Interim Policy is the finding that journalists—not the range of other people who access the Pentagon—have in recent years obtained sensitive information, which was a "significant contributing factor" in the risk that such information could be disseminated. *NYT I*, 2026 WL 1179440, at *6; *see* Parnell Decl. ¶ 11. The unique nature of the journalistic profession and each journalist's access to both sources of and means for distributing information is itself the distinguishing factor that created such a risk. *See id.*

*Second*, although Plaintiffs concede that the escort requirement in the Interim Policy is facially viewpoint neutral—which is made clear by the fact that it applies to all PFAC holders,

14

including current holders, the Times, and any other news organization or individual that signs the requisite acknowledgment to receive PFACs, *see* ECF No. 1-1 at 3—they argue that the Policy was issued to "suppress a particular point of view," rendering the escort requirement viewpoint discriminatory in effect, ECF No. 6-1 at 35-36 (quoting *Cornelius*, 473 U.S. at 812).

Even assuming that such an effects-based claim is viable—which is not clear, *see Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 365 (D.C. Cir. 2018) (assuming, without deciding, that an effects-based viewpoint-suppression claim may proceed), *cert. denied*, 587 U.S. 1039 (2019)—Plaintiffs have failed to point to the kind of evidence that suggests that the imposition of this facially neutral Policy masks "insidious bias," *id.* Retrospective evidence—which "begins with 'statements by government officials on the reasons for' " limiting the forum, *id.* at 366 (quoting *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004))— underscores that the adoption of the escort requirement was driven by security needs, the explicit rationale used in adopting the requirement, *see* ECF No. 1-1 at 3; *see also NYT I*, 2026 WL 1179440, at *2 (describing the security justifications underlying the escort requirement); Parnell Decl. ¶¶ 10-13; *N.Y. Times Co. v. Dep't of Def.*, ---F. Supp. 3d---, 2026 WL 788689, at *5 (D.D.C. 2026) ("*NYT II*") (outlining the security concerns related to the unauthorized disclosure of sensitive information to journalists).

Plaintiffs must then revert to showing that the requirement's "fit between means and ends is loose or nonexistent," which might suggest underlying bias. *Am. Freedom*, 901 F.3d at 366 (quoting *Ridley*, 390 F.3d at 87). Plaintiffs do not attempt to show such a loose fit in pressing their First Amendment claim. *See* ECF No. 6-1 at 34-36. And their brief discussion of over- and underinclusiveness, in the context of their APA claim, carries no water. *See id.* at 41. Plaintiffs claim that "[b]eing present in the Pentagon without an escort does not give journalists access to

15

classified information." *Id.* It does not necessarily do that, standing alone. But it certainly—and logically—*increases the risk* that, without the guidance of an escort, journalists might overhear or solicit, whether intentionally or unintentionally, sensitive information, or notice patterns of behavior that themselves can reveal classified information. That is precisely what the Department observed over the last several months. *See NYT I*, 2026 WL 1179440, at \*2 (noting that unescorted access was "a significant contributing factor" to a pattern of unauthorized disclosure of sensitive information); *see also* Parnell Decl. ¶¶ 6, 9-13. Indeed, in the FOIA context, the Supreme Court and D.C. Circuit have long recognized that even the release of seemingly innocuous information can, if aggregated and combined with other pieces of available information, provide insight into sensitive or classified information that might result in an improper disclosure. *See, e.g.*, *CIA v. Sims*, 471 U.S. 159 (1985); *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 548 F. Supp. 3d 185, 199 (D.D.C. 2021) (laying out the "mosaic theory" of "classification by compilation"), *on reconsideration by*, 754 F. Supp. 3d 56 (D.D.C. 2024).

Plaintiffs next argue that "[k]eeping journalists out of the Pentagon will not prevent them from obtaining information the Department does not want them to have." ECF No. 6-1 at 41. Maybe not necessarily—but the Interim Policy permissibly addresses physical access to the Pentagon via PFAC, not a comprehensive information security strategy. And it will *reduce the risk* of journalists obtaining *sensitive national-security information* to which they are not legally entitled and the disclosure of which, by definition, could harm national security. *See NYT I*, 2026 WL 1179440, at \*2; Parnell Decl. ¶¶ 6, 13 *see also* Exec. Order No. 13526, 75 Fed. Reg. 707, § 1.2(a) (Dec. 29, 2009) (defining the classification levels that may apply to government information). At any rate, the escort requirement does not "keep[] journalists out of the Pentagon," ECF No. 6-1 at 41—it permits access, as long as that access is escorted. Nor does it impose any

restrictions on the types of questions that might be asked or conversations that might occur. The fit between the escort requirement not only passes muster—it affirmatively and concretely advances a specific security rationale.

"Other, less probative types of retrospective evidence," like the background of the decision and any past findings that the government engaged in viewpoint discrimination against the plaintiff, *Am. Freedom*, 901 F.3d at 366, are weak with respect to the escort requirement. As discussed below, Plaintiffs cannot show animus toward them in the adoption of the escort requirement. Defendants' rationale for adopting the escort requirement has consistently articulated a need to prevent the unauthorized disclosure of sensitive national-security information to members of the press and public. Plaintiffs may disagree with Defendants' expressed desire to limit such disclosure, but that mere fact does not mean Defendants have acted with impermissible bias.

