# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>DEPARTMENT OF DEFENSE, a/k/a<br>DEPARTMENT OF WAR, *et al.*,<br><br>    *Defendants*. | Civil Action No. 26-1690 (PLF) |

**DECLARATION OF JOEL MANUEL VALDEZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Joel Manuel Valdez, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**BACKGROUND**

1. I am Acting Pentagon Press Secretary within the Office of the Assistant to the Secretary of War for Public Affairs. I make this declaration based upon my personal knowledge and upon my review of information available to me in my official capacity.

2. I have served as Deputy Press Secretary since June 2025 and Acting Press Secretary since May 2026. My official duties include advising the Chief Pentagon Spokesman Sean Parnell and Press Secretary Kingsley Wilson on strategic communication and preparing them for press engagements, including press briefings, television interviews, speeches, and multimedia content for social media. I also serve as the principal liaison between Pentagon Press Operations desk officers and the Press Secretary, drafting responses to political and sensitive press requests, statements, and releases.

1

**THE INTERIM POLICY**

3. On Monday, March 23, 2026, the Department of War adopted and published the Interim Policy. While that policy has been in effect, journalists from numerous outlets who had previously held PFACs, but turned them in following the issuance of the October 2025 policy, have requested and obtained PFACs. Those outlets include The New York Times and USA Today. Outlets including The Associated Press, CNN, The Daily Mail, The Washington Post, The Wall Street Journal, and CBS News have requested PFACs and were approved but have yet to pick up their badges from the Pentagon.

4. Julian Barnes, a journalist associated with The New York Times, picked up his reinstated PFAC on Tuesday, March 24, 2026. Since then, to the best of my knowledge, he has attempted to enter the Pentagon just twice.

5. Seven other journalists affiliated with The New York Times hold PFACs. PFAC holders and reporters associated with The New York Times have accessed the Pentagon approximately seven times since March 23, 2026. With the exception of one interview discussed in paragraph 17 below, PFAC holders associated with The New York Times have been able to access the Pentagon for journalistic activities on every occasion they have sought to do so.

6. The Interim Policy provides that any PFAC holder may enter the Pentagon only with an escort. The escort requirement has functioned smoothly over the six-plus weeks it has been in effect. Since March 23, 2026, 60 reporters, who hold active PFACs or are employees of outlets who have received approval to pick up their PFACs, have repeatedly accessed the Pentagon to attend media events, including press conferences, on or off record interviews, media roundtables, bilateral meetings with press, and more. Across the

2

Pentagon's Office of the Secretary of War, other departments, and all service branches, 24 media events have been held in person at the Pentagon since March 23, 2026. Escorts are readily available for these meetings. As of June 4, 2026, the Pentagon has held five press briefings since March 23, 2026, which is attended by approximately 60 reporters for every briefing and requires multiple escorts to be dispatched. To date, and to the best of my knowledge, no PFAC holder has been unable to enter the Pentagon because of an inability to arrange an escort.

7. Typically, for non-press affiliated visitors to the Pentagon, an escort can only accompany up to three people at a time. Since media events are usually not small in attendance, the host organization (such as the Office of the Assistant to the Secretary of War for Public Affairs or a specific service branch) contacts the Pentagon Force Protection Agency (PFPA) to allow escorts to accompany up to ten people at a time in order to ensure there is never a shortage of escorts. Pentagon staff either volunteer to escort media or are assigned as escorts by those who are hosting the media engagement. Escorts can accompany journalists on impromptu visits to other engagements if those engagements have been approved by their organization.

8. Under the Interim Policy, as before, there are substantial advantages to holding a PFAC rather than applying for a day pass each time a journalist wishes to enter the Pentagon.

9. PFACs grant access to the Pentagon Library and Conference Center (PLC2) and the Corridor 8 Pedestrian Bridge Access Point. PFAC holders can enter the Pentagon grounds and access PLC2 with their PFACs via a pedestrian bridge.

10. Unlike day pass holders, PFAC holders are pre-cleared in the system and do not need to undergo a background check each time they wish to access the Pentagon. A PFAC holder

requires only an escort, which can be arranged on short notice, including immediately, if needed. By contrast, a day pass must be requested at least 24 hours in advance.

