# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 26-1690 (PLF) |
| DEPARTMENT OF DEFENSE, a/k/a DEPARTMENT OF WAR, *et al.*, | |
| *Defendants*. | |

**<u>DECLARATION OF SEAN PARNELL IN SUPPORT OF DEFENDANTS' OPPOSITION
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

I, Sean Parnell, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**<u>BACKGROUND</u>**

1. I am the Assistant to the Secretary of War for Public Affairs. In this role, I am responsible for advising the Secretary of War and the Deputy Secretary of War on communications strategy and public engagement and serving as the Department of War's Chief Spokesperson. I am the decisionmaker who promulgated the PFAC policy issued on October 6, 2025, and the interim PFAC policy issued on March 23, 2026.

2. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto. In particular, I have personal knowledge of the basis for adopting the interim PFAC policy I signed and issued on March 23, 2026.

3. Kingsley Wilson, the Pentagon Press Secretary, reports directly to me. I am aware that Ms. Wilson provided a declaration in previous litigation regarding the interim PFAC policy issued on March 23, 2026, explaining that prior to the issuance of the October 2025 PFAC policy, journalists—including PFAC holders—frequently contacted the

1

Department regarding sensitive or classified information they had obtained; that that pattern ceased when many journalists surrendered their PFACs after the institution of the October 2025 policy; and that if the Department were required to afford PFAC holders unescorted access to the Pentagon, a resumption of unescorted access would almost certainly result in a return to the previous pattern of journalists frequently receiving controlled or classified information, including highly classified national defense information. *See New York Times v. Dep't of Defense*, No. 1:25-cv-4218 (D.D.C.), ECF 58-1.

## THE PRE-OCTOBER POLICY PATTERN

4. Because Ms. Wilson reports to me, I was aware of the information that she provided to this Court in connection with previous litigation involving press access to the Pentagon. Before the October 2025 PFAC policy was implemented, Ms. Wilson's office was contacted by journalists on a regular basis—often monthly, and sometimes multiple times per month—regarding information they had obtained that was sensitive or classified, including information relating to operational plans, intelligence assessments, diplomatic communications, and force posture decisions. These contacts came from journalists at multiple news outlets, including The New York Times. Many of these journalists, including New York Times journalists, were PFAC holders. *Id.* at ¶ 4.

5. Controlled unclassified information and classified information reached journalists with a frequency that made me seriously concerned about the security of information within the Pentagon. *Id.* at ¶ 5.

6. Prior to adoption of the interim policy in March 2026, Ms. Wilson advised me, and I concluded, that unescorted access to the Pentagon was a significant contributing factor to

the frequency with which controlled and classified information was reaching journalists. Unescorted access allowed journalists to maintain a persistent physical presence near sensitive spaces within the Pentagon. This presence enabled journalists to observe activity patterns—such as which officials were meeting, when, and in what configuration—that could be used to identify individuals with access to specific sensitive information and to time inquiries accordingly. *See id.* ¶ 7.

7. The Correspondents' Corridor was located in close proximity to the office space for the Joint Chiefs of Staff—the military advisors to the President, National Security Council, Homeland Security Council, and Secretary of Defense. *See* 10 U.S.C. § 151. Journalists, including journalists who regularly contacted the Pentagon press office regarding controlled or classified information they had obtained, frequently used their access to closely monitor activity in and out of the Joint Staff spaces. *Id.* ¶ 8.

8. Following the implementation of the PFAC Policy in October 2025, the frequency with which the Pentagon press office was contacted by journalists regarding sensitive, controlled or classified information dropped dramatically. It changed from a regular pattern of contacts involving such information to a small number of isolated incidents. *See id.* ¶ 10.

9. Prior to adoption of the interim policy in March 2026, Ms. Wilson advised me, and I concluded, that this reduction occurred primarily because many journalists no longer maintained a persistent, unescorted presence near sensitive spaces in the Pentagon after they surrendered their PFACs following the implementation of the PFAC Policy. Without the ability to observe activity patterns and time their inquiries accordingly, the systematic pattern was disrupted. *See id.* ¶ 11.

3

## THE INTERIM POLICY

10. It is an unacceptable risk to national security for sensitive, controlled or classified information to regularly reach journalists. The regular pattern of unlawful disclosures prior to October 2025 posed serious risks to national security. Unauthorized disclosure of operational plans, intelligence assessments, force posture decisions, and other obviously sensitive information puts American lives in danger, allows our enemies to adjust their tactics ahead of our operations, and risks compromising our ongoing operations. These disclosures are irreversible: Once compromised, information cannot be recalled.

11. When I adopted the interim policy, I assessed that the combination of unescorted access and the absence of security screening criteria contributed to the frequency with which classified information was reaching journalists. I also agreed with Ms. Wilson that restoring unescorted access to the Pentagon for PFAC holders would result in a return to the same pattern of regular breaches of information security that that unescorted access had previously permitted, especially if we were unable to prohibit journalists from intentionally soliciting unlawful disclosures of information. The escort requirement adopted as part of the Interim Policy was specifically designed to address this assessment of risks to the security of information in the Pentagon, and thus to the nation's security, that would exist if the Department were required to return to the pre-October Policy status quo, under which journalists frequently obtained sensitive information. *See id.* ¶ 9.

12. I reached this conclusion after the Court rejected the October Policy's attempt to permit PFAC holders to access portions of the Pentagon without an escort, subject to a requirement that PFAC holders not intentionally induce unauthorized disclosures. Without the escort requirement or a prohibition on PFAC holders soliciting unlawful

4

disclosures of sensitive information, I concluded that the Department has no other effective means of managing this demonstrated, repeated risk to the security of sensitive information within the Pentagon while still permitting journalists to access the Pentagon.

13. I adopted the escort requirement in response to the Court's rejection of the challenged portions of the October 2025 policy, in order to address the risk to the security of sensitive controlled and classified information within the Pentagon, and the risks that the unauthorized disclosure of that information would carry for the Nation's security, which would exist if the Department had to return to the pre-October Policy status quo.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 4, 2026 at Washington, D.C.

SEAN PARNELL
Assistant to the Secretary of War for
Public Affairs
1400 Defense Pentagon
Washington, D.C. 20301-1400

5