# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, *et al.*,

                      *Plaintiffs*,

     v.

DEPARTMENT OF DEFENSE A/K/A DEPART-
MENT OF WAR, *et al.*,

                      *Defendants*.

**Civil Case No. 26-cv-1690 (PLF)**

## REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Susan Pelletier*
Gibson, Dunn & Crutcher LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500
SPelletier@gibsondunn.com

*Counsel for Plaintiffs The New York Times Company
and Julian E. Barnes*

*\*pro hac vice application forthcoming*

**TABLE OF CONTENTS**

Table of Authorities ...............................................................................................................iii

Introduction........................................................................................................................ 1

Argument ........................................................................................................................... 2

    I.    Defendants' Post-Hoc Justification for the Escort Requirement Is Pretextual

        and the Sole "Evidence" Defendants Offer in Support of it is Easily Refuted. ............. 2

    II.    The Escort Requirement Violates the First Amendment. ............................................... 9

        A. The Interim Policy is retaliation for the exercise of First Amendment rights. .......... 9

        B. The Policy is an impermissible restriction on access to a nonpublic forum. ........... 14

    III.    The Escort Requirement Violates the Administrative Procedure Act. ........................ 18

    IV.    The Remaining Injunction Factors Weigh in Favor of a Preliminary Injunction. ........ 22

        A. Plaintiffs have shown irreparable harm...................................................................... 22

        B. The balance of the equities favors injunctive relief.................................................. 24

Conclusion ....................................................................................................................... 25

TABLE OF AUTHORITIES

**Cases**

*In re Admin. Subpoena 25 1431 032 to Rhode Island Hosp.*,
  2026 WL 1392565 (D.R.I. May 14, 2026) ................................................................13

*Alpine Sec. Corp. v. Fin. Indus. Reg. Auth.*,
  121 F.4th 1314 (D.C. Cir. 2024)..............................................................................22

*Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*,
  901 F.3d 356 (D.C. Cir. 2018)...........................................................................13, 16

*Ateba v. Leavitt*,
  133 F.4th 114 (D.C. Cir. 2025)....................................................................14, 15, 24

*Conserve Southwest Utah v. Dep't of the Interior*,
  2026 WL 569034 (D.D.C. Mar. 1, 2026)..................................................................19

*Crawford-El v. Britton*,
  93 F.3d 813 (D.C. Cir. 1996).....................................................................................14

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)...............................................................................................9, 21

*DHS v. Regents of the Univ. of California*,
  591 U.S. 1 (2020)................................................................................................19, 20

*Esch v. Yeutter*,
  876 F.2d 976 (D.C. Cir. 1989)..................................................................................19

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)...................................................................................................21

*Fed. Educ. Ass'n v. Trump*,
  795 F. Supp. 3d 74 (D.D.C. 2025)............................................................................13

*First Choice Women's Resource Centers, Inc. v. Davenport*,
  146 S. Ct. 1114 (2026)................................................................................................3

*Flynt v. Rumsfeld*,
  355 F.3d 697 (D.C. Cir. 2004)..................................................................................24

*Hesai Tech. Co. v. U.S. Dep't of Def.*,
  792 F. Supp. 3d 22 (D.D.C. 2025).............................................................................20

*IMS, P.C. v. Alvarez*,
  129 F.3d 618 (D.C. Cir. 1997)..................................................................................19

*Int'l Ladies' Garment Workers' Union v. Donovan*,
  722 F.2d 795 (D.C. Cir. 1983)..................................................................................21

*Jud. Watch, Inc. v. U.S. Dep't of Com.*,
  224 F.R.D. 261 (D.D.C. 2004)............................................................................................5

*Judulang v. Holder*,
  565 U.S. 42 (2011)...........................................................................................................18

*Karem v. Trump*,
  404 F. Supp. 3d 203 (D.D.C. 2019)......................................................................22, 23, 24

*Koala v. Khosla*,
  931 F.3d 887 (9th Cir. 2019) ...........................................................................................17

*Luokung Tech. Corp. v. Dep't of Def.*,
  538 F. Supp. 3d 174 (D.D.C. 2021)..................................................................................18

*Media Matters for Am. v. FTC*,
  2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) ..............................................................10, 13

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v.*
  *State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)............................................................................................................21

*Nat'l Pub. Radio, Inc. v. Trump*,
  2026 WL 877434 (D.D.C. Mar. 31, 2026)..........................................................................10

*New York Times Co. v. Dep't of Def.*,
  2026 WL 788689 (D.D.C. Mar. 20, 2026) ("*NYT I*")................................1, 11, 17, 18, 22, 25

*New York Times Co. v. Dep't of Def.*,
  2026 WL 962252 (D.D.C. Apr. 9, 2026) ("*NYT II*") ......................1, 2, 7, 8, 10, 12, 15, 19, 22

*New York Times Co. v. United States*,
  403 U.S. 713 (1971).......................................................................................................4, 18

*New York Times Co. v. United States Dep't of Def.*,
  2026 WL 1179440 (D.C. Cir. Apr. 27, 2026)......................................................8, 15, 23, 25

*Perkins Coie LLP v. U.S. Dep't of Just.*,
  783 F. Supp. 3d 105 (D.D.C. 2025)...................................................................................10

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
  460 U.S. 37 (1983)............................................................................................................14

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
  831 F.3d 500 (D.C. Cir. 2016).....................................................................................22, 24

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980)............................................................................................................3

*Sherrill v. Knight*,
  569 F.2d 124 (D.C. Cir. 1977)..........................................................................................23

*Silver State Land, LLC v. Beaudreau*,
  59 F. Supp. 3d 158 (D.D.C. 2014)....................................................................................19

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)........................................................................................................16, 17

*The New York Times Co. v. Gonzales*,
  459 F.3d 160, 184 (2d Cir. 2006)..............................................................................................4

*Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, &
  Explosives*,
  437 F.3d 75 (D.C. Cir. 2006)....................................................................................................18

*United States v. Oregon*,
  2026 WL 318402 (D. Or. Feb. 5, 2026)..................................................................................13

*United States v. Stauffer Chem. Co.*,
  464 U.S. 165 (1984)......................................................................................................................1

*Yakima Valley Cablevision, Inc. v. FCC*,
  794 F.2d 737 (D.C. Cir. 1986)..................................................................................................22

*Zerilli v. Smith*,
  656 F.2d 705 (D.C. Cir. 1981)..............................................................................................3, 25

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017)......................................................................................................................9

**Statutes**

5 U.S.C. § 552................................................................................................................................18

5 U.S.C. § 706................................................................................................................................18

**Other Authorities**

Alexander Bickel, *The Morality of Consent* (1977)..........................................................................4

CNN, *Trump rails against CNN when asked about $1.776B fund*, YouTube (June
  4, 2026) .......................................................................................................................................11

Helene Cooper, *Jan. 6 Rioter Is Hired to Work in Sensitive Pentagon Office*, N.Y.
  Times (June 4, 2026)....................................................................................................................8

