## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE NEW YORK TIMES COMPANY, *et al.*

                        *Plaintiffs*,

     v.

DEPARTMENT OF DEFENSE, *et al.*,
                      *Defendants*.

Civil Case No. 26-cv-01690 (PLF)

### SUPPLEMENTAL DECLARATION OF JULIAN E. BARNES

I, Julian E. Barnes, hereby declare as follows:

1.     I am over the age of 18 and make this declaration based upon my personal knowledge and experience.  If called to do so, I could and would competently testify to these matters under oath.

2.     I am a national security reporter with The New York Times ("The Times") and a plaintiff in the above-captioned case.  I make this supplemental declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

3.     I have worked for The Times since June 2018 and am assigned to The Times's Washington Bureau.  My work for The Times focuses on the Pentagon, United States intelligence agencies, and international security, among other subjects.  As detailed in my prior declaration filed in this matter, *see* ECF No. 6-17, I am one of seven Times reporters who held a Pentagon Facility Alternate Credentials ("PFAC") issued by the Department of Defense (the "Department") as of fall 2025.  I surrendered my PFAC on or about October 15, 2025 due to the Department's new policy regarding PFACs (the "October Policy"), and I obtained a new PFAC in March 2026, on or around the same day the Department implemented a revised PFAC policy (the "Interim Policy").

1

4.     I have reviewed the Declarations of Joel Manuel Valdez and Sean Parnell filed in the above-captioned case.  In his declaration, Mr. Valdez states that since I picked up my reinstated PFAC on March 24, 2026, I have "attempted to enter the Pentagon just twice."  Valdez Decl., ¶ 4. That is correct.  The reason I have not attempted to visit the Pentagon more frequently since March 24 is because of the Interim Policy.  As I explained in my prior declaration, the Interim Policy's escort requirement makes it much more difficult for me to work from the Pentagon:  I have to plan my visit in advance, submit a request for an escort that is linked to a specific event or appointment, wait for my request to be approved, and then wait for the assigned escort to meet me.

5.     But the escort requirement is not merely logistically burdensome.  It has effectively eliminated what made having a PFAC and visiting the Pentagon valuable for purposes of newsgathering and reporting.  As stated in prior declarations, I have been covering national security for more than 20 years.  At times, including, specifically, when I worked as a Pentagon correspondent for the Los Angeles Times and then The Wall Street Journal from 2006 to 2015, I would visit the Pentagon, on average, three or more times in a typical workweek, spending at least half of the workday in the building.  At least once a week I would typically stay for a full workday. On most of those days, I did not have any appointment or scheduled interview.  Instead, I would make a circuit of the Public Affairs offices around the building—moving, for example, from the Navy Public Affairs Office, to the Army Public Affairs Office, sometimes to the Marine Corps Public Affairs Office, then to the Joint Staff Public Affairs Office, the Air Force Public Affairs Office, and finally to the Public Affairs Office for the Office of the Secretary of Defense.  At each stop, I would visit with senior and junior public affairs officers to talk, face-to-face, about stories I was pursuing—articles that were close to being published as well as those that were in earlier or more nascent stages.  And I would ask questions based on who was there.  For instance, if the Navy

Public Affairs officer responsible for shipbuilding was in the office, I might ask about the status of the latest warship.  I am always working on multiple stories at any given time, and I would typically discuss several different topics with personnel at the Pentagon on any given day.  Those conversations strengthened my reporting by giving me more context and often a more nuanced understanding of the issues; those conversations also helped me to understand and incorporate the U.S. military's perspective in my reporting.

6.    At The Times, because I cover intelligence, I do not go to the Pentagon quite as frequently as some of my other Times colleagues, or as frequently as I did when I was a Pentagon correspondent.  But, until October 2025, I would still go to the Pentagon frequently in the course of my work.  Prior to October 2025, on most of the days that I went to the Pentagon, I did not have a specific, pre-arranged interview, event, or press conference to attend.  Instead, I went because being at the Pentagon significantly improved my ability to do my job effectively by enabling me to speak, face-to-face, with multiple officials, including especially when I was reporting on breaking or rapidly developing events.

