**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, *et al.*,<br><br>　　　　　　　　　　*Plaintiffs*,<br><br>　　v.<br><br>DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR, *et al.*,<br>　　　　　　　　　　*Defendants*. | Civil Case No. 26-cv-01690 (PLF)<br><br>**DECLARATION OF RICHARD W. STEVENSON** |

**DECLARATION OF RICHARD W. STEVENSON**

I, Richard W. Stevenson, hereby declare as follows:

1.　　I am over the age of 18 and make this declaration based upon my personal knowledge and experience. I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction in the above-captioned case. If called to do so, I could and would competently testify to these matters under oath.

2.　　I am an editor and Washington bureau chief with The New York Times ("The Times"). I have worked for The Times since 1985, and I have been based in The Times Washington bureau since 1996.

3.　　As part of my responsibilities as the Times's Washington bureau chief, I oversee coverage of the federal government, including the Pentagon and the Department of Defense (the "Department" or "Pentagon"). I edit the work of reporters at The Times, including reporters who cover the Pentagon and who have held Pentagon Facility Alternate Credentials ("PFACs").

4.　　Since I joined The Times in 1985 until October 2025, The Times has consistently had multiple reporters with PFACs who have regularly accessed the Pentagon in the course of their work. In my view, as an editor at The Times, the ability of Times reporters to access the Pentagon

1

unescorted on a regular basis has enhanced the depth, detail, and quality of The Times's coverage of the Pentagon, the Department, the United States military, and national security issues. It has enabled Times reporters to speak face-to-face with Department officials, attend press conferences and briefings, ask questions of public affairs staff and Department leadership, develop relationships with Department personnel, and provide immediate, in-person coverage of events that occur at the Pentagon. To my knowledge, no Times reporter has ever had their PFAC suspended, revoked, or not renewed because the Department concluded they posed a threat to the safety or security of Department personnel or property, or for any issue related to national security or the receipt or publication of classified information.

5.      In my experience, Times reporters who cover the Pentagon and national security have consistently strived to be accurate, independent, probing, and fair in their coverage. One aspect of those reporters' job is to report on the official pronouncements of the Department and the information that Department leadership wants to convey to the public. But it is also important that those reporters seek to contextualize, investigate, and fact-check the Department's official pronouncements, which includes gathering and reporting information that may contradict or cast doubt on Department leaders' statements, and to sometimes report information that Department leadership does not intend to make public at all. All of this reporting is integral to ensuring that the American public understands what its government and military are doing, and to ensuring that Department leaders are accountable for their actions and statements.

6.      For as long I have been a journalist, covering national security or the Pentagon (indeed, covering any aspect of the federal government) has meant learning information that is not public and that may (or may not) be considered "sensitive, controlled or classified." Sometimes government officials, including officials at the highest levels of government, want non-public

2

information to be made public.  Sometimes non-public information is provided to reporters not for publication but to provide important context for their reporting.  None of this is new.  It has been true for at least the last 40 years that I have been with The Times.  Nor does it mean that journalists are a threat to national security, as the current leadership of the Department now claims.  To the contrary, the careful work that journalists at The Times and other news outlets undertake to deliver fact-based, independent reporting to the American public—including reporting that relies on information that the Department would characterize as secret—strengthens our democracy and helps safeguard our national security.

7.    Since the fall of 2025, the Department has taken unprecedented step after unprecedented step to restrict access to the Pentagon for credentialed journalists with The Times and other news outlets unwilling to report only what the Department's leadership wants them to report.  I submit this declaration to respond to assertions made by the Department regarding its latest unprecedented restriction: an "interim" policy prohibiting credentialed journalists from being anywhere in the Pentagon without an official escort.  In particular, the Department's claim that barring all unescorted access to the Pentagon prevents journalists from obtaining non-public information is factually incorrect.  And, as detailed below, the principal effect of the Department's new escort requirement has been to impose additional roadblocks to lawful, routine newsgathering and reporting by The Times, in particular, as well as other independent news organizations—journalism that serves the interests of the American public.

8.    In September and October 2025, the Department announced new rules governing reporters' PFACs.  I read the first version of this new PFAC policy shortly after it was announced in September, and read the final policy, as revised, when it was issued in early October.  Among other things, the policy stated that a reporter or news organization who sought out, acquired, or

published information that Department officials had not approved—even if that information was not classified—could be deemed a "security or safety risk" and could lose their PFAC immediately, without warning. That meant that the Department could suspend or revoke a reporter's PFAC if that reporter or his or her news outlet gathered or published information that the Department viewed as unflattering or critical of it or its leadership.  As explained in the prior declaration I submitted to the Court in a separate lawsuit filed by The Times challenging its constitutionality, Case No. 25-cv-4218, at ECF No. 10-5, the Department's October 2025 policy was, in my view, intolerable and inconsistent with The Times's journalistic standards and practices.