The final type of relevant evidence—any "prospective evidence" in the government's "lack of evenhandedness" after the forum has been restricted, *id.*—slams the door on Plaintiffs' First Amendment claim. The reason is simple: there is no prospective evidence that Defendants have administered the Interim Policy and its escort requirement in anything but an evenhanded way. "[A]ny PFAC holder may enter the Pentagon only with an escort," regardless of viewpoint, affiliation, and the like. Valdez Decl. ¶ 6. Since March 2026, "60 reporters, who hold active PFACs or are employees of outlets who have received approval to pick up their PFACs, have repeatedly accessed the Pentagon" for reporting activities. *Id.* PFAC holders "are pre-cleared" in Pentagon systems "and do not need to undergo a background check each time they wish to access the Pentagon." *Id.* ¶ 10. "A PFAC holder requires only an escort[.]" *Id.* Plaintiffs cite "no example" of Defendants permitting other similarly situated individuals or entities to gain unescorted or

unsupervised access to the Pentagon's press areas. *Id.*; *see* ECF No. 6-1 at 34-36. Here, as in *American Freedom*, "there is no question" that the escort requirement "sweep[s] out far more than just" Plaintiffs. 901 F.3d at 367. It applies to all current and future PFAC holders. And there's no evidence to suggest that condition has been enforced unfairly: again, "no PFAC holder," regardless of viewpoint, "has been unable to enter the Pentagon because of an inability to arrange an escort." Valdez Decl. ¶ 6.

*       *       *

Defendants have imposed a limited, tailored condition on access to press areas in the Pentagon that ensures reporters may continue to conduct newsgathering and reporting activities at the Pentagon while lessening the risk that such activities might result in the unauthorized disclosure of sensitive information. The escort requirement from which Plaintiffs seek injunctive relief is reasonable and viewpoint neutral. It is thus fully lawful as a reasonable limitation on speech activities in a highly sensitive nonpublic forum.

### 2.   *Plaintiffs are not likely to show that the escort requirement is retaliatory.*

As a general matter, " 'the First Amendment prohibits government officials from subjecting an individual for retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). Under the retaliation framework, a plaintiff must show that (1) he "engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in [his] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken" against the plaintiff. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025) (quoting *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)). As relevant here, to "prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's

18

'subsequent injury.' " *Nieves*, 587 U.S. at 398 (quoting *Hartman*, 547 U.S. at 259). It is "not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured— the motive must *cause* the injury." *Id.* Put otherwise, "a plaintiff pursuing a First Amendment retaliation claim must show, among other things, that the government took an 'adverse action' in response to his speech that 'would not have been taken absent the retaliatory motive.' " *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) (quoting *Nieves*, 587 U.S. at 399).

Plaintiffs fail to carry their burden on the merits at the preliminary-injunction stage for two reasons: (1) they are not likely to show a retaliatory motive; and (2) even if Plaintiffs could show that such a motive existed, Defendants would have adopted the Interim Policy anyway. Instead, the evidence confirms that Defendants—rightfully—issued the Policy to address longstanding security concerns while remaining in compliance with this Court's order in related litigation, an order that closed off Defendants' previous attempts to mitigate those concerns. The Interim Policy—specifically, the escort requirement, the only element of the Policy at issue here—was not issued because of any animus against Plaintiffs. It was not and cannot be retaliatory under the First Amendment.

        a.   <u>Plaintiffs are not likely to prove a retaliatory motive for the Interim Policy.</u>

On its face, the Interim Policy explains why it was adopted. It explains that the terms of the Court's prior order did not permit Defendants to mitigate certain security risks, thus necessitating the use of escorts to ensure that sensitive information would not be improperly disclosed. The Interim Policy's timing confirms the same thing, underscoring that it was adopted in response to the Court's order. The declaration submitted by the decisionmaker who adopted the Interim Policy further explains why it was adopted: in order to secure the Pentagon against the unacceptable risks to information security—and thus national security—that a return to the status quo would present. Parnell Decl. ¶¶ 10-13.

19

In order to establish a likelihood of success on their retaliation claim, Plaintiffs would have to overcome the presumption of regularity and establish that those are not the true justifications for the Interim Policy. *See Media Matters for Am. v. Fed. Trade Comm'n*, No. 25-5302, 2025 WL 2988966, at *9 (D.C. Cir. Oct. 23, 2025) (recognizing that the "presumption of agency regularity" is a "[h]urdle[]" for retaliation claims). They cannot do so. Plaintiffs identify no direct evidence that the Interim Policy was adopted to punish them either for their "reporting" or "their lawsuit" challenging the October Policy. ECF No. 6-1 at 25.

Instead, Plaintiffs rely on three categories of circumstantial evidence: "the face of the Interim Policy," "the sequence of events leading up to its adoption," and "the Department's own statements." Compl. ¶ 131. The D.C. Circuit has cautioned against inferring retaliatory motive from such evidence outside of "unusual factual pattern[s]" and "unprecedented" circumstances. *Media Matters*, 2025 WL 2988966, at *6. No such circumstances, or circumstantial links, are apparent.

*Face of the policy.* The face of the Interim Policy is utterly devoid of any indication that it was issued in retaliation for Plaintiffs' protected speech or conduct. Indeed, the face of the Policy contains no "expression of hostility" to Plaintiffs' protected activity and, further, it affirmatively provides a "legitimate alternative explanation" for issuance of the Policy. *Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, 816 F. Supp. 3d 27, 54 (D.D.C. 2026) (quoting *Media Matters*, 2025 WL 2988966, at *8). The Policy explains that "the Department disagrees with the Court's decision and is pursuing an appeal," consistent with its legal rights. ECF No. 1-1 at 2. And it expressly states that Defendants intended the Interim Policy "*to comply with the Court's order while preserving the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon Reservation.*" *Id.* Those statements

20

merely indicated the Department's legitimate disagreement with the Court's analysis—including a discussion of Defendants' rights under the law—and the Department's intent to comply with the Court's order absent judicial relief. *See id.* The rest of the Interim Policy explained how members of the press would receive updated PFACs, provided clarifications intended to address characterizations of the original Policy that "the Department believes were inaccurate," and announced the consummation of the Department's "commitment" to "upgrade the space" used by members of the press. *Id.* at 2-3. The Policy itself provided revised conditions for access to Pentagon press areas, and, other than in clarifying the "inducement" standard the Policy uses (an attempt at clarification of Defendants' press access policies aimed to mitigate concerns the Court earlier identified, *see id.* at 2-3), did not reference Plaintiffs' prior litigation. *See id.* at 5-19.