11. If a PFAC holder in the PLC2 workspace decides to interview a Department official or speak with Public Affairs staff, all the PFAC holder needs to do is contact that official's office or the Pentagon Press Office to arrange the interview, or reach out to the Public Affairs staff member. If the official or staff member is available, a staff member can escort the PFAC holder into the Pentagon immediately, with no waiting period.

## BARNES DECLARATION CLAIMS

12. I have reviewed the declaration submitted by Julian Barnes in this litigation. This declaration substantially repeats Mr. Barnes's previous declarations, to which I previously responded.

13. Mr. Barnes makes various assertions about the process for picking up his PFAC on March 24 and conversations with Pentagon Press Office staff members he declines to identify. ECF 6-17 at ¶¶ 16-21.

14. In particular, Mr. Barnes reports that he received unclear instructions about how to pick up his PFAC on March 24. ECF 6-17 at ¶ 17. This report omits that, as I previously explained, the Department had informed Mr. Barnes's counsel that Major Andrea Kelly in the Pentagon Press Office would be his point of contact for scheduling pickup, that his colleagues contacted Major Kelly and received proper instructions for PFAC pickup, and that Mr. Barnes arrived at the Pentagon without having communicated or coordinated with Major Kelly or other Pentagon staff. *See* Ex. A at ¶ 7.

15. Mr. Barnes also reports that unnamed Pentagon staff were "unsure," on March 24, how he could access the Pentagon library. ECF 6-17 at ¶ 20. This report omits that, as I

previously explained, PPO staff provided Barnes with photos and Google Maps screenshots showing how to access the library on March 25. *See* Ex. A at ¶ 19. I also maintain, as I previously stated, that Mr. Barnes's statement is not accurate. *See id.* at ¶¶ 15-19.

16. Mr. Barnes additionally reports that PFAC holders did not have permission to ride the Pentagon shuttle bus on March 24. ECF 6-17 at ¶ 20. As I previously explained, that is incorrect: Before Mr. Barnes and his colleagues received their PFACs, my office had already arranged for the Pentagon shuttle bus to transport PFAC holders to the Pentagon Library and Conference Center. Ex. A at ¶ 21. And Mr. Barnes and his colleagues were informed that PFAC holders could use the shuttle bus, and that signage would be updated to reflect as much. *Id.* Shuttle bus signage was in fact updated on April 1, 2026.

17. Mr. Barnes also reports that, on March 31, he attempted to enter the Pentagon with his PFAC, but Pentagon staff were confused about access protocols and the interview he had arranged was cancelled. ECF 6-17 at ¶ 26. This report omits that, as I have explained, the interview was postponed because of a routine scheduling conflict wholly unrelated to the Interim Policy, and that the access confusion was a one-off event, not a result dictated or called for by the Interim Policy. Ex. B at ¶¶ 9-10.

18. Last, Mr. Barnes reports that he has not attended a press conference, but that his colleagues have been required to wear wristbands during press conferences and that their wristbands were checked. ECF 6-17 at ¶ 28. This report omits that, as I have explained, those are standard security protocols for events involving the Secretary of War, are not new, and are not restrictions imposed by the Interim Policy. Ex. B at ¶ 12. As for the limitations on restroom breaks that Mr. Barnes reports on behalf of his colleagues, ECF

6-17 at ¶ 28, that report omits that, as I have explained, the closest restrooms to the Pentagon Briefing Room are located in a restricted area near the Joint Chiefs of Staff corridor, and escorts are required. PPO staff thus informed reporters of this fact and recommended that they use the restrooms half an hour before the briefing started, when escorts are readily available, to avoid delays once the briefing commenced. Ex. B at ¶ 14.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 4, 2026 at Washington, D.C.

_Joel Valdez_
JOEL MANUEL VALDEZ
Acting Pentagon Press Secretary
Office of the Assistant to the Secretary of War for
Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400

6

# Declaration Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DEPARTMENT OF DEFENSE a/k/a DEPARTMENT OF WAR, et al., <br><br> Defendants. | Civil Action No. 1:25-cv-04218-PLF |

### SUPPLEMENTAL DECLARATION OF JOEL MANUEL VALDEZ

I, Joel Manuel Valdez, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

### **INTRODUCTION**

1. I am Deputy Press Secretary within the Office of the Assistant to the Secretary of War for Public Affairs (OATSW(PA)). I previously submitted a declaration in this matter on March 27, 2026 (ECF No. 41-3). I submit this Supplemental Declaration in response to the Supplemental Declaration of Julian E. Barnes (ECF No. 44-1, "Barnes Supp. Decl.") filed on March 29, 2026, and the Second Supplemental Declaration of Julian E. Barnes (ECF No. 45, "Second Supp. Barnes Decl.") filed on March 31, 2026.

2. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto. My official duties include advising the Chief Pentagon Spokesman and Press Secretary on strategic communication, serving as the principal liaison between Pentagon Press Operations (PPO) desk officers and the Press Secretary, and overseeing the implementation of the Department's press access policies.

1

3. Throughout his supplemental declaration, Mr. Barnes attributes various claims to unnamed "Pentagon Press Office staff" and "a Pentagon public affairs officer" without identifying these individuals by name. Barnes Supp. Decl. ¶¶ 6, 7, 8, 9. These sources are unnamed not because they requested anonymity, but because Mr. Barnes did not identify them.

## A.  <u>TIMELINE</u>

4. Mr. Barnes's Supplemental Declaration indicated he picked up his PFAC and received a copy of the Interim Policy at around 1pm on "Monday, March 23." Barnes Supp. Decl. ¶ 6. That was incorrect, for two reasons.

5. First, Mr. Barnes could not have received a copy of the Interim Policy at 1:00 PM on Monday, because the policy had not been finalized or adopted at that time. The Interim Policy was not signed until approximately 4:15 PM Eastern on Monday, March 23. The Interim Policy was transmitted to Plaintiffs' counsel promptly upon signing. *See* ECF No. 37-6 (email to Plaintiff's counsel attaching revised policy, received by Plaintiff's counsel at 1:15 PM Pacific time—4:15 PM Eastern time—on Monday, March 23).

6. Second, Mr. Barnes—together with four other New York Times journalists—picked up his PFAC on Tuesday, March 24, not on Monday, March 23. Mr. Barnes corrected the date in his Second Supplemental Declaration.

7. On Monday, March 23, Commander Parlatore sent representatives from The New York Times a point of contact at the Pentagon Press Office — Major Andrea L. Kelly, PPO Operations Officer — to schedule PFAC pickup for Tuesday, March 24. Mr. Barnes's colleagues, New York Times journalists Helene Cooper and John Ismay, contacted Major

Kelly to schedule a pickup time and received instructions to pick up their PFACs between 12:00 PM and 3:00 PM.

8. Mr. Barnes did not schedule a pickup time through Major Kelly. Instead, he arrived at the Pentagon at 8:00 AM without having communicated with Major Kelly or other Pentagon staff.

9. Mr. Barnes declares that he "received an email from the Pentagon saying I could pick up my PFAC between 6:00 am and 6:00 pm Eastern time." Barnes Supp. Decl. ¶ 6. The email Mr. Barnes is referring to is an automated notification from the Pentagon Visitor Management System (VMS). PPO submitted Mr. Barnes into the VMS for arrival between 6:00 AM to 6:00 PM in order to ensure scheduling flexibility in the event Mr. Barnes had limited availability and could not pick up his PFAC between 12:00 PM to 3:00 PM.

## B. <u>GRAPHIC DESIGN AND ACCESS</u>

10. Mr. Barnes declares that the PFACs issued to him and his colleagues were "different from the ones we had previously held." Barnes Supp. Decl. ¶ 7. The PFACs issued on Tuesday, March 24 are the current PFAC version. The appearance of PFACs was updated in October 2025 to include a red banner with "PRESS" reflected in white text. The previous version that Mr. Barnes held did not have this red banner.

11. This graphic design change was announced in the October 6, 2025 Policy, which stated: "The new PFACs will have 'PRESS' clearly imprinted on them in red letters both vertically and horizontally to assist in identifying members of the press within the Pentagon." AR at 2.

12. The access granted by the PFACs issued on March 24 aligns with the Interim Policy. Specifically, the PFACs grant access to the Pentagon Library and Conference Center (PLC2) and the Corridor 8 Pedestrian Bridge Access Point. Access to the main Pentagon building requires escort by authorized Department personnel, consistent with the Interim Policy. The PFACs are configured to reflect the access arrangements described in the Interim Policy.

13. PFAC holders can enter the Pentagon and access PLC2 with their PFACs via a pedestrian bridge. *See* ¶¶ 15-21 below.

14. By Monday, March 23, I personally witnessed confirmation from the Pentagon's library leadership that a temporary workspace for PFAC holders, in PLC2, was ready for use. I was shown the spaces during a walkthrough.