Peter Baker, *Washington's Daily Secret Machine*, N.Y. Times (June 9, 2021) ...............................4

Sadie Gurman, Josh Dawsey, and Aruna Viswanatha, *Trump Complaints About
  Iran War Leaks Prompt Aggressive DOJ Investigations*, Wall St. J. (May 11,
  2026) ..............................................................................................................................................6

Scott Nover, *Pentagon bans journalists from press office, designating it a
  classified space*, Wash. Post (June 1, 2026)............................................................................12

Wright, Miller & Cooper, Federal Practice and Procedure § 4444 (2009).....................................1

v

**Rules**

Fed. R. Evid. 602 ......................................................................................................................5

## INTRODUCTION

The Interim Policy is the product of a Department of Defense determined to exclude journalists and news organizations, including, specifically, The Times, from the Pentagon "based on [their] editorial viewpoint—that is, whether the individual or organization is willing to publish only stories that are favorable to or spoon-fed by Department leadership." *New York Times Co. v. Dep't of Def.*, 2026 WL 788689, at *14 (D.D.C. Mar. 20, 2026) ("*NYT I*").[1] When this Court held its first attempt to do so through its October Policy unconstitutional, the Department hastily threw together the Interim Policy in a "transparent attempt[] to negate the impact of this Court's Order[.]" *New York Times Co. v. Dep't of Def.*, 2026 WL 962252, at *8 (D.D.C. Apr. 9, 2026) ("*NYT II*"). The October Policy was not, as this Court held on the basis of an undisputed factual record, motivated by any legitimate "security" concern. *NYT I*, 2026 WL 788689, at *14. And neither was the Interim Policy. It was, as is evident from its face and the factual record, a lashing out in response to an adverse court ruling—and a blatant attempt to punish The Times—which Secretary Hegseth has branded "unpatriotic" alongside all news organizations that insist on reporting independently on the military, and to keep The Times out of the Pentagon one way or another.

Now, called upon to defend the Interim Policy's escort requirement on its merits, Defendants offer up a new version of their earlier, baseless claim that by vacating the October Policy's unconstitutional provisions, this Court purportedly put the Pentagon's "security" in jeopardy. *See* Declaration of Sean Parnell, Dkt. 11-3, ¶ 13. Specifically, the Department now asserts that the Interim Policy's escort requirement is necessary because if it "had to return to the pre-October

---

[1] Defendants are barred by issue preclusion from relitigating this Court's rulings that the October Policy had an unconstitutional viewpoint-discriminatory motive and that the Pentagon's pre-October approach to press access protected safety and security. *See United States v. Stauffer Chem. Co.*, 464 U.S. 165, 169 (1984); Wright, Miller & Cooper, Fed. Practice and Proc. § 4444 (2009).

Policy status quo"—the status quo that existed for decades prior to Secretary Hegseth's tenure—the "security of sensitive[,] controlled[,] and classified information within the Pentagon" would suddenly be at "risk." *Id*. That assertion, like the Department's prior claimed "security" concerns, is pretextual and, in the words of this Court, utter "nonsense." *NYT II*, 2026 WL 962252, at *7.

Defendants' argument ignores the substance of this Court's prior rulings, cannot be reconciled with the long history of press access to the Pentagon that, as Defendants admitted, posed no security or safety threat, and is belied by the testimony of experienced Times journalists and former Pentagon press officials alike, *see* Decl. of Richard W. Stevenson ¶¶ 6, 19; Decl. of Julian Barnes, Dkt. 6-17, ¶¶ 8–10; Decl. of Pete Williams, Dkt. 6-20, ¶ 10; Decl. of Chris Meagher, Dkt. 6-19, ¶¶ 9–10. Defendants' purported justification for the escort requirement rests entirely on easily refuted, invented "observa[tions]" of its Press Secretary, and a single unsupported and unexplained reference to "377781military secrets [sic]" that reporters supposedly "regularly gained access to" before October 2025. Defs' Opp. to Mot. for Prelim. Injunction, Dkt. 11-1 ("Opp.") at 1, 27. Their attempt to offer some valid reason for the requirement only highlights that there isn't one, and betrays their antipathy towards independent journalism in general, and The Times in particular.

The escort requirement is a retaliatory, arbitrary, unconstitutional restriction on access to and use of a nonpublic forum that is inflicting serious irreparable harm contrary to the public interest. It violates the First Amendment and the Administrative Procedure Act. Preliminary injunctive relief is warranted.

**ARGUMENT**

## I. Defendants' Post-Hoc Justification for the Escort Requirement Is Pretextual and the Sole "Evidence" Defendants Offer in Support of it is Easily Refuted.

Defendants' argument that it would pose a grave threat to national security for any credentialed journalist to be anywhere in the Pentagon without an official escort is preposterous and

plainly pretextual. It is predicated on misleading, factually incorrect assertions and, at bottom, simply misrepresents how journalism works. Yet Defendants' post-hoc "national security" rationale is their answer to everything—why the policy is not unreasonable, Opp. 12–14; why it is not viewpoint motivated, Opp. 15–17; why it is not retaliatory, Opp. 19, 23–24, 26–27; and why it is not arbitrary and capricious, Opp. 31–35. Because that rationale fails in the face of contrary evidence and on its own terms, Plaintiffs are likely to succeed on the merits.

As an initial matter, the Department's attempt to justify the escort requirement by pointing to a purported concern about the "security of sensitive[,] controlled[,] and classified information within the Pentagon" makes no sense. Parnell Decl. ¶ 13. Journalists do not "have access to sensitive or classified information simply by being in the building without an escort[.]" Williams Decl. ¶ 21; Meagher Decl. ¶¶ 9–10. And the fact that journalists may, in the course of their work *outside the Pentagon*, learn non-public information that the Department may (or may not) deem "sensitive," "controlled," or "classified" cannot justify an escort requirement *within the Pentagon*.

More fundamentally, the "unique nature of the journalistic profession" is not, as the Department suggests, a reason to *restrict* journalists' access to the Pentagon. *See* Opp. 14 (arguing that journalists deserve less access than other non-Department employees with Pentagon access, like shop clerks and food-service vendors, because their job is to seek out information). To the contrary, the Press Clause of the First Amendment singles out the press for protection precisely *because* of the unique role journalists play as "surrogates for the public." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572–73 (1980); *Zerilli v. Smith*, 656 F.2d 705, 710–11 (D.C. Cir. 1981) (The First Amendment guarantees a free press primarily because it serves as "a vital source of public information."); *see also First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1122 (2026) ("The First Amendment guarantees all Americans the rights to speak,

3

worship, *publish*, assemble, and petition their government freely." (emphasis added)).  Defendants' argument boils down to the claim that independent journalism is by its very nature a threat to national security, and that the Department may therefore treat reporters *worse* than others—including the thousands of non-Department employees that continue to have unescorted access to the building.  That is a perverse reading of the First Amendment.  That the escort requirement looks to disrupt the "healthy adversarial tension between the government, which may seek to keep its secrets" and "the press, which may endeavor to" report them, is all the more reason it should be enjoined.  *The New York Times Co. v. Gonzales*, 459 F.3d 160, 184 (2d Cir. 2006) (Sack, J., dissenting) (citing Alexander Bickel, *The Morality of Consent* 81 (1977)).