7.    To be an effective reporter, I often need to have conversations, follow leads, and ask questions that cannot be planned days or even hours ahead of time.  Before October 2025, being present at the Pentagon was one of the best ways for me to gain the kind of knowledge and context that is critical to in-depth, informed reporting.  The escort requirement prevents me from doing any of that at the Pentagon.  With the escort requirement in place, going to the Pentagon is rarely worthwhile.  I visit the Pentagon only if I have a scheduled interview, and those are infrequently approved by the Department.  If not for the escort requirement, I would go to the Pentagon more frequently, just as I did before October 2025.

3

8.    I understand that the Department emphasizes, in its briefing, that the October Policy also imposed an escort requirement for certain parts of the Pentagon. *See* Opp. at 4. An escort requirement applicable to the entire building, like the one imposed for the first time in the Interim Policy, is categorically different from any restrictions the Department previously had in place. In my experience covering the Pentagon since 2004, there have always been certain areas of the Pentagon that for legitimate reasons credentialed reporters could not go without an invitation or without being accompanied by someone from the Department. But as a general matter, reporters were still able to freely move through the Pentagon's corridors, visit the various press offices around the building, and do their jobs. The Interim Policy bars reporters from accessing any part of the Pentagon without an escort. That restriction is unprecedented.

9.    Last week the Department announced it had re-designated the Pentagon Press Office as a Secure Compartmented Information Facility, or "SCIF." In my experience, the Pentagon Press Office, consistent with its name and purpose, has traditionally been open to members of the press. In fact, in the past, including during President Trump's first term in office, the Department would hold morning press gaggles in the Pentagon Press Office. Some press offices, including the Press Office for the Office of the Secretary of Defense (OSD), had a separate internal room that was designated as a SCIF, but the rest of the Press Office was open and accessible to credentialed reporters without an escort.

10.    Mr. Parnell's declaration states that, according to Pentagon Press Secretary Kingsley Wilson, her office received less frequent contacts from reporters after the October Policy was put in place, and that Ms. Wilson attributed that to reporters having less access to non-public information. While I can only speak to my own experience, those statements are not true with respect to me or any other reporter with The Times. At The Times, we practice "no surprises"

journalism; we contact the Department to get their perspective and comment any time that we plan to publish a story involving the Department. I adhered to that practice both before and after the October Policy was put in place and have continued to adhere to it since the Interim Policy was put in place. Simply put, I am not contacting the Department any less frequently than I did before the October Policy. Moreover, lacking unescorted access to the Pentagon has unquestionably impeded my ability to pursue the kinds of informal conversations that are important to doing my job well, but it has not eliminated my ability to report stories that rely on non-public information.

11. Mr. Valdez's declaration repeatedly takes issue with statements in my prior declaration, but it does not actually refute or contradict any of those statements. For example, it is true that I received unclear instructions about how to pick up my new PFAC and that, when I did pick up my new PFAC on March 24, Pentagon Press Office staff expressed uncertainty about how I could access the Pentagon library. *See* ECF No. 6-17 at ¶¶ 17, 20. The fact that I was told to contact a specific Department staff person, *see* Valdez Decl., ¶ 14, or that I received instructions for accessing the Library on a *subsequent day*, *id.*, ¶ 15, does not establish that the instructions given to me on March 23 and March 24 were clear. They were not.

12. Similarly, Mr. Valdez asserts that Pentagon staff's "confusion" about whether and how I could access the building when I came for a pre-arranged interview on March 31, 2026 was a "one-off event." *Id.*, ¶ 17. Even if that is true, that confusion—like the uncertainty about how reporters could access the Library and the unclear instructions regarding picking up PFACs— reinforces my view that the Department implemented the Interim Policy in a hasty and haphazard manner after the October Policy was invalidated, for the specific purpose of preventing me and other reporters from The Times from having their unescorted access to the Pentagon restored.

5

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9 day of June 2026 in _Washington, D.C._.

_____
Julian E. Barnes

6