9.    Ultimately, all seven Times reporters who held PFACs as of August 2025—Eric Schmitt, Helene Cooper, Greg Jaffe, John Ismay, Carol Rosenberg, Julian Barnes, and Bill Hennigan—decided not to sign the "Acknowledgment" required under the Department's October 2025 policy and were compelled to surrender their PFACs as a result.  Accordingly, beginning in or around October 15, 2025, The Times no longer had reporters at the Pentagon regularly.  Other individuals who were willing to sign the "Acknowledgement"—including Laura Loomer, Mike Lindell, and James O'Keefe, among others—were issued PFACs by the Department shortly thereafter, which gave them unescorted access to Correspondents' Corridor, the Pentagon Press Office, and other areas within the building.

10.    On or about March 20, 2026, I learned that the district court had ordered the Department to reinstate the PFACs previously held by journalists with The Times. I understood the district court's order to require that Times reporters have their access to the Pentagon restored, and I was thrilled that Times reporters would once again be able to report from the building on a regular basis.  While The Times continued to provide in-depth coverage of the Pentagon after October 15, 2025, that reporting was made more difficult and burdensome because no Times

reporter had a PFAC.  In my view, keeping Times journalists out of the Pentagon is a detriment

primarily to The Times's readership, who are deprived of perspectives and information that might

otherwise be reported, but also to the Department itself.

11.     On or about March 23, 2026, I learned that the Department had issued a revised

"interim" policy (the "Interim Policy") governing PFACs and reporters' access to the Pentagon.  I

reviewed that Interim Policy shortly after it was issued. Among other things, the Interim Policy

states that the Correspondents' Corridor—the area in the Pentagon where reporters work—is

closed effective immediately, and that no journalist with a PFAC is permitted to enter the Pentagon

unless it is for a pre-arranged interview, press conference or other event, and even then, only if the

journalist is accompanied by an official escort at all times.

12.     I have read the Declaration of Joel Manuel Valdez filed in the above-captioned case.

Mr. Valdez's declaration states that the escort requirement has "functioned smoothly," suggests

that The Times's reporters who hold PFACs have been able to access the Pentagon without issue

since the Interim Policy took effect on or about March 23, 2026 "on every occasion they have

sought to do so," and asserts that escorts have been "readily available."  Valdez Decl., ¶¶ 5-6.  This

is inaccurate and misleading because it overlooks the ways in which the escort requirement has

made it more cumbersome, more inefficient, and less worthwhile for The Times's reporters to

access the Pentagon in the first place.  Before October 15, 2025, Times reporters with PFACs often

accessed the Pentagon on a regular basis.  For example, Eric Schmitt would frequently spend most

or all of his workday at the Pentagon.  While at the Pentagon, Times reporters would gather

information and context for their reporting both through pre-arranged events and interviews and

through informal or unplanned interactions.  The escort requirement now makes it difficult (if not

impossible) for reporters to engage in informal or unplanned conversations at the Pentagon and

requires far more effort and advanced planning for any pre-arranged interviews or even to attend press conferences and other scheduled events.  As Mr. Valdez acknowledges, Times national security reporters have only accessed the Pentagon a handful of times since March 23, 2026.  *See* Valdez Decl., ¶ 5.  That is because the escort requirement interferes with the reporters' ability to effectively do their jobs.  If not for the escort requirement, in addition to the other constraints imposed by the Department's Interim Policy, including the closure of the Correspondents' Corridor, Times reporters would be at the Pentagon on a regular basis, typically at least several times a week, as they were before October 2025.

13.     Mr. Valdez's declaration also states that it is a "standard security protocol[]" for PFAC holders to be issued wristbands, and for Department staff to repeatedly check their wristbands, when they attend press conferences and other scheduled events at the Pentagon. Valdez Decl., ¶ 18.  To my knowledge, there was no requirement that PFAC holders wear wristbands at the Pentagon prior to October 2025.  There was also no requirement, prior to October 2025, that reporters with PFACs obtain an escort to use the restroom.  Nor was there any restriction on *when* reporters were permitted to use the restrooms in the Pentagon.  Now, as Mr. Valdez acknowledges, *id*., reporters are being told when to use the restroom and are prohibited from visiting the restroom without an escort.  Mr. Valdez's assertion that this is because the "closest restrooms to the Pentagon Briefing Room are located in a restricted area near the Joint Chiefs of Staff corridor" is misleading:  Before October 2025, The Times's reporters were able to access those same restrooms, and others throughout the Pentagon, without restrictions.