Plaintiffs also claim that Defendants "lashe[d] out at the Court" in a "clap back to the Court's order." ECF No 6-1 at 28-29. But it is an ordinary and expected part of the process of challenging agency actions for the agency to conduct a new regulatory action in response to an adverse court decision, even if the agency disagrees with the decision—as the D.C. Circuit recognized in staying the Court's previous injunction against enforcement of the escort requirement. *See NYT I*, 2026 WL 1179440, at \*2; *see also*, *e.g.*, *Harmon v. Thornburgh*, 878 F.2d 484, 495 (D.C. Cir. 1989); *Donovan*, 737 F.2d at 72. And even if Plaintiffs were right in this assertion about the Interim Policy's motivations, this "clap back" theory would in reality *undermine* Plaintiffs' claim of an intent to retaliate against *them*.

*Timing.* Moreover, the "timing," Compl. ¶ 131, of the Policy's issuance underscores why the Policy cannot be construed to be retaliatory against Plaintiffs. The timing, promptly after the Court set aside the October Policy, makes clear that the Interim Policy was prompted by the need for agency action to fill the gap created when the Court vacated key provisions of the October

Policy. Of course, government agencies "remain[] free to promulgate new, narrower regulations, subject to review of the district court," following adverse orders against them. *Harmon*, 878 F.2d at 495; *see also Donovan*, 737 F.2d at 72; *NYT I*, 2026 WL 1179440, at *2 ("Under settled law, an agency may respond to an adverse ruling by adopting a revised policy."). Such an act does not evince retaliatory animus. *See Nieves*, 587 U.S. at 398-99. The timing of the Policy points to one reasonable conclusion: that Defendants understood their original policy to be set aside as unlawful under the Court's order, and that they believed they could fulfill their obligation to ensure the safe, efficient, and secure operation of the Pentagon by issuing a revised policy with narrowed and different-in-kind requirements, like the escort requirement at issue here.

That timing particularly undercuts Plaintiffs' attempt to link the Interim Policy to their earlier speech. Again, the policy was plainly precipitated by the need for a new policy in light of the Court's order, not anything Plaintiffs said or did. *See* ECF No. 1-1 at 2 (noting that "the Department has revised the Policy to comply with the Court's order").

*Statements.* Plaintiffs are left, then, to point to statements that Defendants have made about Plaintiffs' coverage of the Department. ECF No. 6-1 at 28. Most of the statements Plaintiffs marshal were made "in the lead-up to the October Policy." *Id.* But Plaintiffs are presently challenging the Interim Policy, not the October Policy, and those remote-in-time statements cannot persuasively be invoked to supposedly contaminate the Interim Policy—unless Plaintiffs' implication is that *any* policy adopted by the Department would be impermissibly tainted by those past statements, leaving the Department unable to take any actions in this area. That would be a startling and unsupported decision.

The more recent statements—the only statements close in time to Defendants' issuance of the Interim Policy itself—do nothing to support Plaintiffs' claims that the escort requirement was

22

adopted to retaliate against Plaintiffs for their reporting or litigation. Instead, they concern Defendants' opinions about how Plaintiffs' reporting itself might harm national security and whether the reporting is accurate, not any hostility toward the fact that Plaintiffs are engaged in protected activity. *See* Ex. 8 to Compl. at 12-13, ECF No. 1-9 (Secretary Hegseth noting his belief that the Times is "willing to publish things based on classified information that would potentially harm those in harm's way" and that "them doing so is incredibly irresponsible and unpatriotic"); ECF No. 6-1 at 28 (noting Secretary Hegseth's statement that the press would "scrutinize[e] every good act in order to find a violation" (alteration in original) (quoting Ex. 9 to Compl., ECF No. 1-10)). Further, Defendant Parlatore's statement that the Interim Policy "us[es] more words to say the same thing and to foreclose creative misinterpretations," *N.Y. Times Co. v. Dep't of Def.*, ---F. Supp. 3d---, 2026 WL 962252, at *5 (D.D.C. 2026), *appeal filed & stay granted by* No. 26-5113, 2026 WL 1179440 (D.C. Cir. Apr. 27, 2026)—the only statement Plaintiffs identify from Defendants that relates directly to the Interim Policy itself, *see* ECF No. 6-1 at 28-29—underscores only that Defendants intended to serve the same security goals at issue in the original policy and identified expressly in the Interim Policy itself. *See* ECF No. 1-1 at 2 (noting the "Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon Reservation"); *see also id.* at 3 (noting that "the Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen PFAC holders for security risks," thus requiring press to have escorts on an interim basis).