## C. PFAC HOLDERS HAVE UNESCORTED ACCESS TO PLC2

15. Mr. Barnes declares that he and his colleagues "asked how we could access the library because, to our knowledge, the only way to access it on foot is through a corridor that we were told we could no longer walk through" and that "the Pentagon Press Office staff indicated that they were unsure how we could access the library." Barnes Supp. Decl. ¶ 9. Both of these statements are inaccurate, and the information necessary to correct them was available to Mr. Barnes in the policy document he received and from the personnel he had access to.

16. First, the PLC2 is not accessible only through the Pentagon. The PLC2 is accessible via the Corridor 8 Pedestrian Bridge, which connects the Pentagon's North Parking Lot to the PLC2. A PFAC holder does not need to enter the Pentagon to reach the PLC2. The PFAC holder can walk, drive, carpool, rideshare, or take the Pentagon shuttle bus to the North

4

Parking Lot and then cross the Corridor 8 Pedestrian Bridge to the PLC2. Journalists may park in the designated press parking area at the Connector Lot and proceed from there to the North Parking Lot by foot or by shuttle bus. In approaching the PLC2, a PFAC badge holder will be required to present the PFAC badge to access the PLC2 as is required of any and all badge holders with access to the PLC2.

17. Second, PPO staff did not indicate that they were "unsure how [Mr. Barnes and his colleagues] could access the library." PPO staff explained the access options to Mr. Barnes and his colleagues and stated that the decision on how to arrive at the Pedestrian Bridge — whether by walking, driving, or shuttle bus — was up to the journalists.

18. Third, the Interim Policy that Mr. Barnes received itself described PLC2 as the designated workspace and breaking news gathering point. The Interim Policy states that "[i]n breaking news situations, PFAC holders will gather at the Pentagon Library and Conference Center and be escorted into the Pentagon by authorized DoW personnel." ECF No. 37-2 at 7. The Interim Policy further states that "[a] new press workspace will be established in an annex facility outside the Pentagon." ECF No. 37-2 at 7. And the Interim Policy references Appendix D, which "shall be updated to reflect the relocation of the press workspace to the Pentagon Library and Conference Center." ECF No. 37-2 at 15.

19. Fourth, on the morning of Wednesday, March 25—two days before Mr. Barnes signed his Supplemental Declaration—PPO staff provided Mr. Barnes with photos and Google Maps screenshots to show him where to access PLC2.

20. Fifth, regardless, Mr. Barnes had multiple avenues to obtain accurate information about PLC2 access. His designated point of contact, Major Kelly, could have answered any questions. Indeed, his colleagues Cooper and Ismay used the designated POC and received proper instructions. Or he could have asked his counsel to confer with counsel for the defendants in this matter to raise concerns or seek clarification. Verifying information should be routine for a veteran Pentagon reporter.

21. Mr. Barnes also declares that "PFAC holders did not have permission to ride on the shuttle bus." Barnes Supp. Decl. ¶ 9. This is incorrect. Before the New York Times reporters received their PFACs, OATSW(PA) had already arranged for the Pentagon shuttle bus to transport PFAC holders to the PLC2. The shuttle bus route includes a stop near the Pentagon Library and Conference Center, as shown on the Pentagon Circulator flyer attached hereto as Exhibit A. Mr. Barnes was told that PFAC holders could use the shuttle bus and that the signage — which currently states "Common Access Card (CAC) required to ride DoD Shuttles" — would be updated to include PFAC holders. Despite being told he could ride the shuttle bus, Mr. Barnes presented the outdated signage to the Court as if it prohibited him from riding. The accommodation was already in place, and Mr. Barnes was informed of it well before he signed his supplemental declaration on March 27.

### D.  PFACs PROVIDE SIGNIFICANT ADVANTAGES OVER DAY PASSES

22. Mr. Barnes declares that the reinstated PFACs are "essentially worthless" because "[a]ll reporters, whether or not they hold a PFAC, can access the Pentagon if they obtain pre-approval to attend a specific press conference, event, or a pre-arranged interview."

Barnes Supp. Decl. ¶ 13. This is incorrect. There are significant differences between holding a PFAC and obtaining a day pass.