It has always been lawful and expected for journalists to seek out and publish non-public information about the government.  *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring) ("The press was protected so that it could bare the secrets of government and inform the people.").  As The Times's then-Washington Bureau Chief Max Frankel explained in his 1971 affidavit in the Pentagon Papers case, what is "secret" in Washington is not limited to information that would be "somehow detrimental to the national interest if prematurely disclosed."  Aff. of Max Frankel, Supplemental Decl. of Theodore J. Boutrous ("Supp. Boutrous Decl."), Ex. 1 ¶ 5.  "[P]ractically everything that our Government does, plans, thinks, hears and contemplates in the realms of foreign policy is stamped and treated as secret—and then unraveled by that same Government, by the Congress and by the press in one continuing round of professional and social contacts and cooperative and competitive exchanges of information."  *Id.* ¶¶ 5–6.  "Fifty years later, this is still an apt description of how Washington works."  Peter Baker, *Washington's Daily Secret Machine*, N.Y. Times (June 9, 2021), Supp. Boutrous Decl., Ex. 2.  To this day, far from putting our Nation at risk, "the careful work that journalists at The Times and other news outlets

undertake to deliver fact-based, independent reporting to the American public—including reporting that relies on information that the Department would characterize as secret—strengthens our democracy and helps safeguard our national security." Stevenson Decl. ¶ 6.

The only support Defendants muster for their argument to the contrary consists of the inadmissible "observa[tions]" of Press Secretary Kingsley Wilson set forth in the Parnell Declaration.[2] According to Parnell, Wilson reported that after the October Policy took effect, "the frequency with which the Pentagon press office was contacted by journalists regarding sensitive, controlled or classified information" declined. Parnell Decl. ¶ 8. From this, Wilson guessed journalists were obtaining such information less frequently. *Id.* And she further speculated that this was due to credentialed journalists no longer being in the building and able to, in her words, "observe activity patterns and time their inquiries accordingly." *Id.* ¶ 9. Wilson's conjecture on top of conjecture via the Parnell declaration is the only evidence Defendants offer in defense of the escort requirement. Indeed, Defendants cite Parnell's declaration citing Wilson's extra-record statements more than 20 times. Wilson's claims, however, do not withstand even casual scrutiny.

To be clear, the only "reduction" Wilson purportedly observed was in "the frequency with which *the Department learned* journalists had obtained" sensitive, controlled, or classified information, *i.e.*, in the number of contacts Wilson's office reportedly received from journalists asking about such information. Parnell Decl. ¶ 9 (emphasis added); Opp. 7. On its face, what "the Department learned" says *nothing* about the frequency with which journalists at The Times or else-

---

[2] Defendants do not submit any direct evidence from Wilson herself. *See* Dkt. 11. Parnell's attempt to testify as to Wilson's observations is impermissible hearsay for which he lacks sufficient "first-hand basis of perception or personal experience to support." *Jud. Watch, Inc. v. U.S. Dep't of Com.*, 224 F.R.D. 261, 264 (D.D.C. 2004); Fed. R. Evid. 602.

where were *actually obtaining* non-public information in the course of their reporting.  And, indeed, outside of this litigation, the Administration has made clear it does not believe there has been a dramatic reduction in the amount of non-public information about the Department being reported by journalists and news organizations in recent months.  *See* Sadie Gurman, Josh Dawsey, and Aruna Viswanatha, *Trump Complaints About Iran War Leaks Prompt Aggressive DOJ Investigations*, Wall St. J. (May 11, 2026), Supp. Boutrous Decl., Ex. 3.

With respect to The Times, Wilson's speculative hearsay assertions are demonstrably false.  It is simply untrue that after the October Policy was implemented, journalists at The Times were prevented from learning non-public information about the Department.  Wilson need only to have read The Times before submitting her declaration to realize as much.  Between October 15, 2025 and March 31, 2026,[3] The Times published 308 stories about the Department; 109 (or 36.5%) of those stories were "scoops"—*i.e.*, original reporting, including original reporting that built or expanded on earlier reporting by other news outlets.  Stevenson Decl. ¶ 16.  More than half of those stories—158 (or 51.6%)—relied on non-public information.  In comparison, during the first 123 days of the Trump Administration, *before* Secretary Hegseth had imposed any new restrictions on credentialed journalists' access to the Pentagon, The Times published 170 stories about the Department; 60 (or 35.7%) of those stories were "scoops" and 76 (or 44.7%) of them relied on non-public information.  *Id*.  In other words, The Times broke a *higher* percentage of stories about the Department based on non-public information *after* the October Policy.  The frequency with which Times journalists "obtained" non-public information did not "drop[] dramatically."  Parnell Decl. ¶¶ 7–8.  Nor did the frequency of Times journalists' contacts with the Pentagon Press Office.  It is

---

[3] The October Policy went into effect on October 15, 2025.  Defendants filed Wilson's declaration for the first time on April 10, 2026.

The Times's practice to always engage with Public Affairs officials at the Department before publishing a story about the Department; Times journalists contact the Pentagon Press Office to seek information and comment on a regular basis, just as they did before the Interim Policy, and before the October Policy. Stevenson Decl. ¶ 18; Supp. Decl. of Julian E. Barnes ("Supp. Barnes Decl.") ¶¶ 8–9. Those contacts did not "drop[] dramatically" after the October Policy. Stevenson Decl. ¶ 16; Supp. Barnes Decl. ¶ 10.

Finally, even if Defendants' post-hoc "national security" explanation for the Interim Policy did not fail on its own terms, its timing alone makes clear it is pretextual. Defendants said nothing about Wilson's "observ[ations]" in the Interim Policy itself, in their briefing on The Times's Motion to Enforce the Court's March 20 Order, in the multiple declarations they submitted in opposition to that motion, or during the hearing on that motion. Defendants do not explain why, but the reason is obvious. *See* Mot. for Prelim. Injunction, Dkt. 6-1 ("Mot.") 30. In its prior attempt to justify the Interim Policy, Defendants gave a different rationale. They claimed (wrongly) that the Interim Policy was needed because "the Court [had] vac[ated] the [October] PFAC Policy's security screening provisions." Dkt. 1-1 at 3. This Court rightly rejected that claim as "nonsense"; the "Court did not 'remove' or 'excise' the Department's authority to screen PFAC holders." *NYT II*, 2026 WL 962252, at *7. Defendants were thus forced to take a different tack.