14.     I have also read the Declaration of Sean Parnell filed in the above-captioned case. Mr. Parnell asserts in his declaration that "[f]ollowing the implementation of the PFAC Policy in October 2025, the frequency with which the Pentagon press office was contacted by journalists

regarding sensitive, controlled or classified information dropped dramatically" and "changed from a regular pattern of contacts . . . to a small number of isolated incidents."  Parnell Decl., ¶ 8. Mr. Parnell also states in his declaration that prior to the Department's implementation of the October Policy, "journalists frequently obtained sensitive information," *id.*, ¶ 11, and suggests that the "escort requirement" in the Interim Policy reduces the frequency with which journalists obtain "sensitive information."  I do not know exactly what Mr. Parnell means by "sensitive, controlled, or classified information" or "sensitive information," particularly because "sensitive information" is not a term defined in the Interim Policy (or the October Policy) or Mr. Parnell's declaration. Further, as explained above, journalists frequently learn information that is not classified but is also not public, and may (or may not) be considered "sensitive," in the course of their reporting. To the extent Mr. Parnell is suggesting that The Times's reporting of non-public information about the Department decreased after October 15, 2025, that claim is demonstrably false.

15.    After Pentagon Press Secretary Kingsley Wilson first made a similar claim in a declaration filed with the D.C. Circuit Court of Appeals on April 10, 2026, The Times set about fact checking it.  To do so, the national security team looked at articles published by The Times beginning in October 2025 to determine whether it was apparent from the face of an article that it included original reporting about the Department that relied on non-public information.  The information we took into account was available to Ms. Wilson when she filed her declaration in April 10, 2026, and was available to Mr. Parnell when he filed his declaration on June 4, 2026.

16.    Between October 15, 2025 and March 31, 2026, The Times published 308 stories about the Department or U.S. military from its Pentagon team; 109 (or 36.5%) of those stories were "scoops"—*i.e.*, original reporting, which includes original reporting that builds or expands on exclusive information other news outlets published.  More than half of those stories—158 (or

51.6%)—relied on non-public information. In comparison, during the first 123 days of the Trump Administration, *before* Secretary Hegseth had imposed any new restrictions on credentialed journalists' access to the Pentagon, The Times's published 170 stories about the Department or U.S. military from its Pentagon team; 60 (or 35.7%) of those stories were "scoops" and 76 (or 44.7%) of them relied on non-public information. In other words, the Times broke on average *more* stories about the Department based on non-public information after journalists' Pentagon access was revoked in October 2025. The frequency with which Times journalists "obtained" non-public information not approved for release by the Department did not "drop[] dramatically," and Mr. Parnell, like Ms. Wilson in her earlier statement, offers no data to support a claim to the contrary.

17.    To give one recent example, on June 6, 2026, The Times published an article by Julian E. Barnes and Eric Schmitt about a growing concern within the Pentagon regarding espionage by Israel. That article included non-public information that the Department may well have considered "sensitive" or "secret." To my knowledge, the Times's reporters did not visit the Pentagon in the course of reporting that story. The notion that the escort requirement will prevent reporters from learning and reporting non-public information is preposterous. It has not had that effect so far, at least as far as The Times is concerned, and I do not expect that it will have that effect in the future.

18.    Mr. Parnell's declaration also seems to imply that a purported reduction in the frequency with which journalists contact the Pentagon Press Office "regarding sensitive, controlled or classified information" demonstrates a corresponding reduction in journalists' amount of access to such information. Based on my experience, that assumption is incorrect, at least with respect to The Times. It is The Times's practice to always engage with Public Affairs

officials at the Department before publishing any story that has potentially sensitive or disputed elements. We have not changed that approach in response to constraints on our reporting imposed by the Department. The Times's journalists continue to contact the Pentagon Press Office to seek information and comment on a regular basis, just as they did before the Interim Policy and before the October Policy. Simply put, there has been no reduction in the frequency of contacts to the Pentagon Press Office by Times journalists as a result of changes in the Department's press access policies.

19.    To the extent that the Department's rationale for the escort requirement is that it prevents reporters from accessing non-public information, that rationale simply does not hold water. It seems clear to me that the principal purpose and intended effect of barring journalists from the Pentagon without an escort is not to stop them from obtaining non-public information, but instead to thwart the basic and essential newsgathering that, prior to Secretary Hegseth's tenure, regularly took place at the Pentagon without posing any threat to national security.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of June 2026 in Washington, D.C.

Richard W. Stevenson