That leads to the final supposed piece of evidence Plaintiffs invoke: Defendants' supposedly "changing and implausible justifications" and "pretextual explanation" for adoption of the Interim Policy. ECF No. 6-1 at 29-30. Defendants have offered no such explanations. To the contrary, Defendants have consistently explained that the Interim Policy was adopted to reduce

23

unlawful, unauthorized disclosures of sensitive information to journalists, as the Interim Policy itself states. It is not surprising that litigation prompted a fuller explanation of the factual basis for that decision, as the Wilson declaration in the previous litigation and the Parnell declaration in this litigation make clear. *See* ECF No. 1-1 at 3 (noting that the Department's "security posture" meant that "unescorted access" could not be maintained without enhanced screening of press); *NYT I*, 2026 WL 1179440, at *2 (noting that "[u]nescorted access to the Pentagon was, according to the Department, 'a significant contributing factor'" to the unauthorized release of sensitive information, and limiting such access "furthers important national security interests").

Indeed, even before the Interim Policy, Defendants have been clear for months that they considered unescorted access to areas within the Pentagon to be a security risk. The October Policy itself imposed an escort requirement for specific areas on the second floor of the Pentagon, and it indicated that the "list of authorized areas is expected to be modified within the next three months, as DoW intends to upgrade the space used by PFAC holders to a different area that provides WiFi access and cell phone service, as well as increased space for the expanded press corps." ECF No. 1-3 at 6.  Those consistent explanations do not suffice to show pretext, to the extent such evidence is even relevant to assessing a First Amendment retaliation claim. *Cf. Media Matters*, 2025 WL 2988966, at *8 (making no suggestion that pretext suggests retaliation).

Nor is any of that at all inconsistent—to the extent the record in a separate case challenging a different agency action is relevant—with the record in the litigation over the October Policy, where Defendants did not contest that the October Policy did not address a "security or safety risk to Pentagon property or personnel." *First NYT Litigation*, ECF No. 10-36 at ¶ 11; *see* ECF No. 6-1 at 30. The challenged provisions in the October Policy, like those in the Interim Policy, focused on national security risks posed by unauthorized, illegal disclosures of sensitive information, not

24

on risks to property (for example, graffiti) or personal safety (for example, violence toward Pentagon employees). *See, e.g.*, ECF No. 1-3 at 7 ("Unauthorized disclosure of CNSI or CUI poses a security risk that could damage the national security of the United States and place DoW personnel in jeopardy."). The Court's previous order "stripped" out the portions of the October Policy that permitted the Department to "screen PFAC holders" for the risks to information security that the Department had identified in the October Policy, ECF No. 6-1 at 29, so it was far from irrational for the Department to adopt a new policy to serve its potent information-security and national-security concerns.

      b.  <u>Even if Plaintiffs showed some retaliatory motive, Defendants would have issued the Interim Policy anyway.</u>

Even if there were a causal link between some protected activity of Plaintiffs' and Defendants' issuance of the Interim Policy the motive that caused the injury "must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves*, 587 U.S. at 399 (quoting *Hartman*, 547 U.S. at 260); *see also Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of the Treasury*, 45 F.4th 324, 340 (D.C. Cir. 2022); *Bailey v. Fed. Bureau of Prisons*, Civ. A. No. 24-1219 (PLF), 2024 WL 3219207, at *10 (D.D.C. June 28, 2024) (noting that the "causation standard is strict"), *ordered issued by*, 2024 WL 3227051 (D.D.C. June 28, 2024). "[E]ven if there was retaliatory motive," if Defendants can show that they "would have issued" the escort requirement in the Policy "anyway," they can defeat a prima facie retaliation claim. *Media Matters*, 2025 WL 2988966, at *9; *see also Doe v. District of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015) (noting that the but-for causation inquiry "is a subjective one").

Multiple pieces of evidence compel the conclusion that Defendants would have imposed the escort requirement in the Interim Policy after the Court's ruling for reasons entirely unrelated

to Plaintiffs' protected activity. Start with the Policy itself. As explained above, the Policy memorandum provides an independent, nonretaliatory basis for imposing the escort requirement. *See Nieves*, 587 U.S. at 398. "[T]he Department determined that unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen PFAC holders for security risks," ECF No. 1-1 at 3, procedures that the Department intends to implement, *see id.* at 16-19. Such changes would "preserv[e] the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon Reservation." *Id.* at 2; *see also* 10 U.S.C. § 2674(c)(1).[4] That evidence alone provides enough of a basis to conclude that Plaintiffs' retaliation claim should fail. It beggars belief to think that the Department would have let this risk to national security go unaddressed.

Plaintiffs assert that this justification cannot be the "real" explanation for the Policy because "The Times, and only The Times" is "ke[pt] out of the building" under its terms. ECF No. 6-1 at 31. That is a baffling claim: the Times is not barred from the Pentagon, as its own evidence makes clear. Barnes Decl., ECF No. 6-17 ¶¶ 27-28; *see also* Valdez Decl. ¶ 5. Nor is the Policy somehow limited to or targeted at the Times. As Plaintiffs admit in the same breath, the Interim Policy applies to *all* individuals and organizations seeking to report from the Pentagon. It applies equally to "new" Pentagon press corps, the Times, and any other organization with PFACs seeking regular access to Pentagon press areas. *See* ECF No. 1-1 at 2-3. Indeed, Plaintiffs elsewhere agree that the Interim Policy is "facially neutral." ECF No. 6-1 at 35.

Further evidence—much of which was put into the record prior to Defendants' original policy—underscores the validity of Defendants' information-security concerns. "The Pentagon

---

[4] The Secretary's duty to "protect the buildings, grounds, and property located in the National Capital Region" that are controlled by "the Department of Defense" is a mandatory duty. 10 U.S.C. § 2674(b)(1).