23. A day pass requires at least 24 hours advance notice and a background check conducted by the Pentagon Force Protection Agency (PFPA). A journalist without a PFAC who wishes to attend a press event must submit a request at least 24 hours in advance, undergo a background check, and wait for PFPA approval before being granted access.

24. A PFAC holder, by contrast, is already pre-cleared in the system. A PFAC holder does not need to undergo a background check each time he or she wishes to access the Pentagon. A PFAC holder requires only an escort, which can be arranged on short notice — including immediately, if needed. If a PFAC holder in the PLC2 workspace decides to interview a Department official or speak with Public Affairs staff (which Mr. Barnes "would frequently spend [his] days" doing as a PFAC holder, Barnes Supp. Decl. at ¶ 14), all the PFAC holder needs to do is contact that official's office or the Pentagon Press Office to arrange the interview, or reach out to the Public Affairs staff member. If the official or staff member is available, a staff member can escort the PFAC holder into the Pentagon immediately, with no waiting period.

25. Mr. Barnes declares that reporters "would need to submit a request to attend such events at least one day in advance in order to obtain an escort." Barnes Supp. Decl. ¶ 8. The Interim Policy contains no such requirement for PFAC holders. The 24-hour advance notice requirement applies to day passes — not to PFACs. *See* ECF No. 37-2 at 8-9 (Interim Policy specifying that a PFAC "affords escort privileges for up to three visiting media members from the [PFAC holder's] same media outlet," although such "[v]isiting media members must be entered into the PFPA Visitor Management System (VMS) …

no later than one business day in advance for U.S. citizens."). Mr. Barnes apparently did not seek clarification from his designated point of contact or by having his attorneys confer with counsel for the defendants in this matter.

26. To be clear, the Interim Policy does not require PFAC holders to submit requests to attend events or obtain escorts "at least one day in advance."

27. Just this morning, for example, the Department held a press briefing that was announced at approximately 3 PM Eastern yesterday. New York Times journalist and PFAC holder Greg Jaffe attended the press conference. Attending journalists, including Mr. Jaffe, were escorted to and from the press briefing seamlessly.

### E. THE INTERIM POLICY'S PROVISIONS ARE CLEAR

28. Mr. Barnes declares that the Interim Policy's prohibition on "intentional inducement of unauthorized disclosure" is unclear, and asks whether he would be in violation "simply by asking a Public Affairs representative follow-up questions or seeking clarification in a way that pushes beyond that person's pre-approved talking points." Barnes Supp. Decl. ¶ 16. The answer is no. Safe harbor (a) of the Interim Policy expressly protects "[a]sking questions of Department personnel who are authorized to speak with the press, including Public Affairs Officers, designated spokespersons, and other personnel speaking on the record in their official capacity, regardless of the subject matter of the question." ECF No. 37-2 at 15 (emphasis added). Follow-up questions, probing questions, and questions that push beyond talking points are all "questions" within the meaning of safe harbor (a). The safe harbor contains no limitation on the type, tone, or persistence of questions directed at authorized personnel. The copy of the Interim Policy that Mr. Barnes received makes this clear.

29. Mr. Barnes also declares that "many authorized sources, including high-ranking officials and Public Affairs Office staff, often ask for anonymity or agree to speak only on background, with their name withheld — even if they are authorized to speak with me about the information in question." Barnes Supp. Decl. ¶ 17. That situation raises no concerns under the policy, for two reasons. First, even if the presumption applied, safe harbor (a) protects "[a]sking questions of Department personnel who are authorized to speak with the press," "regardless of the subject matter of the question." ECF No. 37-2 at 15. That safe harbor applies whether or not the Public Affairs Office staff member is speaking on background, anonymously, off the record, or on the record with full attribution. Second, the presumption addresses a fundamentally different situation: where the journalist proactively offers anonymity as an inducement to get someone to talk who otherwise would not. When an employee voluntarily chooses to provide information and asks that his or her name not be used, the employee is the initiator of the disclosure — not the journalist. This is consistent with safe harbor (b), which protects "[r]eceiving unsolicited information, including classified national security information or controlled unclassified information." ECF No. 37-2 at 15. Just as the receipt of unsolicited information is protected, so too is the receipt of information from a source who voluntarily discloses and independently requests anonymity.