Defendants first proffered their theory that the Court's March 20 Order jeopardizes national security because the "pre-October Policy status quo" of unescorted access to parts of the Pentagon by credentialed journalists puts the "security of sensitive[,] controlled[,] and classified information within the Pentagon" at risk, Parnell Decl. ¶ 13, only *after* this Court concluded that Defendants had adopted the Interim Policy "not [as a] security measure[] or effort[] to make good on prior commitments but rather [as a] transparent attempt[] to negate the impact of this Court's Order,"

requiring them to restore The Times's access to the Pentagon.  *NYT II*, 2026 WL 962252, at \*8.

Defendants filed their declaration from Wilson outlining the supposed basis for that theory in support of their motion for a partial stay of this Court's Enforcement Order pending appeal.  *New York Times v. Dep't of Def.*, No. 25-cv-4218 (D.D.C. Apr. 10, 2026), Dkt. 58-1. It was transparently concocted for litigation purposes after the Department's first attempt to defend the Interim Policy failed.  Such a belated post-hoc justification reeks of pretext.[4]

Even setting aside the Department's generally cavalier approach to national security,[5] it is not credible that the Department realized that unescorted access posed a grave national security threat but sat on that realization for months, zealously defended a policy permitting unescorted access (so long as The Times and other disfavored outlets were excluded from the building), and only decided to act, coincidentally, over the weekend following this Court's March 20 Order.  And Parnell's nonsensical assertion that the escort requirement was necessary because after the Court's vacatur of key provisions of the October Policy there was no longer "a prohibition on PFAC holders soliciting unlawful disclosures of sensitive information," Parnell Decl. ¶ 12, underscores that lack of credibility.  The Interim Policy includes a prohibition on the "intentional inducement of unauthorized disclosure."  Dkt. 1-1 at 14.  In other words, a resurrected version of the October

---

[4] Defendants wrongly suggest that the D.C. Circuit's decision granting a partial stay of this Court's Enforcement Order requires this Court to credit Defendants' arguments.  *Contra* Opp. 2. Setting aside that the decision is not precedential, the two-judge majority of the motions panel said only that, for the non-merits elements of the stay test, Defendants' assertions "supported [the Department's] claim that [the escort requirement] furthers important national security interests" while overall the equities were in equipoise, *New York Times Co. v. Dep't of Def.*, 2026 WL 1179440, at \*2 (D.C. Cir. Apr. 27, 2026).  The panel did not address the merits of the Interim Policy.  *Id.* And because the Wilson Declaration was submitted only after this Court's decision, Plaintiffs had not yet had an opportunity to rebut it.

[5] Mot. 38 n.3; *see also* Helene Cooper, *Jan. 6 Rioter Is Hired to Work in Sensitive Pentagon Office*, N.Y. Times (June 4, 2026), Supp. Boutrous Decl. Ex. 4 (reporting on the Department's recent hiring of an individual who pled guilty to charges related to the January 6 attack on the Capitol for a role that routinely deals with classified information).

Policy's unlawful-disclosure provision (in "different words to say the same thing") was included alongside the escort requirement in the Interim Policy. The escort requirement did not spring into existence after that provision was struck by this Court as a violation of its March 20 Order.

"[N]ational-security concerns must not become a talisman used to ward off inconvenient claims." *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017). The Department repeatedly incants "national security" as if repeated use of the phrase, alone, decides this case. But Defendants' entire "national security" argument devolves into unsupported hearsay speculation by the Department's Press Secretary that is neither credible nor consistent with the facts. Because Defendants' opposition rests on nothing more, Plaintiffs' motion for preliminary injunction should be granted.

## II.  The Escort Requirement Violates the First Amendment.

Plaintiffs are likely to succeed on the merits of their claim that the Interim Policy, like the October Policy it replaced, was implemented to retaliate against Plaintiffs for exercising their First Amendment rights and intended to punish and suppress independent journalism that does not merely parrot official pronouncements. Defendants' opposition largely ignores (and certainly does not overcome) Plaintiffs' showing that the escort requirement violates the First Amendment.

### A.  The Interim Policy is retaliation for the exercise of First Amendment rights.

Defendants do not dispute that Plaintiffs' journalism and their lawsuit challenging the constitutionality of the October Policy are protected by the First Amendment, but they claim the Interim Policy was not retaliatory because it was motivated by a desire to protect "the security of sensitive[,] controlled[,] and classified information." Parnell Decl. ¶ 13; *see* Opp. 18–19. That it was issued in direct response to a Court order requiring Defendants to restore Pentagon access for The Times, and only The Times, Defendants would have this Court believe, is merely a coincidence. But this Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). It need not ignore the factual record.

9

Defendants have loudly and repeatedly expressed their disdain for—and desire to punish—news organizations, including The Times specifically, because of how they cover the Department. Among many examples: Parnell has called The Times "garbage" for reporting that Secretary Hegseth shared war plans on a Signal chat with his wife, his brother, and Parlatore. Dkt. 1-34. He said The Times needed to be held "accountab[le]" and that its days of spreading "fake narratives" were "over." Dkt. 1-3; *see generally* Mot. 7–8, 12, 14, 28. Defendants do not even attempt to dispute that these statements are evidence of unlawful retaliatory intent. Opp. 22. Their only response is that these particular statements are too "remote in time" to be relevant because they were made closer to the October Policy than the Interim Policy. *Id.* Defendants are wrong.

Defendants identify no facts to support the proposition that their animus simply vanished over the weekend following this Court's March 20 Order. Nor could they. As this Court found, the Interim Policy was meant to evade the Court's injunction requiring The Times's access be restored. *NYT II*, 2026 WL 962252, at *4. Nor does any legal principle support ignoring evidence of retaliatory intent because the animus is longstanding. In *Media Matters for America v. FTC*, the D.C. Circuit cited threats from 2023 as evidence that a 2025 investigation violated the First Amendment. 2025 WL 2988966, at *1–2 (D.C. Cir. Oct. 23, 2025); *see also Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 162 (D.D.C. 2025) (citing statements by the President "[s]ince 2017" as evidence that a 2025 executive order was retaliatory); *Nat'l Pub. Radio, Inc. v. Trump*, 2026 WL 877434, at *6 (D.D.C. Mar. 31, 2026) (citing statements by the President "throughout 2024" as evidence that 2025 executive order was retaliatory).

In any event, as detailed in Plaintiffs' Motion, Defendants' admissions of animus have only piled up. Mot. 28. Defendants' attempt to dismiss these more recent statements as "opinions"

10

about Plaintiffs' reporting that do not reflect "any hostility toward the fact that Plaintiffs are engaged in protected activity," Opp. 23, is farcical. If Secretary Hegseth's April 2026 rebuke of the press for failing to "choos[e] wisely" when they, like the "Pharisees," decide "to witness, to write everything down, to report," and to "scrutiniz[e] every good act in order to find a violation" does not demonstrate "hostility" toward an independent press for engaging in protected newsgathering and reporting, it is hard to imagine what would. *See* Dkt. 1-10; *see also*, *e.g.*, Dkt. 1-9 (Hegseth calling The Times "unpatriotic" in April 2026); Dkt. 6-7 (President Trump calling The Times's reporting "sort of treasonous" in May 2026 for not repeating the official narrative that the ongoing war in Iran was a "total military victory"); CNN, *Trump rails against CNN when asked about $1.776B fund*, YouTube (June 4, 2026), Supp. Boutrous Decl., Ex. 5 (President Trump claiming "the fake news like CNN and The New York Times" have "abused our people so badly").