Press Secretary" submitted a declaration in the earlier litigation "explaining that, prior to the 2025 PFAC Policy, journalists obtained 'sensitive or classified' information 'often monthly, and sometimes multiple times per month.' " *NYT I*, 2026 WL 1179440, at *2; *see also NYT II*, 2026 WL 788689, at *5 (outlining security considerations under the original credentialing policy). "Unescorted access" contributed to that pattern by enabling "reporters to 'observe activity patterns' and identify potential sources of sensitive information." *Id.* "Controlled unclassified information and classified information was reaching journalists with a frequency that raised serious concerns about the security of information within the Pentagon." Decl. of Kingsley Wilson ¶ 5, *First NYT Litigation*, ECF No. 58-1.

Evidence submitted in this litigation underscores the point. "Unauthorized disclosure of operational plans, intelligence assessments, force posture decisions, and other obviously sensitive information puts American lives in danger, allows our enemies to adjust their tactics ahead of our operations, and risks compromising our ongoing operations." Parnell Decl. ¶ 10. The "regular pattern of unlawful disclosures" of sensitive controlled or classified information under the previous status quo "posed serious risks to national security." *Id.* The Interim Policy was adopted to address those concerns, based on observations about patterns that enabled journalists to obtain these disclosures. *Id.* ¶¶ 6-9. Security concerns were—and are—legitimate. And they thus provide an adequate basis to find that Defendants' escort policy may be sustained on nonretaliatory grounds.

    c.  <u>Plaintiffs are unlikely to show that the escort requirement would deter a person of ordinary firmness from exercising First Amendment rights.</u>

Plaintiffs are not likely to succeed in showing that a person of ordinary firmness would be deterred from exercising his First Amendment rights, either. Plaintiffs argue that the escort requirement would deter an ordinarily firm person because the requirement renders their PFACs "effectively worthless," ECF No. 6-1 at 26, but that is incorrect. Under the Policy, journalists have

ample opportunity to engage in exactly the kinds of activities they concede are core to their professional goals: attending media events, press conferences, on- or off-the-record interviews, bilateral meetings, and more. *See* Valdez Decl. ¶ 6. Indeed, other than in one instance where an interview was rescheduled for reasons unrelated to the Policy, the Times's own journalists "have been able to access the Pentagon for journalist activities on every occasion they have sought to do so." *Id.* ¶ 5. PFAC holders, like Plaintiffs, have pre-cleared access to the Pentagon upon the ready and rapid provision of an escort. *See id.* ¶ 10. Indeed, it is still the case that PFACs afford PFAC holders marked advantages over day pass holders, like the ability to enter the Pentagon immediately upon request—unlike day pass holders, who must request entrance at least 24 hours in advance. *See id.*

Plaintiffs say that, as a practical matter, even if they can readily enter the Pentagon, a "looming" escort will still devalue their PFACs by keeping them from "verify[ing] sources, gather[ing] information, or speak[ing] candidly with Department personnel," ECF No. 6-1 at 26 (quoting *NYT I*, 2026 WL 1179440, at *6 (Childs, J., dissenting)), but they do not explain why a conversation in the presence of two Department employees is necessarily less "candid[]," informational, or useful for verifying a source than a conversation with one Department employee. Nor do they offer any factual support for the claim that the escort requirement has had these effects in practice. Mr. Barnes has only attempted to enter the Pentagon twice, and no other declaration attempts even an anecdote to support this claim about the requirement's supposedly rampant effects.

Plaintiffs' view of the escort requirement as a punitive deterrent is a particularly weak because escort requirements are common—both in the Pentagon, where Plaintiffs did not challenge the October Policy's implementation of an escort requirement for all but three corridors on one

floor of the Pentagon, ECF No. 1-3 at 6; and elsewhere, such as for day pass holders at the White House, *see Ateba*, 133 F.4th at 117. Indeed, in *Ateba*, both the district court and the D.C. Circuit concluded that the availability of *escorted* access throughout the litigation *prevented* irreparable harm to the plaintiff journalist during the pendency of his case. *See* 133 F.4th at 117, 127; *Ateba v. Jean-Pierre*, 2023 WL 5748567, at *3-4 (D.D.C. Sept. 6, 2023). That is an unusual pedigree for a supposedly "aggressive" deterrent mechanism. ECF No. 6-1 at 27.

**B.      Plaintiffs are not likely to show that adoption of the Interim Policy was arbitrary and capricious.**

The APA's standard of review, 5 U.S.C. § 706(2)(A), is "[h]ighly deferential" to and "presumes the validity of agency action." *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (citation omitted). Reviewing courts may not "substitute" their "judgment for that of the agency." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)). To satisfy the standard, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.' " *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Courts "simply" ensure "that the agency has acted within a zone of reasonableness." *China Telecom (Ams.) Corp. v. FCC*, 57 F.4th 256, 264 (D.C. Cir. 2022) (citation omitted).

An action might be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or "is so implausible that it could not be ascribed to a difference in view" or "the product of agency expertise." *State Farm*, 463 U.S. at 43. Courts will "uphold a decision of less than ideal

29

clarity if the agency's path may reasonably be discerned." *Bowman Transp. Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 286 (1974)). Factual determinations must be upheld if supported by "substantial evidence." *Khalid v. Transp. Sec. Admin.*, 172 F.4th 866, 874 (D.C. Cir. 2026) (citation omitted). And courts' role "in reviewing factual determinations" in "the area of national security" is "highly deferential." *Id.* (citation omitted).[5]

Plaintiffs' challenges are likely to fail on all counts. Here, the Department's decision-making path can readily be discerned and is adequately supported by evidence. The Department adopted the escort requirement to address an observed pattern of unauthorized disclosures associated with unescorted press access to certain spaces within the Pentagon. *See* Parnell Decl. ¶¶ 6-13. It did so on an interim basis, after the Court rejected its previous policy and during an appeal of that decision. Plaintiffs' contrary arguments boil down to speculative theories of bad faith and rushed decision-making that fail to meet Plaintiffs' burden.