30. To be clear about how the "intentional inducement" provision operates in practice: the Department does not actively monitor published stories to identify anonymous sources, and the publication of a story with an anonymous source does not necessarily suggest a violation of the policy. For example, the anonymous source may have been a Press Office staffer (as Mr. Barnes says is "often" the case, *see* Barnes Supp. Decl. ¶ 17), the

9

anonymous source may have offered the information to the journalist (*see* ¶ 29 above), or the anonymous source may have been a "source relationship[]" developed "outside the Pentagon through independent reporting (Interim Policy safe harbor (d), ECF No. 37-2 at 15).

31. Department employees receive training on reporting attempted security breaches, including information security breaches. If a Department employee believes that anyone has attempted to induce the employee to disclose information the employee is not authorized to disclose, the proper means to report that attempt is through the Department's security reporting channels.

32. If an employee reports such an attempt, and the report identifies a specific journalist who offered anonymity or privacy protection to induce the employee to disclose information not authorized for release, the presumption may apply. The presumption is rebuttable— the journalist may provide evidence that he or she did not know the employee was not authorized to disclose the information, notwithstanding the offer of anonymity.

33. Critically, because the Interim Policy defines "intentional inducement of unauthorized disclosure" as inducing "a specific Department employee," the Department cannot act on this provision without identifying that specific employee. The publication of a story relying on anonymous sources does not, standing alone, provide the Department with sufficient information to satisfy the "specific Department employee" element. The only way the Department can identify the specific employee is through the employee's own report — not by reading a published story. Without a specific employee report identifying a specific journalist's specific conduct, the Department has no basis for action under this

10

provision. There is no "inquisition panel" that reviews published stories. The enforcement mechanism is employee-initiated, not Department-initiated.

34. Mr. Barnes declares that he does not "know all the various kinds of information that qualify as 'controlled unclassified information'" and that he "would not know how to avoid soliciting that information — other than by avoiding all information-gathering activities altogether." Barnes Supp. Decl. ¶ 18. Safe harbor (f) of the Interim Policy directly addresses this concern. It provides that "asking questions of any Department employee where the journalist does not know that the employee is not authorized to disclose the information sought" does not constitute "intentional inducement of unauthorized disclosure." ECF No. 37-2 at 15. If Mr. Barnes does not know whether information qualifies as CUI, and does not know whether the employee he is speaking with is authorized to disclose it, safe harbor (f) protects him. The intentional inducement provision applies only where the journalist *knows* the employee is prohibited from disclosing the information by "Article 92 of the [UCMJ] (10 U.S.C. §892), 18 U.S.C. § 1905, or 5 U.S.C. § 552a." ECF No. 37-2 at 14. Mr. Barnes's professed lack of knowledge about CUI categories is precisely the situation the safe harbor was designed to address.

### F.  THE DEPARTMENT'S WEEKEND COORDINATION

35. Mr. Barnes declares that "[i]t was readily apparent to me that the Pentagon Press Office was unprepared for the changes effectuated by the Interim Policy" and that "these new rules had been implemented hastily and in response to the Court's March 20, 2026 ruling." Barnes Supp. Decl. ¶ 10. The Department issued PFACs, prepared a workspace, and adopted the Interim Policy within two business days of the Court's order. That the

Department moved quickly to comply with a judicial order does not mean it was unprepared — it means the Department took the Court's order seriously and devoted significant resources to compliance on an expedited timeline.

### EXHIBIT

36. Attached hereto as **Exhibit A** is a true and correct copy of the Pentagon Circulator Service flyer, showing the shuttle bus route including the stop near the Pentagon Library and Conference Center.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 31, 2026 at Washington, D.C.

*Joel Valdez*

JOEL MANUEL VALDEZ
Deputy Press Secretary
Office of the Assistant to the Secretary of War for
Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400

# Declaration Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>DEPARTMENT OF DEFENSE a/k/a DEPARTMENT OF WAR, et al.,<br><br>  Defendants. | Civil Action No. 1:25-cv-04218-PLF |

SECOND SUPPLEMENTAL DECLARATION OF JOEL MANUEL VALDEZ

I, Joel Manuel Valdez, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**INTRODUCTION**

1. I am Deputy Press Secretary within the Office of the Assistant to the Secretary of War for Public Affairs (OATSW(PA)). I previously submitted declarations in this matter on March 27, 2026 (ECF No. 41-3) and March 31, 2026 (ECF No. 46). I submit this Second Supplemental Declaration in response to the Third Supplemental Declaration of Julian E. Barnes (ECF No. 48-2) filed on April 2, 2026, and the Post-Hearing Brief (ECF No. 48-1) filed the same day.

2. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

**MR. BARNES'S ACCOUNT OF THE PLC2 CONVERSATION**

3. Mr. Barnes declares that "Mr. Valdez was not present when that conversation took place, and I stand by the accuracy of my statements." Third Barnes Decl. ¶ 3. I was not present during Mr. Barnes's conversation with PPO staff on March 24, 2026. However, before

1

submitting my first Supplemental Declaration, I spoke with both PPO staffers who interacted with Mr. Barnes on that day. Both confirmed the account I provided to the Court. My declaration was based on the facts—not on speculation.

**THE MARCH 31 INTERVIEW WITH A SENIOR DEPARTMENT OFFICIAL**

4. Mr. Barnes declares that on Monday, March 30, 2026, he scheduled an interview with "a Department official" for Tuesday, March 31, 2026. Third Barnes Decl. ¶ 5. This is correct. In response to an interview request made by Mr. Barnes, a senior Department official granted an interview. OATSW(PA) facilitated the logistics of the interview as a liaison but was not involved in setting the terms of the interview.

5. Mr. Barnes declares that "the press office later requested that interview be on background — meaning he would be an anonymous source." Third Barnes Decl. ¶ 5. To clarify: the senior official's office requested that the interview be conducted on background. This was the official's preference, not a request from OATSW(PA) or the Pentagon Press Office. The decision to conduct an interview on background is a routine matter between the official and the journalist. It is not uncommon for senior Department officials to speak with reporters on background, and the decision to do so is made by the official — not by the press office.

6. This fact is relevant to the anonymity presumption in the Interim Policy. The presumption is triggered when a journalist *offers* anonymity or privacy protection to a Department employee "in exchange for information." ECF No. 37-2 at 14. Here, the official's office requested background treatment — the journalist did not offer it as an inducement. This is precisely the distinction the Interim Policy draws: when the source initiates the request for anonymity, the journalist is not "offering" anything. The presumption does not apply.

2

7. If that were not enough, the interview is also covered, in its entirety, by safe harbor (e), which applies to "interviews arranged through public affairs offices." ECF 37-2 at 15.

## MR. BARNES'S ESCORT ON MARCH 31

8. Mr. Barnes declares that on March 31, 2026, he arrived at the Pentagon Visitor Center for his scheduled interview, was told that PFAC holders must enter through Corridor 8, and was unable to meet his escort in the Visitor's Center as planned. Third Barnes Decl. ¶ 6.

9. This was a one-off event, not a result dictated by the Interim Policy. Mr. Barnes's escort had not been fully briefed on the access procedures for PFAC holders under the Interim Policy. Going forward, OATSW(PA) and PFPA will permit reporters visiting the Pentagon to be escorted through either the Visitor's Center or Corridor 8, reducing the risk for any confusion in the future.

10. Mr. Barnes also declares that "the interview was postponed, and I was immediately escorted out of the building." Third Barnes Decl. ¶ 6. The interview was postponed because the senior official was in a meeting that overlapped with Mr. Barnes's scheduled interview time and could not leave in time to conduct the interview. This was a routine scheduling conflict, not a consequence of the Interim Policy or any restriction on Mr. Barnes's access. The interview has been rescheduled.

## THE MARCH 31 PRESS CONFERENCE

11. Mr. Barnes declares that his colleague's experience of the March 31 press conference was not "seamless" and describes various security requirements, including early arrival, wristbands, and restrictions on restroom access. Third Barnes Decl. ¶ 11.

3

12. The aspects of the press conference about which Mr. Barnes's colleague complains—the arrival time and wristbands—are standard security protocols for events involving the Secretary. They are not new, and they are not imposed by the Interim Policy.

13. As is the case with all bilateral meetings when the Secretary of War is present, reporters who have received confirmation to attend must arrive no later than 7:00 AM Eastern in order to be properly screened. The wristbands indicate to security personnel that the wearer has been screened and does not require additional security checks. These requirements apply to all media — credentialed and non-credentialed alike — and are standard security protocols for events involving the Secretary. In every media advisory announcing a morning press briefing, the email clearly indicates that press must arrive no later than 7:00 AM, briefings begin at 8:00 AM, and reporters must be in their seats no later than 7:30 AM.