That the Interim Policy was issued to punish Plaintiffs for successfully challenging the October Policy's constitutionality also cannot reasonably be disputed. *See* Mot. 28–29. Try as Defendants might to spin it as an ordinary, good-faith response to the Court's March 20 Order, Opp. 19–22, the Interim Policy was hastily thrown together over a weekend for one reason: so the Department could avoid restoring The Times's access to the Pentagon—no other news organization was covered by that portion of the Court's injunction. Order Granting Plaintiffs' Mot. to Compel, *New York Times Co. v. Dep't of Def.*, No. 25-cv-4218, Dkt. 54 (D.D.C. Apr. 9, 2026).

While it can be "an ordinary and expected" for an "agency to conduct a new regulatory action in response to an adverse court decision," Opp. 21, this Court's March 20 decision was no ordinary adverse court decision. The Court held the Department adopted the October Policy for the unconstitutional purpose of "weed[ing] out disfavored journalists." *NYT I*, 2026 WL 788689, at *14. Nor is the Interim Policy the type of "new regulatory action" an agency would take if it

11

were attempting, in good faith, to comply with the Constitution with the benefit of judicial guidance. As Parlatore explained, the Interim Policy just "use[d] more words to say the same thing" as the October Policy. *NYT II*, 2026 WL 962252, at *5. To punish The Times for successfully suing to restore its PFACs, Defendants spitefully made those PFACs as worthless as possible. The point was to show The Times—and this Court—that continuing to protect the public's access to critical information will only lead to new, increasingly draconian restrictions. That is the essence of First Amendment retaliation—it is punishment meant to send the message that one should stop their protected activity, or else. Defendants' suggestion that, if anything, they are trying to "clap back" at the Court rather than Plaintiffs, Opp. 21, amounts to an admission that the success of Plaintiffs' lawsuit enraged the Department.

Defendants' actions since the The Times filed its Motion only underline their intent to continue to retaliate against Plaintiffs for seeking to vindicate their First Amendment rights and evade any preliminary injunctive relief that may be entered by this Court. The Times's Motion explained that one reason why unescorted access is (and has always been) compatible with national security is that access to areas of the Pentagon where classified information is discussed—specifically, Sensitive Compartmented Information Facilities, or SCIFs—is restricted. Mot. 33. Within ten days, Defendants had announced that the Pentagon's main Press Office—the office whose very purpose, as its name suggests, is to liaise with the press—would be redesignated as a SCIF so that reporters could no longer enter it unescorted. Scott Nover, *Pentagon bans journalists from press office, designating it a classified space*, Wash. Post (June 1, 2026), Supp. Boutrous Decl. Ex. 6. By banning the press from the Press Office, Defendants went from Kafka, *NYT II*, 2026 WL 962252, at *9 n.7, to Orwell. And they neglected to inform the Court of this "redesignation" in their opposition even though, by denying Plaintiffs access "in a manner commensurate with" their

12

access before March 20, it violates the not-stayed part of the injunction in *NYT I*. Order Granting Plaintiffs' Mot. to Compel, *New York Times Co. v. Dep't of Def.*, No. 25-cv-4218, Dkt. 54 (D.D.C. Apr. 9, 2026). Even setting aside the palpable bad faith shown by this "redesignation," it proves Defendants' retaliatory purpose. Defendants' point is clear: every time The Times defends its rights, even successfully, Defendants will attempt to shrink its access to the Pentagon further.

Defendants contend they would have adopted the escort requirement even if the October Policy had never been challenged, citing Wilson's purported "observ[ations]." Opp. 25–27. But, as detailed above, her speculative conclusions offered for the first time only after the Interim Policy was enjoined are belied by the facts and simply not credible, *supra* Part I; Defendants' reliance on Wilson's claims only confirms their unlawful, retaliatory motive. *See* Opp. 25–27. Courts routinely treat "post-hoc rationalization[s]" as evidence that the government had an improper, speech-suppressive purpose. *Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*, 901 F.3d 356, 366 (D.C. Cir. 2018) ("*WMATA*"). And while the Department questions whether pretext is evidence of retaliation because page eight of the *Media Matters* opinion did not cite pretext, Opp. 24, it overlooks the fact that page seven of that opinion expressly did. 2025 WL 2988966, at *7 (explaining that "the district court did not err in considering . . . relevant evidence of pretext" in finding First Amendment retaliation). Nor can the "presumption of regularity" save Defendants. *See* Opp. 20. To the extent the presumption still exists at all,[6] it is inapplicable here. Defendants'

---

[6] Multiple courts have concluded that in light of "the discrepancy between the honorable conduct expected of federal prosecutors and DOJ's tactics" in cases before it, "'[t]he presumption of regularity that has previously been extended to [the government] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds.'" *In re Admin. Subpoena 25 1431 032 to Rhode Island Hosp.*, 2026 WL 1392565, at *10 (D.R.I. May 14, 2026) (quoting *United States v. Oregon*, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026); *see also Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 92 (D.D.C. 2025) ("In just six months, the President of the United States may have forfeited the right to such a presumption of regularity.").

13

repeated, express admissions of animus, this Court's prior finding of viewpoint-discriminatory intent with respect to the October Policy, and its finding that Defendants sought to evade the Court's ruling have soundly defeated any presumption in Defendants' favor.

Finally, Defendants posit that the escort requirement is not adverse enough to be the basis of a retaliation claim. *See* Opp. 27–29. Defendants are wrong. The purpose of requiring an "adverse" action is to screen out trivial or de minimis acts, like a "supervisor frowning at an employee in retaliation." *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996); *see* Mot. 25–26. The escort requirement is far from trivial. *See infra* 14–16. As Barnes explains, and is further detailed below, journalists cannot effectively do their jobs without "hav[ing] conversations, follow[ing] leads, and ask[ing] questions that cannot be planned days or even hours ahead of time." Supp. Barnes Decl. ¶ 7. Because the escort requirement makes it no longer possible to do any of that at the Pentagon, it makes a PFAC "essentially worthless." Barnes Decl. ¶ 31.

### B. The Policy is an impermissible restriction on access to a nonpublic forum.

Defendants concede, as they must, that the Pentagon's press areas are a nonpublic forum. Restrictions on access therefore must be reasonable in light of the purposes of the forum and "not an effort to suppress expression merely because public officials oppose the speaker's view." *Ateba v. Leavitt*, 133 F.4th 114, 123 (D.C. Cir. 2025) (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983)); Opp. 11–12; *see* Mot. 31–32. The escort requirement fails both prongs.