*First*, Plaintiffs argue that Defendants promulgated the Interim Policy too quickly to have complied with the APA. ECF No. 6-1 at 37-38. That is an argument that only a consummate bureaucrat could love. The United States military is accustomed to dealing promptly with pressing national security concerns. And it is often the job of both press officials and agency leadership to respond to urgent concerns as they arise, which frequently requires swift work "over the weekend." *Id.* at 37. The APA does not forbid prompt responses to serious problems like a well-founded concern about imminently returning to a status quo that resulted in regular, unauthorized disclosures of sensitive information in the nation's military headquarters. At any rate, Defendants

---

[5] Further, review of extra-record evidence like a declaration is acceptable even under APA review "in cases where relief is at issue, especially at the preliminary injunction stage." *Conserve Sw. Utah v. U.S. Dep't of the Interior*, ---F. Supp. 3d---, 2026 WL 569034, *19 n.7 (D.D.C. Mar. 1, 2026) (quoting *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)).

had been actively considering policies to limit the unauthorized disclosure of sensitive information for months—since well before the October Policy's issuance. The formulation of the Interim Policy was not the first time Defendants encountered or considered these concerns.

*Second*, Defendants plainly considered permissible factors in drafting and promulgating the escort requirement. *Contra* ECF No. 6-1 at 37. Congress required the Secretary to "protect the buildings, grounds, and property" of the Department, including by prescribing "such rules and regulations as the Secretary considers appropriate to ensure the safe, efficient, and secure operation of the Pentagon Reservation." 10 U.S.C. § 2674(b)(1), (c)(1). Those factors expressly formed the basis of the Interim Policy and its escort requirement: the Policy explains that it was "revised" "to comply with the Court's order while preserving the Department's legitimate security interests and its statutory obligation to ensure the safe, efficient, and secure operation of the Pentagon Reservation." ECF No. 1-1 at 2 (citing 10 U.S.C. § 2674). The statutory standard—couched in "broad" language suggesting "flexibility" to consider a wide array of factors related to those goals, *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (citation omitted)—certainly contemplates the kinds of security justifications invoked in this case.

Plaintiffs point to no express bar that indicates the kinds of factors Congress meant to exclude from consideration. *See* ECF No. 6-1 at 37-38 (invoking only bad faith and pretext). Their bad-faith and pretext arguments fail for the reasons explained already. The Policy explained that the Department's "security posture" required it to limit "unescorted access" without any ability to "screen" for "security risks" of the kind the October Policy had addressed—risks to the security of the sensitive information that constantly flows through the Pentagon as the nation's military headquarters. ECF No. 1-1 at 3. As Defendants explained contemporaneously, the escort requirement reduced the risk that reporters might obtain sensitive or classified information. *See*

31

*NYT I*, 2026 WL 1179440, at *2; *see also* Parnell Decl. ¶¶ 10-13. Neither the face of the Policy nor any other evidence Plaintiffs cite suffices to carry their burden to show that the Policy was motivated by improper motives. *See supra* Section I.A.2. The Policy relied on permissible factors. And Plaintiffs can point to no direct or indirect evidence of the consideration of factors falling outside the broad scope of authority Congress conferred on the Secretary.

*Third*, as Defendants have shown through their consistent and supported determination that affording journalists unescorted access to the Pentagon creates a security risk by substantially increasing the risk of unauthorized disclosures of sensitive, protected information, the reasoning underlying the Policy's escort requirement satisfactorily and reasonably explains imposition of the requirement. *See State Farm*, 463 U.S. at 43. *Contra* ECF No. 6-1 at 38-41. The rationale certainly provides ample basis to reasonably discern Defendants' decisional path. *See State Farm*, 463 U.S. at 43 (citing *Bowman*, 419 U.S. at 286).

Plaintiffs' only substantive argument on this point is a claim that the Department "ignored" evidence that the status quo has "served the Department effectively for decades." ECF No. 6-1 at 39. The D.C. Circuit has already disagreed, concluding at the stay stage that the Department "supported its claim" that the escort requirement "furthers important national security interests" by attesting to the fact that unescorted access to the Pentagon had resulted in a pattern of unauthorized release of sensitive information. *NYT I*, 2026 WL 1179440, at *2. Plaintiffs instead focus on this Court's reasoning in the ruling the D.C. Circuit stayed in relevant part. ECF No. 6-1 at 39. But even if the D.C. Circuit had not already disagreed, the Court's conclusions in a different case, which challenged a different policy and involved a different factual record, do not control here. The Court must consider the evidence in this case and at this stage, including a declaration from the decisionmaker who adopted the Interim Policy explaining that he adopted the Interim

32

Policy in order to prevent risks to the security of sensitive information at the Pentagon based on an observed, repeated pattern of unauthorized disclosures that presented an unacceptable risk to national security. *See* Parnell Decl. ¶¶ 6-13.

At bottom, Plaintiffs cite their own evidence to claim, in effect, that the security risks from unescorted access are not so bad. That is not their call to make, nor is it this Court's. Defendants' factual determination warrants significant deference here—especially considering that it concerns national-security risks. *See, e.g.*, *Holder v. Humanitarian L. Proj.*, 561 U.S. 1, 34 (2010) (identifying "marked" lack of "competence on the part of the courts" in "collecting evidence and drawing factual inferences" about national security risks) (citation omitted); *Khalid*, 172 F.4th at 874-75.