14. Mr. Barnes also states that his colleague was "told they need to have an escort to use the restrooms and could not use the restrooms after 7:30 a.m. because it would present a security risk." Third Barnes Decl. ¶ 11. The restrooms nearest to the Pentagon Briefing Room are located down the hall in proximity to the Joint Chiefs of Staff corridor — a restricted area. Journalists require an escort to access that area. PPO staff informed reporters of this logistical reality and recommended that they use the restrooms before 7:30 AM — when escorts were readily available — to avoid delays once the briefing commenced. This was a practical accommodation, not a punitive restriction. The fact that every reporter whose RSVP was confirmed was screened, escorted into the building, and prepared for the press briefing by 8:00 AM confirms that the process functioned as intended.

4

## THE ANONYMITY DISTINCTION IN PRACTICE

15. Mr. Barnes declares that the distinction between a journalist offering anonymity and a source requesting it is "blurry" in practice, and that "conversations sometimes go on and off the record, with it unclear exactly who initiated what." Third Barnes Decl. ¶ 10. The Interim Policy's anonymity presumption addresses a specific, identifiable situation: where a journalist proactively offers anonymity or privacy protection to a Department employee as an inducement to disclose information the employee is not authorized to disclose. It does not address the fluid, conversational dynamics Mr. Barnes describes — where parties negotiate terms of engagement as a conversation unfolds, or where a source independently requests that his or her name not be used.

16. When an employee voluntarily chooses to provide information and asks that his or her name not be used, the employee is the initiator of the disclosure — not the journalist. This is consistent with safe harbor (b), which protects the receipt of unsolicited information. Just as the receipt of unsolicited information is protected, so too is the receipt of information from a source who voluntarily discloses and independently requests anonymity. The presumption addresses a fundamentally different situation: where the journalist proactively offers anonymity as an inducement to get someone to talk who otherwise would not.

17. As I explained in my prior Supplemental Declaration, the Department does not actively monitor published stories to identify anonymous sources. The enforcement mechanism is employee-initiated: if a Department employee believes a journalist has attempted to induce the employee to disclose unauthorized information, the employee reports the attempt through the Department's existing security reporting channels. Because the

5

Interim Policy requires identification of "a specific Department employee," the Department cannot act without a specific employee report identifying a specific journalist's specific conduct. The publication of a story with anonymous sources does not, standing alone, provide the Department with sufficient information to act.

**MR. BARNES'S CHARACTERIZATION OF THE SCHEDULING PROCESS**

18. Mr. Barnes declares that "going through a sometimes-lengthy process of scheduling official appointments in order to ask even one or two questions to an official… does not allow for meaningful engagement with Department personnel on a timeline consistent with news reporting." Third Barnes Decl. ¶ 8. As I explained in my prior Supplemental Declaration, PFAC holders are pre-cleared in the system and do not need to undergo a background check each time they wish to access the Pentagon. A PFAC holder requires only an escort, which can be arranged on short notice — including immediately, if needed.

19. To the extent Mr. Barnes experiences delays in scheduling interviews with Department officials, those delays are attributable to the officials' own schedules — not to the Interim Policy. Before the Interim Policy, if Mr. Barnes wished to interview a specific Department official, he still had to schedule through that official's office and wait for the official to be available. The Interim Policy does not change the officials' scheduling process. The only additional step is the escort from PLC2 to the official's office, which can be arranged immediately once the official is available. Mr. Barnes's own experience last week demonstrates this: he scheduled an interview with a senior Department official on Monday and the interview was arranged for Tuesday — with less than 24 hours' notice.

6

20. Mr. Barnes also declares that "Pentagon officials and personnel are not permitted to and do not discuss classified or national-security sensitive information in Pentagon hallways." Third Barnes Decl. ¶ 9. Pentagon officials and personnel are not permitted to discuss classified or national-security sensitive information with reporters in any setting. However, the security concern addressed by the escort requirement is not limited to the verbal disclosure of classified information in hallways. Unescorted access to hallways near sensitive spaces can provide information about activity patterns within the Pentagon — such as which officials are meeting, when, and in what configuration — that may be used to identify and target sources for unauthorized disclosures of non-public information. The escort requirement addresses this broader information-security concern.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 6, 2026 at Washington, D.C.

*Joel Valdez*
JOEL MANUEL VALDEZ
Deputy Press Secretary
Office of the Assistant to the Secretary of War for
Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400