#### 1. *The escort requirement is unreasonable.*

The escort requirement is patently inconsistent with the purpose of having credentialed journalists in the Pentagon in the first place: to facilitate newsgathering and reporting about the Department and U.S. military for the benefit of the American people. Mot. 32–34. Defendants

14

attempt throughout their opposition to characterize the escort requirement as merely a slight inconvenience. Opp. 8–9, 28. But as this Court previously recognized, the escort requirement severely restricts PFAC holders' access to and use of the Pentagon's press areas for newsgathering and reporting. *NYT II*, 2026 WL 962252, at *8; *see also NYT III*, 2026 WL 1179440, at *6 (Childs, J., dissenting) ("Reporters can hardly verify sources, gather information, or speak candidly with Department personnel with an escort looming over their shoulders."). The problem with the escort requirement is not, as Defendants suggest, simply that escorts are unavailable, or even that a reporter may shy away from soliciting secrets in the presence of a minder. *Contra* Opp. 28. The requirement to formally schedule, in advance, every interview or inquiry is contrary to the nature of breaking news. And the constant presence of an escort, even for interviews that are meant to be on background or for context, makes it more difficult to engage in candid conversations that are essential to newsgathering. While Defendants point to certain activities that are still theoretically possible under the escort requirement (most of which any visitor could do without a PFAC), Opp. 13, they ignore or mischaracterize the requirement's severe impact on credentialed journalists' ability to do their jobs both efficiently and effectively; the escort requirement, by design, makes The Times's PFACs practically worthless. *See supra* 14–15.

The escort requirement's incompatibility with journalism is what makes it an outlier, *see* Mot. 32–34. Defendants do not dispute that credentialed reporters have unescorted access in other government buildings like the Supreme Court and Justice Department. *See id*. As to the White House, Defendants misstate its policy as described in *Ateba*. The *Ateba* court found little burden from requiring reporters with day passes to be escorted "from the White House gate to the Press Area," where they would then have "the same privileges" as hard-pass holders. 133 F.4th at 117 (D.C. Cir. 2025); *see also* Meagher Decl. ¶ 4. That does not resemble being permitted in the

15

building only for a pre-arranged interview or press conference, and being minded at all times by an official escort. And as for the Department itself, Defendants' lone historical example of a supposedly comparable Department press restriction involved reporters being subject to military law when they were embedded (*i.e.*, when they accompanied armed forces) during World War II. *See* Opp. 11. The Department's resort to this plainly distinguishable example underscores how historically unprecedented the Interim Policy's escort requirement is.

There is no legitimate reason for the escort requirement. As detailed in Plaintiffs' Motion, certain areas of the Pentagon have historically been off limits, and "[r]eporters [a]re clear which areas of the Pentagon they [can] access and which they [cannot]" and "respect[] those boundaries." Meagher Decl. ¶¶ 9–10; *see also* Williams Decl. ¶ 12. That is why prohibiting unescorted access for credentialed journalists serves no purpose, as former Pentagon press officials attest. Mot. 33–34. Defendants' statement that "the purpose of [the] Pentagon's press areas has never been to permit journalists unfettered access to spaces throughout the building," Opp. 13, is wrong and also misses the point. That some areas have been traditionally off-limits to journalists doesn't undermine the purpose of other areas in the building being traditionally open to credentialed journalists: to promote—not impede—effective, accurate journalism. It only shows that the Department has ways to maintain security without making effective reporting from the Pentagon impossible.

### 2. The Interim Policy is an effort to suppress expression based on editorial viewpoint.

Save a passing suggestion, Defendants do not meaningfully dispute that a facially neutral policy is unlawful when its intent is to suppress a particular viewpoint. *See* Opp. 15. Nor could they; Supreme Court precedent is clear. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) (a measure which "appear[s] neutral as to content and speaker" would be "unconstitutional" if its "purpose [were] to suppress speech"); *see also WMATA*, 901 F.3d at 365 (restricting access to or

16

use of a forum "with the intent of suppressing" certain speakers' viewpoints "surely would violate the First Amendment"). The purpose and effect of the Interim Policy is the same as the October Policy's: to weed out journalists not "on board and willing to serve" the Administration. *NYT I*, 2026 WL 788689, at *7. Defendants' stated aim to be covered by the "patriotic" press rather than those they characterize as the "Trump-hating press" is patently viewpoint discriminatory. *Id.*

Defendants' response that the escort requirement applies "evenhanded[ly]," Opp. 17, misapprehends the constitutional problem. A law that is facially evenhanded but whose predictable and intended effect is to suppress certain viewpoints is unconstitutional: "A government bent on frustrating an impending demonstration" may not "pass a law demanding two years' notice before the issuance of parade permits," even if the law applies to all parades going forward. *Sorrell*, 564 U.S. at 566; *see also Koala v. Khosla*, 931 F.3d 887, 905 (9th Cir. 2019) (plaintiff stated a cognizable First Amendment retaliation claim where a desire to impede its First Amendment activity was the "motivating factor" for a purportedly even-handed policy). Applying the escort requirement to all credentialed journalists may appear evenhanded, but the purpose and effect of the requirement is to hinder the newsgathering and reporting of journalists and news organizations like The Times who believe that journalism in the public interest requires more than just repeating official pronouncements. Because the escort requirement imposes a restriction on access to and use of a nonpublic forum to suppress an editorial viewpoint about the role of the press that the Department disfavors, it violates the First Amendment. *NYT I*, 2026 WL 788689, at *14.

Here, as elsewhere, Defendants invoke "sensitive" information as though there is a constitutional loophole that allows the government to suppress speech whenever it might reveal information the government would prefer not be disclosed. There is not. Both the Supreme Court and

17

Congress have recognized that the public is entitled to information about the decisions its government makes, including information about decisionmakers and the decision-making process that officials may prefer to keep hidden. *See New York Times Co. v. United States*, 403 U.S. 713 (1971); 5 U.S.C. § 552 (Freedom of Information Act), § 706 (administrative record review). Defendants identify no reporting that reveals active battle plans or impending military actions, and that is plainly not the type of information that Defendants are concerned reporters may obtain and publish. (Indeed, Secretary Hegseth disclosed such information in his own Signal chats, *see* Mot. 8). As Frankel explained decades ago, there is a vast array of information that the Department might deem "secret," but which does not threaten national security and enjoys no special constitutional status. Supp. Boutrous Decl., Ex. 1 ¶¶ 7–18. And, indeed, Defendants themselves sometimes choose to reveal it. *Id*. at 3; Stevenson Decl. ¶¶ 5–6; Barnes Decl. ¶ 30. Defendants' assertion that they adopted the Interim Policy to prevent journalists from learning and publishing non-public information it has not authorized for release is an admission of viewpoint discrimination. *NYT I*, 2026 WL 788689, at *14.