Plaintiffs next claim that the Interim Policy's "duration" is "unexplained and unjustified," questioning why the escort requirement would no longer apply when "new security screening standards are fully implemented and new press workspace is established." ECF No. 6-1 at 40. That argument simply overlooks that the Interim Policy is an interim policy, adopted while the Court's decision regarding the October Policy is on appeal. It is perfectly sensible for an interim policy to sunset upon implementation of the "security screening standards" in the October Policy following a successful appeal and when the press workspace has been established in a permanent new space that does not present the same security risks as the previous Correspondents' Corridor did by virtue of its proximity to the Joint Chiefs office space. The Department's decisional path is more than discernible here—meaning it satisfies arbitrary-and-capricious review. *See Bowman*, 419 U.S. at 286.

Plaintiffs also argue the Policy is unreasoned because it is over- and underinclusive, but that characterization fails for the reasons already explained. *See supra* Section I.A.1. Plaintiffs'

hypotheticals illustrate only that Plaintiffs (or other members of the press) might circumvent restrictions on access to and dissemination of sensitive information. *See* ECF No. 6-1 at 41; *see also supra* Section I.A.1. But under the APA, agencies "need not address all problems" in "one fell swoop." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 588 (D.C. Cir. 2004) (quoting *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 86 (D.C. Cir. 2001)). Indeed, agencies enjoy "broad discretion in determining how to handle related, yet discrete, issues in terms of procedures and priorities." *Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 863 F.3d 911, 919 n.7 (D.C. Cir. 2017) (quoting *Mobil Oil Expl. & Producing Se., Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991)). Defendants "need not 'make progress on every front' " before they "can make progress on any front." *Id.* (quoting *Pers. Watercraft Indus. Ass'n v. Dep't of Com.*, 48 F.3d 540, 544 (D.C. Cir. 1995)). Defendants' choice to focus on limiting the specific security risks posed by journalists' physical access to the Pentagon, in a policy governing credentials that afford journalists physical access to the Pentagon, certainly does not render that choice arbitrary and capricious.

*Fourth*, Plaintiffs' argument that Defendants failed to consider reasonable alternatives to the escort requirement, *see* ECF No. 6-1 at 42, stumbles out of the gate. The Policy expressly considers and compares a reasonable alternative: the policy that Defendants had in place prior to the Court's injunction. *See* ECF No. 1-1 at 2-3. Of course, Defendants could not implement that policy—but they resolved to implement, in their view, the next best thing: an escort requirement. *See id.* Further, the Interim Policy compares the escort requirement to the status quo, and, as noted several times over, concludes that the status quo presented unacceptable risks to the security of sensitive military information in the Pentagon. *See id.* at 3 (noting that the "Department's security posture" merited the requirement); *NYT I*, 2026 WL 1179440, at *2 (describing—and crediting— the government's assertion that the status quo of permitting unescorted access "contribut[ed]" to

34

information-security breaches); Parnell Decl. ¶¶ 5, 11-12. The APA requires that Defendants explain their change in policy. *See Fox Television Studios, Inc.*, 556 U.S. at 515. But Defendants "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.* It "suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* Defendants' actions here readily satisfy that low burden.

Defendants adequately explained the Policy and provided substantial evidence that it is (1) authorized and (2) warranted. That amply satisfies the APA's deferential arbitrary-and-capricious standard.

## II.    Plaintiffs Fail to Show Immediate and Irreparable Harm.

Plaintiffs assert that they are suffering immediate, irreparable harm from a "loss of First Amendment freedoms," for even a minimal period of time, and from an "arbitrar[y] exclu[sion] from sources of information." ECF No. 6-1 at 43; (first quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); and then quoting *Sherrill v. Knight*, 569 F.2d 124, 130 (D.C. Cir. 1977)). But Plaintiffs overstate the injury they believe they are suffering from having only escorted access to the Pentagon. And they understate the burden they must carry to satisfy the irreparable-harm prong for receiving preliminary-injunctive relief.

Plaintiffs identify no logistical problems with the escort requirement of the kind they predicted the last time they asked this Court to enter an injunction against the requirement. *See First NYT Litigation*, ECF No. 44 at 10-11 (speculating that Department officials would require pre-approval of escort requests and arbitrarily or discriminatorily deny escorts). "[N]o PFAC holder has been unable to enter the Pentagon because of an inability to arrange an escort." Valdez Decl. ¶ 6. Instead, Plaintiffs allege that while they can physically enter the Pentagon as desired to

35

speak with their sources, they "currently lack the access" to pursue "journalistically productive conversations" in the Pentagon. ECF No. 6-1 at 43 (quoting *Karem v. Trump*, 404 F. Supp. 3d 203, 217 (D.D.C. 2019)). But the weight of that purported First Amendment injury is minimal, for the simple reason that Plaintiffs have *not* lost access to their sources of information. *See* Valdez Decl. ¶¶ 5-7. As they acknowledge, the Policy does allow access to engage in conversations with officials at the Pentagon, the same as it did before this litigation. *See* ECF No. 6-1 at 43; *see also* ECF No. 1-1 at 2-3. And it permits Plaintiffs access to the Pentagon for scheduled press briefings, press conferences, interviews, and breaking-news scenarios. ECF No. 1-1 at 3; Valdez Decl. ¶¶ 6-7. Indeed, the D.C. Circuit previously concluded that a journalist was not harmed by delays in obtaining a pass that would afford him unescorted access to the White House because he could obtain *escorted* access in the interim. *Ateba*, 133 F.4th at 117, 127. Moreover, the Policy does *not* "arbitrarily exclude" Plaintiffs "from sources of information"—its terms apply to all PFAC holders. *See* Valdez Decl. ¶ 6; ECF No. 1-1 at 3. So Plaintiffs' asserted injury distills to a purported harm to an asserted right to engage in *spontaneous* newsgathering on terms that Plaintiffs seek to impose—namely, unescorted and with an unimpeded ability to walk within a nonpublic, highly sensitive military building to observe and disseminate patterns of activity that might reveal sensitive or classified information. *See* ECF No. 6-1 at 19-23.