**III. The Escort Requirement Violates the Administrative Procedure Act.**

To "survive judicial review . . . , an agency action must . . . be supported by 'reasoned decisionmaking.'" *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006) (courts "do not . . . simply accept whatever conclusion an agency proffers merely because the conclusion reflects the agency's judgment"). That is no less true in the national security context, where "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 182 (D.D.C. 2021) (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011)). Nothing in the Department's opposition even suggests it has met that bar.

18

To begin with the Interim Policy's most obvious failing, Defendants considered impermissible factors when drafting and promulgating it.  Mot. 37–38.  While the Department argues that an agency is allowed to consider a broad range of "permissible factors," Opp. 31–32, there can be no reasonable dispute that the Department was not empowered to promulgate a policy in order to nullify a court order, retaliate against Plaintiffs for exercising their First Amendment rights, or punish and chill independent journalism.  *Supra* 16–18.

But even setting aside the Department's consideration of impermissible factors, its decision to adopt the escort requirement still would be arbitrary and capricious.  "An agency must defend its actions based on the reasons it gave *when it acted*."  *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 24 (2020) (emphasis added).  But, here, Defendants rely entirely on the "national security" explanation proffered by Wilson and Parnell—an explanation that did not surface until nearly three weeks *after* the Interim Policy was promulgated, *supra* 7 .  Even if it did not fail on its own terms (it does), that post-hoc rationalization would not help Defendants under the APA.[7]

To the extent the Department is suggesting that Wilson and Parnell are merely elaborating on the Interim Policy's stated rationale, *see* Opp. 24, its suggestion is false.  The Department's proffered "justification" for the Interim Policy at the time was that the Court had removed "all security screening authority'" and "'unescorted access to the Pentagon cannot be responsibly maintained without the ability to screen credential holders for security risks.'"  *NYT II*, 2026 WL

---

[7] Defendants cite *Conserve Southwest Utah v. Dep't of the Interior* in a footnote to suggest that "extra-record evidence" is "acceptable even under APA review in cases" where relief is at issue. Opp. 30 n.5 (quoting 2026 WL 569034, *19 n.7 (D.D.C. Mar. 1, 2026)).  But the case *Conserve* cites, *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989), has been significantly narrowed.  *See Silver State Land, LLC v. Beaudreau*, 59 F. Supp. 3d 158, 164 (D.D.C. 2014) (collecting cases). And the narrow exceptions it addresses do not allow the Department to do an end-run around its APA obligations.  *See, e.g.*, *Esch*, 876 F.2d at 991 (noting exceptions are focused on "enabl[ing]" "effective" "judicial review"); *see also IMS, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C. Cir. 1997).

962252, at *7.  Defendants' new rationale is not a "clearer or more detailed explanation" of "the justification[s] offered" at the time the Interim Policy was issued.  *Hesai Tech. Co. v. U.S. Dep't of Def.*, 792 F. Supp. 3d 22, 44, 46 (D.D.C. 2025) (quotation marks omitted); *Regents*, 591 U.S. at 22; *supra* 7.  It is an "impermissible *post hoc* rationalization[]," *Regents*, 591 U.S. at 21.

Defendants cannot overcome their failure to examine relevant data and articulate a satisfactory explanation for the Interim Policy's escort requirement.  Defendants do not dispute that the Interim Policy was thrown together over a weekend primarily by Parlatore, a part-time Department official with his own private law practice, and without any apparent investigation, fact finding, or anything else required for reasoned decisionmaking.  Mot. 37–38.  The Department's opposition ignores Parlatore's role altogether.  *See* Opp. 30–31.  Even under its own telling, the Interim Policy was rushed.  *Id*.  The Department's attempt to explain its hasty weekend scramble as a desire to quickly address a problem it had long considered is not substantiated by *any* contemporaneous evidence—no communications, no analysis, no findings—and defies commonsense.

Nor does the Department point to anything in the record that suggests it considered any contrary evidence.  This Court had already rejected the Department's claim that unescorted access for credentialed journalists at the Pentagon—the very same access that credentialed journalists had for decades—posed a safety or security threat.  Mot. 39.  But in drafting its Interim Policy, the Department grappled with *none* of the Court's findings.  *Id.; supra* 1 n. 1.  And while the Department claims that the majority of the D.C. Circuit's motions panel "disagreed" in its per curiam stay order that the Department had "ignored" contrary evidence, the D.C. Circuit did no such thing.  Opp. 32 (citing Mot. 39).  The stay panel expressly did not address the lawfulness of any aspect of the Interim Policy under the APA or otherwise.

20

The Department's attempt to explain away the Interim Policy's obvious under- and over-inclusiveness likewise falls short.  While it is true that agencies can move incrementally and need not tackle an entire issue at once, Opp. 33–34, here, as the record amply demonstrates, the Interim Policy simply does not tackle the issue the Department is allegedly trying to solve at all, *id.*; Stevenson Decl. ¶¶ 14–19.  That "significant mismatch" is a problem under the APA twice over. *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019).  It demonstrates the lack of "rational connection between the facts found and the choice made," *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), and provides further evidence of pretext, *Dep't of Com.*, 588 U.S. at 781–85.

Finally, the Department failed to consider reasonable alternatives.  *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 816 n.41 (D.C. Cir. 1983) (explaining that "consideration of some alternatives does not free [an agency] from considering other obvious" ones).  Contrary to the Department's argument, the vacated, unconstitutional provisions of the October Policy were not a reasonable alternative.  Opp. 34.  And the Department's claim that it considered a return to the pre-October Policy status quo is belied by the record.  Opp. 34–35.  As detailed above, the Department has given inconsistent, pretextual explanations for implementing the Interim Policy after portions of its October Policy were vacated.  Where a "new policy rests upon factual findings that contradict those which underlay its prior policy" an agency "must" "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).  And while it need not have "better" reasons for the Interim Policy, the Department was still required to have "good" ones. *Id.* at 516.  It has articulated neither.  The Department's failure to consider "obvious and less drastic alternative[s]"

21

to the escort requirement, and to explain why those alternatives were inadequate, violated the APA. *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 (D.C. Cir. 1986).

## IV. The Remaining Injunction Factors Weigh in Favor of a Preliminary Injunction.

As explained above, the Department's attempts to treat the escort requirement as a mere inconvenience ignores reality and misunderstands the nature of Plaintiffs' injuries, which are "both certain and great" and present "a clear and present need for equitable relief on an expedited time-line." *Alpine Sec. Corp. v. Fin. Indus. Reg. Auth.*, 121 F.4th 1314, 1332 (D.C. Cir. 2024) (citations and quotation marks omitted). Indeed, this Court has already explained why depriving The Times of meaningful access to the Pentagon irreparably injures The Times and the public. *NYT I*, 2026 WL 788689, at *17–18; *see also NYT II*, 2026 WL 962252, at *7–9. That has not changed.