At the core, Plaintiffs assert that the inability to gather information in a nonpublic space on their own terms constitutes irreparable and actionable harm. But that asserted right is not sufficiently weighty. Indeed, as discussed, a desire for more access to make reporting "better" does not establish a First Amendment injury. *Flynt*, 355 F.3d at 703. And, of course, to the extent that Plaintiffs assert a right to gather, observe, and disseminate sensitive information, any injury to that right is no injury at all—they "cannot suffer infringement of a First Amendment right that does

36

not exist." *McCutcheon v. FEC*, 496 F. Supp. 3d 318, 336 (D.D.C. 2020). That fact—paired with the fact that the limits on Plaintiffs' access to Pentagon press areas are not so limited after all—means they cannot show "both certain and great" injury under the D.C. Circuit's "high standard" to show irreparable harm. *Alpine Secs. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1332 (D.C. Cir. 2024) (citation omitted), *cert. denied*, 145 S. Ct. 2751 (June 2, 2025).

As already noted above, Plaintiffs maintain access to the Pentagon for journalistic activities. *See* Valdez Decl. ¶¶ 5-6. They have consistently obtained access to the Pentagon to engage in newsgathering. *See id.* ¶ 5. And they, along with other reporters, have access to press conferences, interviews, roundtables, and any other kind of media event the Department and its employees typically undertake. *See id.* ¶ 6. Indeed, "no PFAC holder has been unable to enter the Pentagon because of an inability to arrange an escort," *id.*, underscoring exactly how minimal the Policy's burden is. All that Plaintiffs have to do to engage in their newsgathering within the Pentagon is to have an escort, and escorts have been readily made available upon request. Plaintiffs have not shown—and cannot show—that this kind of neutral and reasonable restriction represents a "certain and great" injury to their First Amendment rights. *Alpine*, 121 F.4th at 1332.

### III.    The Balance of the Equities and Public Interest Do Not Favor Plaintiffs.

The D.C. Circuit previously concluded, in staying the Court's previous injunction against enforcement of the escort requirement, that "both sides have established substantial, competing interests," and "the balance of the equities and the public interest do not strongly favor either party." *NYT I*, 2026 WL 1179440, at *3. Plaintiffs do not acknowledge this conclusion in their motion. They instead rely on general assertions about the importance of First Amendment rights. *See* ECF No. 6-1 at 44-45.

On the current record, the balance has—if anything—shifted to favor the Department. Experience with the application of the escort requirement over the last six weeks has sharply

37

undercut Plaintiffs' claims to this Court and the D.C. Circuit that they would be unable to physically access the Pentagon to engage in in-person newsgathering at all. *See First NYT Litigation*, ECF No. 44 at 10-11; Appellees' Resp. in Opp'n at 18-19, *N.Y. Times v. Dep't of Def.*, No. 26-5113 (D.C. Cir. Apr. 17, 2026) (raising fears of "exclusion from the Pentagon"). By contrast, the Department's need for the escort requirement has not changed, nor have Plaintiffs undermined it. Enjoining the escort requirement would require the Department to allow members of the press to roam the Pentagon unescorted, despite the Department's judgment that allowing that kind of unfettered physical access poses national security risks by, among other things, threatening a resumption of the frequent unauthorized disclosure of sensitive information that previously occurred when members of the press roamed the Pentagon without escorts. As explained above, the Department adopted the escort requirement in light of serious concerns about the frequency with which sensitive information, including highly classified national security information, was reaching journalists accessing the Pentagon with PFACs. Parnell Decl. ¶¶ 5, 10, 13. The Department concluded that these disclosures posed serious risks to national security. *Id.* ¶¶ 10, 11, 13 And the Department concluded that "restoring unescorted access to the Pentagon for PFAC holders would result in a return to the same pattern of regular breaches of information security that that unescorted access had previously permitted." *Id.* ¶ 11.

Requiring the Department to afford journalists unescorted access to the Pentagon, despite those judgments, would fly in the face of the D.C. Circuit's decision to stay the Court's previous injunction. It would also run afoul of the D.C. Circuit's admonitions that courts should "not lightly override the Department's judgments on matters involving national security." Stay Order, *Anthropic PBC v. Dep't of War*, No. 26-1049 (D.C. Cir. Apr. 8, 2026) (per curiam); *see also Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003) ("[W]e have

consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review."). And it would amount to "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Immigr. & Naturalization Serv. v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers). The Court should reject Plaintiffs' attempt to obtain a new injunction just like the one the D.C. Circuit stayed.

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiff's motion for preliminary injunction.

Dated: June 4, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

*/s/ Sarah Welch*
SARAH WELCH
Senior Counsel to the Assistant Attorney General
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
(202) 514-3180
sarah.e.welch@usdoj.gov

JOSEPH E. BORSON
Assistant Branch Director
Civil Division, Federal Programs Branch

*Counsel for Defendants*

39