### A. Plaintiffs have shown irreparable harm.

It is well established that *any* "loss of First Amendment freedoms . . . constitutes irreparable injury," *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citation and quotations omitted), including the deprivation of journalists' "ability to freely pursue 'journalistically productive conversations,'" *Karem v. Trump*, 404 F. Supp. 3d 203, 217 (D.D.C. 2019). Plaintiffs have shown that the escort requirement substantially burdens their ability to engage in constitutionally protected newsgathering. Requesting escorts is "time-consuming and burdensome, and it has substantially reduced" Plaintiffs' "amount of interaction with" important sources and "made it exceedingly challenging to speak with press officials and other personnel in person." Barnes Decl. ¶¶ 24–25; *see also* Decl. of Robert Burns, Dkt. 6-18, ¶¶ 21, 24 (escort requirement will "inhibit[] if not completely eliminate[]" reporters' "sustained interactions" with Department officials, thereby "mak[ing] accurate reporting more difficult"); Stevenson Decl. ¶ 12 ("[T]he escort requirement interferes with the reporters' ability to effectively do their jobs."). The First Amendment protects reporters' access to "source[s] of information" that have "been made

22

publicly available," *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977), and the deprivation of "access to pursue those conversations" is a constitutional harm that "cannot be remedied retrospectively," *Karem*, 404 F. Supp. 3d at 217.  The D.C. Circuit recognized this harm to newsgathering as irreparable, noting that it "extends beyond the press itself, implicating the public's interest in the free flow of information about government operations."  *New York Times*, 2026 WL 1179440, at *2.

The Department attempts to downplay the harm by noting that "Barnes has only attempted to enter the Pentagon twice" since the escort requirement was imposed, Opp. 28.  But that only proves Plaintiffs' point.  The infrequency with which Barnes now visits the Pentagon is *directly attributable* to the escort requirement, which "effectively eliminated" the value and purpose of Pentagon access, Supp. Barnes Decl. ¶ 5.  If not for the escort requirement, Barnes and other Times journalists would access the Pentagon on a regular basis, *id.* ¶ 5, "several times a week, as they [did] before October 2025," Stevenson Decl. ¶ 12.

Nor is the harm inflicted by the escort requirement only felt by The Times:  The Department's own declarations indicate that other news outlets that used to regularly report from the Pentagon, including The Associated Press, CNN, The Daily Mail, The Washington Post, The Wall Street Journal, and CBS News, "have yet to pick up their badges" since the escort requirement was implemented.  Valdez Decl. ¶ 3.  The infrequency of reporters' visits to the Pentagon under the Interim Policy only confirms that the escort requirement has stripped PFACs of their value, making them "essentially worthless."  Barnes Decl. ¶ 31.

The Department acknowledges that the escort requirement deprives Plaintiffs of their "asserted right to engage in spontaneous newsgathering," Opp. 36, but dismisses that right as "not sufficiently weighty" to constitute irreparable harm, *id.*, suggesting it is merely "a desire for more

23

access to make reporting 'better,'" *id*. (quoting *Flynt v. Rumsfeld*, 355 F.3d 697, 703 (D.C. Cir. 2004)).  To the contrary, Plaintiffs' First Amendment right to engage in spontaneous newsgathering *is* weighty, and the Department's deprivation of that right is an irreparable harm.  It impedes Plaintiffs' "ability to freely pursue 'journalistically productive conversations.'"  *Karem*, 404 F. Supp. 3d at 217.  "To be . . . effective reporter[s]" on issues such as national security and the U.S. military, Mr. Barnes and his colleagues "need to have conversations, follow leads, and ask questions that cannot be planned days or even hours ahead of time."  Supp. Barnes Decl. ¶ 7.  "The escort requirement now makes it difficult (if not impossible) for reporters to engage in informal or unplanned conversations" that are essential to effective newsgathering.  Stevenson Decl. ¶ 12.

This is entirely unlike the situation in *Ateba*, cited by the Department.  Opp. 28–29.  There, "hard pass" holders who could enter the White House unescorted and "[d]ay-pass" holders who had to "wait for an escort to take them . . . to the Press Area" both had "the *same privileges* once they [were] inside the Press Area," *Ateba*, 133 F.4th at 117 (emphasis added).  So that "escort" requirement did not preclude journalists from pursuing journalistically productive conversations, including spontaneous ones, in the building.  Here, the escort requirement prevents reporters from having any interaction with anyone at the Pentagon without Department pre-approval and an official minder, in stark contrast to the way in which reporters could gather news before.  The Department is wrong when it asserts that "Plaintiffs have *not* lost access to their sources of information" within the Pentagon.  *See* Opp. 36.  Plaintiffs *have* lost access to sources, and to a critically important method of newsgathering, due to the escort requirement.  That "loss of [that] First Amendment freedom[] . . . constitutes irreparable injury."  *Pursuing Am.'s Greatness*, 831 F.3d at 511.

## B.  The balance of the equities favors injunctive relief.

In arguing that an injunction is not necessary to protect the public's right to information, Defendants again invoke their purported determination that credentialed journalists' unescorted

access threatens national security and the D.C. Circuit stay panel's conclusion that "both sides have established substantial, competing interests." Opp. 37 (quoting *New York Times Co.*, 2026 WL 1179440, at *3). As explained, the Department's purported "national security" rationale for the escort requirement is pretextual and not only unsupported but refuted by readily available facts. *Supra* 2–9. Defendants' say-so is insufficient to establish that the access that reporters enjoyed for decades suddenly undermines national security in a manner that no other Pentagon official ever appreciated. *Id.*; *compare* Williams Decl. ¶ 10 (former Assistant Secretary of Defense for Public Affairs never encountered "any security or safety incident arising out of the presence of a credentialed journalist at the Pentagon"); Meagher Decl. ¶ 14 (former Assistant to the Secretary of Defense for Public Affairs is "not aware of any safety or security incident at the Pentagon caused by a credentialed journalist having unescorted access to the building"). And, as explained above, the D.C. Circuit stay panel's decision does none of the work Defendants suggest. *Supra* 8 n.4.

Continued enforcement of the escort requirement is contrary to the public interest. "Without an unfettered press, citizens would be far less able to make informed political, social, and economic choices. But the press's function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired." *Zerilli*, 656 F.2d at 711. Because The Times has established that both its reporters and the public are being kept from information that will inform them "about what their government is doing" so that they may responsibly participate in our democratic system, *NYT I*, 2026 WL 788689, at *18, injunctive relief is warranted.

CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a preliminary injunction barring the Department's enforcement of the escort requirement.

25

Dated:   June 9, 2026

Respectfully submitted,

*/s/* Theodore J. Boutrous, Jr.

GIBSON, DUNN & CRUTCHER LLP
Theodore J. Boutrous, Jr. (D.D.C. Bar No. 420440)
Katie Townsend (D.D.C. Bar No. 1026115)
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com

Susan Pelletier*
Gibson, Dunn & Crutcher LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500
SPelletier@gibsondunn.com

*Counsel for Plaintiffs The New York Times Company and Julian E. Barnes.*

**pro hac vice application forthcoming*

26